## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN

ELECTION INTEGRITY FUND )
   and )    Case No. 1:20-cv-00805
ONE NATION MICHIGAN, )
 )
      Plaintiffs, )
 )    Verified Complaint for
 )    Declaratory and Injunctive Relief
v. )
 )
GRETCHEN WHITMER, in her official capacity as )
GOVERNOR OF THE STATE OF MICHIGAN, )
 )
      Defendant. )
 )

## VERIFIED COMPLAINT FOR IMMEDIATE
## DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs Election Integrity Fund ("EIF") and One Nation Michigan ("One Nation"), by and through counsel, for their complaint against Governor Gretchen Whitmer, in her official capacity as Governor of the State of Michigan, state the following:

### INTRODUCTION

1.    On March 10, 2020, Governor Whitmer issued Executive Order 2020-4 which declared a state of emergency in Michigan "to address the COVID-19 pandemic." In the five months since, the Governor has failed to create adequate breathing space for Michiganders who want to engage in in-person First Amendment speech and association. She has limited indoor gatherings to 10 people regardless of room size and outdoor gatherings to 100, even where masks are worn and citizens socially distance. Most political rallies, debates, and intimate associational meetings are punishable as crimes. In an election year when Citizens are more than ever focused on debating fundamental questions about the nature of our Republic, the Governor's decrees virtually eliminate retail politics. This necessarily forces most public debate online or over the

1

mass media. This is an inadequate alternative to real, in-person communication because it is expensive and impersonal. It discriminates against grassroots and less well-funded groups who rely on in-person communication, rather than expensive mass media and previously earned name recognition, to motivate their fellow citizens and spread their message. The Governor's orders disproportionately favor those in power, favoring incumbents and further alienating those without political power.  In-person, responsible politicking, the bread and butter of grassroots movements, has been largely criminalized.

2.     It is significant that these restrictions come not by way of legislation but by way of emergency executive orders issued by one person acting without rulemaking, notice, or a hearing. New restrictions can be imposed at any time without notice. The restrictions are so broad and are being kept in place for such a length of time that not every citizen and not every violation can possibly be policed by the state. Non-enforcement is therefore prevalent. This means enforcement is unpredictable and based completely on personal discretion. Relief from enforcement is granted without resort to any fixed standards. When it comes to in-person political speech and association, therefore, Michigan is effectively under the personal rule of a single official, resembling a system of prior restraint that includes no notice, no due process, and no fixed standards for deciding which 11-person gatherings will lead to criminal punishment and which will not. Arbitrary and content-based enforcement is too likely to occur, and in fact, as shown below, has occurred. This further chills First Amendment speech and association.

3.     There is no pandemic exception to the Due Process Clause or the First Amendment. Even if there were, Michigan is long past the point where it would have applied. What was originally a temporary emergency measure to handle a sudden, acute, flash-in-the-pan threat has gradually grown into a months-long, statewide system of speech-denying executive

orders.  The assumption of this power by one partisan government official is the very tyranny against which the Constitution was meant to protect. An order which purports to prospectively ban broad swaths of retail politics cannot survive First Amendment scrutiny, especially when one branch of government claims sole authority *to be the law* rather than *participating in making the law*. Free speech and assembly must prevail, even in the time of COVID. "Precisely because the need for action against the drug scourge [or the coronavirus] is manifest, the need for vigilance against unconstitutional excess is great. History teaches that grave threats to liberty often come in times of urgency, when constitutional rights seem too extravagant to endure." *Skinner v. Railway Labor Executives Ass'n*, 489 U.S. 602, 635 (1989) (Marshall, J., dissenting).

4.      For these reasons, Plaintiffs seek an order declaring that the Governor's executive orders cannot apply as a blanket criminal sanction against "Responsible Politicking": First Amendment assembly of more than 10 indoors, and more than 100 outdoors, in which participants use social distancing and masks.

### FACTUAL ALLEGATIONS

**I.      On March 10, 2020, Governor Whitmer declared a State of Emergency in Michigan in response to COVID.**

5.      On March 10, 2020, Governor Whitmer declared a statewide state of emergency due to the coronavirus, citing three distinct sources of authority:

> Section 1 of article 5 of the Michigan Constitution of 1963 vests the executive power of the State of Michigan in the governor.
>
> The Emergency Management Act, 1976 PA 390, as amended, MCL 30.403(4), provides that "[t]he governor shall, by executive order or proclamation, declare a state of emergency if he or she finds that an emergency has occurred or that the threat of an emergency exists."

The Emergency Powers of the Governor Act of 1945, 1945 PA 302, as amended, MCL 10.31(1), provides that "[d]uring times of great public crisis, disaster, rioting, catastrophe, or similar public emergency within the state, or reasonable apprehension of immediate danger of a public emergency of that kind, . . . the governor may proclaim a state of emergency and designate the area involved."

*See* Executive Order ("EO") 2020-04.

6.     The Governor "renewed" this declaration multiple times, including on April 2, 2020 (EO 2020-33); April 30 (EO 2020-67 and 68).

7.     On March 23, 2020, Governor Whitmer entered her first stay-at-home order, EO 2020-21 ("Temporary requirement to suspend activities that are not necessary to sustain or protect life.").

8.     The Governor's "stay-at-home" orders generally offered the following rationale:

To suppress the spread of COVID-19, to prevent the state's health care system from being overwhelmed, to allow time for the production of critical test kits, ventilators, and personal protective equipment, to establish the public health infrastructure necessary to contain the spread of infection, and to avoid needless deaths, it is reasonable and necessary to direct residents to remain at home or in their place of residence to the maximum extent feasible.

9.     Subject to certain exceptions, the stay-at-home orders made it a misdemeanor to willfully violate any of the following provisions:

2.     Subject to the exceptions in section 7, all individuals currently living within the State of Michigan are ordered to stay at home or at their place of residence. Subject to the same exceptions, all public and private gatherings of any number of people occurring among persons not part of a single household are prohibited.

3.     All individuals who leave their home or place of residence must adhere to social distancing measures recommended by the Centers for Disease Control and Prevention, including remaining at least six feet from people from outside the individual's household to the extent feasible under the circumstances.

4.     No person or entity shall operate a business or conduct operations that require workers to leave their homes or places of residence except to the extent that those workers are necessary to sustain or protect life or to conduct minimum basic operations.

4

10.    Paragraph 7's exceptions focused on various necessary activities; they also provided that "a. Individuals may leave their home or place of residence, and travel as necessary:

> 1. To engage in outdoor recreational activity, consistent with remaining at least six feet from people from outside the individual's household. Outdoor recreational activity includes walking, hiking, running, cycling, boating, golfing, or other similar activity, as well as any comparable activity for those with limited mobility.

11.    None of those exceptions permitted political rallies or protests, get-out-the-vote efforts, voter registration, or other "retail politicking" that typically occurs throughout a general election year.

12.    These basic prohibitions remained unchanged in several successive stay-at-home orders. *See* EO 2020-42; 59; 70 (adding a requirement that "Any individual able to medically tolerate a face covering must wear a covering over his or her nose and mouth—such as a homemade mask, scarf, bandana, or handkerchief—when in any enclosed public space"); 77 (adding the proviso, "Similarly, nothing in this order shall be taken to abridge protections guaranteed by the state or federal constitution under these emergency circumstances"); 92 (on May 18, 2020, retaining constitutional proviso; dividing state into regions, and allowing, in two rural regions, "social gatherings of up to 10 people" and the reopening of retail stores, offices, and restaurants and bars with limited seating); and 96 (on May 21, 2020, extending the 10-person allowance on social gatherings statewide).

13.    Eventually, a constitutional proviso was included in the Governor's executive orders which generally stated:

> Nothing in this order should be taken to interfere with or infringe on the powers of the legislative and judicial branches to perform their constitutional duties or exercise their authority. Similarly, nothing in this order shall be taken to abridge protections guaranteed by the state or federal constitution under these emergency circumstances.

14.     The Governor's "Frequently Asked Questions" section of her website further interprets this provision. One question states as follows:

> Q: Does Executive Order 2020-110 prohibit persons from engaging in *outdoor activities* that are protected by the First Amendment to the United States Constitution?
>
> A: No. Persons may engage in expressive activities protected by the First Amendment within the State of Michigan, but must adhere to social distancing measures recommended by the Centers for Disease Control and Prevention, including remaining at least six feet from people from outside the person's household.

*See* Executive Order 2020-100 FAQs (emphasis added).

15.     The guidance has been in effect since at least EO 2020-42, and by its own terms does not apply to indoor gatherings.

16.     The same guidance is provided on the Governor's website related to Executive Order 2020-160.[1]

**II.     After her June prediction that a "second wave" of COVID may occur, the Governor issued Executive Order 2020-160 in July, imposing strict attendance limits on organized events which prevent Plaintiffs from engaging in large categories of protected political speech.**

17.     On July 29, 2020, Governor Whitmer issued Executive order 2020-160, her "Amended Safe Start Order".

18.     The Governor justified the Order by citing the rise in Michigan's per capita rate of new daily cases of COVID.

19.     Specifically, the Governor blamed the rise in cases on "large social gatherings, often attended by young people", referencing "a single house Party in Saline; an outbreak at a Lansing bar… and a sandbar party at Torch Lake over the July 4 weekend."

---

[1]     *See* Executive Order 2020-160 FAQs, available online at https://www.michigan.gov/coronavirus/0,9753,7-406-98178_98455-535202--,00.html

20.     Based on this rationale, the Governor ordered that "social gathering[s] or organized event[s] among persons not part of the same household" would be limited to 10 people if indoors and 100 people if outdoors. EO 2020-160(7)(a)(1)-(4).

21.     A willful violation of the Executive Order, including the attendance limits on social gatherings and organized events, is a misdemeanor. *See* EO 2020-160(17).

22.     The 10 person limit on indoor gatherings applies to all indoor venues, regardless of the size of the venue.

23.     For example, the 38 member Michigan Senate meeting in its hallowed chambers in the state capitol would violate the attendance limits in EO 2020-160.

24.     The 100 person limit on outdoor gatherings applies regardless of the size of the outdoor venue or the physical space in which the gathering is held, even if the size allows for six foot social distancing.

25.     The 110 member Michigan House of Representatives would likewise run afoul of EO 2020-160 if it met for a group photograph on the steps of the state capitol.

26.     In the same order and at the same time the Governor justified these stringent restrictions because of a risk that COVID might spread from "large" public gatherings, she also allowed Detroit casinos to open subject to a 15% capacity limit. *See* EO 2020-160 ("I am taking the occasion, too, to allow for the reopening of the Detroit casinos, subject to a 15% capacity limit and strict workplace safeguards."). All three casinos in Detroit are permitted to have more than 10 people indoors under the Order.

27.     If 11 Michiganders hold a socially distanced book club in one of their homes, they would be in violation of Section 7(a)(4) of EO 2020-160 and subject to criminal penalty.

28.     If after their lively book discussion, those same 11 Michiganders recruit 90 friends and hold a socially distanced political rally in the public square, they would be in violation of Section 7(a)(4) of EO 2020-160 and subject to criminal penalty.

29.     If after the rally, those same 101 Michiganders go to the MGM Grand Detroit, they are in compliance with EO 2020-160. The only risk they run is a thinner pocketbook, rather than arrest and criminal prosecution.

30.     EO 2020-160 seems to attempt to address its constitutional implications in a section titled "Separation of powers". Specifically, it states: "…[N]othing in this order shall be taken to abridge protections guaranteed by the state or federal constitution under these emergency circumstances." EO 2020-160(13).

31.     The EO does not explain what the Governor believes may qualify as "protections guaranteed by the state or federal constitution **under these emergency circumstances**." The EO suggests that "these emergency circumstances" impose limits on federally-guaranteed rights, and does not explain what those limits are. Further, under the plain terms of the order, an attendee at an 11 person indoor political rally or a 101 person outdoor rally is subject to criminal penalties.

32.     A political rally of more than 100 people is banned throughout the State of Michigan, regardless of venue.

33.     EO 2020-160 has no expiration date. It will govern and restrict organized events in Michigan for the foreseeable future, including in the weeks and months leading up to the November 3rd election.

**III.     Since declaring a State of Emergency in March, Governor Whitmer and her executive orders have been at odds with the First Amendment.**

34.     On March 31, 2020, pursuant to the Governor's Stay at Home Order, which contained no accommodations for constitutionally protected activity, police arrested a pro-life

8

protestor engaged in protected speech on a public sidewalk in Detroit. That man sued Governor Whitmer for violating his First Amendment rights. Shortly thereafter, Governor Whitmer entered into a Stipulated Order and settlement with the protestor, acknowledging for the first time that his constitutionally protected activity was not prohibited by the Governor's orders.

35.     On April 9, 2020, Governor Whitmer signed Executive Order 2020-40, which purported to ban large stores from the "advertising or promotion of goods that are not groceries, medical supplies, or items that are necessary to maintain the safety, sanitation, and basic operation of residences". EO 2020-40(11)(d)(3). Willful violation of the order was punishable as a misdemeanor. EO 2020-40(17).

36.     The Governor extended this prohibition on advertising under the same terms in EO 2020-42.  As with the previous order, a willful violation was a misdemeanor. EO 2020-42(17). Despite much criticism from retailers, this ban on advertising remained in place until April 24 when the Governor signed EO 2020-59, rescinding EO 2020-142 and removing the advertising restrictions for large retailers.

37.     On June 18, under the authority of the Governor's executive order, the State Attorney General threatened to prosecute a movie theater that announced its plans to hold a "socially-distanced film festival" to participate in and honor the Juneteenth holiday. Faced with this threat, the theater was forced to cancel its event.

38.     On June 22, Governor Whitmer suggested that she would use her asserted power over public gatherings to block an indoor Trump rally, citing the continuing requirements of wearing a face covering and the continuing limits on the size of gatherings.[2]

---

[2]     Tim Collins, *Governor Whitmer Threatens to Block Trump Rallies in Michigan*, WBCK, Jun. 22, 2020, https://wbckfm.com/governor-whitmer-threatens-to-block-trump-rallies-in-michigan/

39.     Similarly, during an appearance on "The View," over a month earlier, on May 13, 2020, Whitmer criticized protesters who had gathered to oppose her stay-at-home orders made it "much more precarious" and "in a perverse way, make it likelier that we are going to have to say in a stay-home posture."[3]

40.     Yet in between these two statements, on Thursday, June 4, Whitmer "stood shoulder to shoulder with some Detroit march participants," activists who marched against perceived racism and police violence, making up a "rolling quarter-mile of humanity."[4] At the time, Governor Whitmer was widely perceived to be vying for the Democratic Vice Presidential nomination.   The Governor's office first responded to criticism by claiming that she had maintained social distancing, but numerous pictures show social distancing was not maintained, even though many attendees (and Whitmer) wore masks. Her office then claimed that the Governor did not violate her own order because peaceful protests are protected by the Constitution.

41.     Now, in EO 2020-160, Governor Whitmer has ordered extreme limits on the number of people that can join together for any common purpose, including retail politics and political speech and assembly.

42.     Faced with a cadre of County Sheriffs who questioned the legality of the executive orders (including her mask order) and publicly refused to enforce them, the Governor issued an Executive Directive ordering all state agencies to enforce her executive orders, including event attendance restrictions, even where local officials refuse to do so. *See* Executive

---

[3]     Craig Mauger and James Dickson, *With little social distancing, Whitmer marches with protestors*, The Detroit News, Jun. 4, 2020, https://www.detroitnews.com/story/news/local/michigan/2020/06/04/whitmer-appears-break-social-distance-rules-highland-park-march/3146244001/

[4]     *Id.*

Directive 2020-08. The Directive specifically ordered that the Michigan State Police *must* enforce her orders. Executive Directive 2020-08(4).

**IV.**   **The Governor's claimed authority to dictate where, when, how, and by whom speech and assembly may take place has a chilling effect on Plaintiffs' First Amendment rights.**

43.   Plaintiffs EIF, One Nation, and their respective members desire to exercise their fundamental rights to assemble and speak in furtherance of their shared political and electoral goals.

44.   Plaintiff EIF and its members have devoted time and resources to planning events in advance of the November election, including but not limited to the following:

a. Monday, August 24: an indoor reception/recruitment event for approximately 100-120 attendees in Ingham County, MI to bring together like-minded individuals who are concerned about the integrity of the ballot box.

b. Monday, August 31: An indoor debrief event in Rochester Hills, MI for 50-75 attendees. This event will bring together people who worked as poll watchers and poll challengers in the August primary and in previous years. EIF plans to hear testimonials of past years, strategies for the future, and to form a policy to combat voter fraud in November.

c. Tuesday, September 29: An indoor training meeting, in Ingham County, MI for 200-250 people to focus on training poll challengers for the November election.

d. Tuesday, October 27: An indoor meeting event in Rochester Hills, MI for approximately 200-250 attendees to rally, provide answers to last-minute questions, provide materials to poll watchers/challengers, and assign final precinct posts.

11

45.     Plaintiff EIF intends for all of its events to provide for social distancing and also intends to have masks and hand sanitizer available for use by attendees. Although not included in its letter, Plaintiff EIF also intends to hold outdoor rallies which it expects will draw attendance in excess of the limits imposed by the Governor's orders.

46.     Plaintiff One Nation and its members have devoted time and resources to planning events to engage in dialogue regarding race and unity in advance of the November election and to develop coherent political and electoral goals related to these discussions. These events include, but are not limited to, the following meetings, all of which would be held indoors:

     a.  Friday August 28 –Detroit, MI

     b.  Friday September 11 –Rochester Hills, MI

     c.  Friday, October 2 – Lansing, MI

47.     Plaintiff One Nation intends for all of its events to provide for social distancing and also intends to have masks and hand sanitizer available for use by attendees. Although not included in its letter, Plaintiff One Nation also intends to hold outdoor rallies which it expects will draw attendance in excess of the limits imposed by the Governor's orders.

48.     In seeking to abide by the law and the Governor's executive orders, on or about August 17, 2020, Plaintiffs sent identical letters to Governor Whitmer, Attorney General Nessel, and the county prosecutors for the counties in which the proposed events are to be held, including Ingham, Wayne, and Oakland Counties. *See* EIF Letter, Ex. A; One Nation Michigan Letter, Ex. B. These letters described the organizations and the events they were planning, and then asked for a response from each of the recipients as to whether or not the proposed events

would run afoul of the Governor's Executive Orders. Plaintiffs planned to use the responses to help them to determine which of their planned events they could hold, if any.

49.     On or about August 17, 2020, Plaintiffs EIF and One Nation each sent a copy of their respective letter to the Ingham County Prosecutor's Office regarding the events they were planning as outlined in ¶38 and ¶40 above. Each group was planning at least one event within Ingham County leading up to the November 3 election.

50.     In its letter, Plaintiff EIF informed the Prosecutor's Office that it was planning to hold two events in Ingham County. The first was an August 24, 2020 indoor reception and recruitment event for 100-120 people to "bring together like-minded individuals who are concerned about the integrity of the ballot box."  The second was a September 29 training meeting to train poll challengers for the November election, with an expected attendance of 200-250 people. The letter made clear that both events would provide for social distancing and masks and hand sanitizer would be provided. EIF requested an answer from the Prosecutor as to whether the events were permitted under the Governor's executive orders.

51.     In its letter, Plaintiff One Nation informed the Prosecutor's Office that it was planning to hold a meeting in Lansing on October 2 to further its purpose of healing racial divides and promoting unity in the United States. One Nation requested an answer from the Prosecutor as to whether the events were permitted under the Governor's executive orders and whether the Ingham County Prosecutor would enforce the orders via citation or criminal complaint.

52.     In response to Plaintiffs' separate queries regarding their respective events in Ingham County, Carol Siemon, the Ingham County Prosecutor, responded to both groups in a single email asking for more information about the planned events, including the size of the

rooms in which the events would be held.[5] Ms. Siemon noted that "[a] perhaps significant factor that was not mentioned in either of your letters is the capacity of the specific venues you plan to use. Social distancing in a ballroom with a capacity for 500 persons would potentially be a very different issue from using a smaller capacity room, for example."[6] Ms. Siemon also communicated to the groups that her office does "enforce the governor's executive orders (EO) via a citation or criminal complaint, but only if that is the last resort to guarantee adherence and public safety."[7]

53.     Before Plaintiffs had a chance to respond to Ms. Siemon's additional queries, she sent a second email informing Plaintiffs that none of the events outlined in their letters would comply with the Governor's executive orders.[8] Hence, the events could not take place without subjecting the attendees to potential criminal prosecution. In this second correspondence, Ms. Siemon also forwarded an opinion from "my public health director" with which she said she consulted regarding Plaintiffs' inquiries.[9] The forwarded opinion stated:

> The EO only allows 10 indoors.   Even in a huge ballroom.  Bars and restaurants are 50% capacity.  Indoor gatherings are at 10.  So these events aren't happening. Lansing Center is not holding any meetings or conferences.   Same with Henry Center on campus and so on.  I had that one interpreted by the state as well.[10]

54.     This response from the Ingham County Prosecuting Attorney herself reflects an explicit and credible threat of prosecution if Plaintiffs carry out these events as planned.

55.     Plaintiff One Nation sent a copy of its letter to the Wayne County Prosecuting Attorney as well, specifically requesting an opinion on One Nation's plan to hold an indoor

---

[5]     *See* Ex. C, Aug. 18, 2020 email from Carol Siemon to Susan Allen (EIF) and Dr. Linda Tarver (One Nation).
[6]     *Id.*
[7]     *Id.*
[8]     See Ex. D, Aug. 18, 2020 email from Carol Siemon to Susan Allen (EIF) and Dr. Linda Tarver (One Nation).
[9]     *Id.*
[10]    *Id.*

meeting in Detroit on August 28. On August 20, 2020, in response to that letter, One Nation representative Linda Tarver received an email from Denise Fair, Chief Public health Officer of the Detroit Health Department.[11] Ms. Fair's email stated:

> In response to your request to hold an indoor event in Detroit and in accordance with Executive Order 2020-160, subsection 7 (3), the described One Nation MI event on August 28, 2020 in Detroit would only be permissible if there are **less than** 10 people with appropriate social distancing and enforcement of masks. See below for the referenced section of the Executive Order. This part of the Executive Order refers directly to indoor social gatherings or organized events, which would involve bringing together persons from multiple households at the same time for a discrete, shared or group experience in a single room, space, meeting hall, or other indoor space.

56.     Dr. Tarver responded to Ms. Fair, indicating that One Nation believed it could accomplish six foot social distancing if it limited attendance to 150 people and asked if such an event would be permissible if attendees wore masks. Ms. Fair responded, stating that "[e]ven with masks, the event with 150 people inside or outside will go against the Governor's Executive order."[12]

57.     On August 17, 2020, Plaintiffs EIF and One Nation sent copies of their respective letters – Exhibits A and B to this Complaint – to Governor Gretchen Whitmer, Attorney General Dana Nessel, and Oakland County Prosecuting Attorney Jessica Cooper requesting a response from each of them by August 21, 2020. Plaintiffs did not receive responses from any of these officials on that date, or before the filing of this suit.

58.     At least one official responsible for enforcing the Governor's Executive Orders with respect to each planned gathering has made clear that they are enforcing them strictly and to the letter, without any exceptions for political events even where participants wear masks and socially distance. No official is applying the Governor's purported "constitution in an

---

[11]     See Ex. E, Aug. 20, 2020 email from Denise Fair to Dr. Linda Tarver (One Nation).
[12]     See Ex. F, Aug. 21, 2020 email from Denise Fair to Dr. Linda Tarver (One Nation).

emergency" proviso to allow in-person, retail politicking of more than 10 people indoors or more than 100 people outdoors, regardless of any other factors or precautions.

59.     Therefore, the Governor's Executive Orders, including but not limited to EO 2020-160, are the source of Plaintiffs' injury, and if those Executive Orders are declared invalid as applied to the types of gatherings Plaintiffs are planning ("Responsible Politicking"), then Plaintiffs would be free to hold these events and engage in Responsible Politicking without fear of reprisal, citation, or prosecution by the state.

**V.     Plaintiffs' ability to engage in political speech at this time is particularly important given the emphasis that the Governor has placed on mail in voting for the November 3 election.**

60.     Governor Whitmer has encouraged Michiganders to vote by absentee ballot[13], rendering Responsible Politicking in the months leading up to the election of even greater significance. Unlike other years in which the vast majority of ballots would be cast on election day, hundreds of thousands or millions of votes will be cast in the weeks leading up to November 3rd. Early voting in Michigan via mail in ballot begins on September 21, 2020. In Michigan's August 4 election, a record number of ballots -- over 1.2 million-- were cast before election day, nearly three times the number cast in advance of the August 2016 election.[14]

61.     As the Michigan electorate complies with the Governor's insistence that they cast absentee ballots leading up to election day, her executive orders prevent those same voters from gathering to speak about the candidates and issues on which they are voting.

---

[13]     See Press Release, Office of Governor Gretchen Whitmer, Governor Whitmer Joins Coalition of Governors to Protect Voting Rights and Voter Access (2020), https://www.michigan.gov/whitmer/0,9309,7-387-90487-537248--,00.html (last visited Aug. 20, 2020) ("I encourage everyone who can to make sure you're registered to vote and to request your absentee ballot as soon as possible."); Press Release, Office of Michigan Secretary of State Jocelyn Benson, Benson to mail postcards encouraging voters to apply online to vote from home (2020), https://www.michigan.gov/sos/0,4670,7-127--536718--,00.html (last visited Aug. 20, 2020).
[14]     Press Release, Office of Michigan Secretary of State Jocelyn Benson, Bring absent voter ballots to clerk offices and drop boxes, https://www.michigan.gov/sos/0,4670,7-127-1640_9150-535497--,00.html (last visited Aug. 20, 2020).

62.     Michiganders will soon be casting ballots to choose their representatives and support or oppose issues of the utmost importance, while at the same time political speech, including Responsible Politicking, is being stifled by the Governor's executive orders.

## PARTIES

63.      Plaintiff Election Integrity Fund is a Michigan nonprofit entity formed to promote social welfare. EIF's primary purposes include maintaining the integrity of electoral processes, preserving the purity of elections, and guarding against the abuse of the elective franchise in the state of Michigan. EIF members served as election challengers in Michigan's August 4, 2020 election. EIF desires and has made plans to engage in Responsible Politicking in the form of meetings, rallies, and events in advance of the November 3 election that would violate the terms of the Governor's executive orders.

64.     Plaintiff One Nation Michigan is a Michigan unincorporated association. One Nation's primary purposes include promoting reasonable and responsible dialogue on race anchored by recognizing diverse peoples' commonality as individuals with intrinsic value and the importance that this intrinsic value be reflected in just laws which respect individual liberty. One Nation desires and has made plans to engage in Responsible Politicking in the form of meetings, rallies, and events in advance of the November 3 election that would violate the terms of the Governor's executive orders.

65.     Defendant Gretchen Whitmer is the Governor of the State of Michigan. The Governor is named in her official capacity only. Declaratory and/or injunctive relief against Defendant will afford Plaintiffs complete relief.

## JURISDICTION AND VENUE

66.     Under 28 U.S.C. §§ 1331 and 1343, this Court has subject matter jurisdiction because this action arises under the Constitution and laws of the United States and involves a federal election.

67.     Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202, by Rules 57 and 65 of the Federal Rules of Civil Procedure, by *Ex parte Young*, 209 U.S. 123 (1908), and by the general legal and equitable powers of this Court.

68.     Venue is proper because a substantial part of the events giving rise to the claims occurred in this District and the Office of the Governor of Michigan is located in this judicial District. 28 U.S.C. § 1391.

## COUNT I: VIOLATION OF PLAINTIFFS' FIRST AMENDMENT RIGHTS, 42 U.S.C. § 1983

69.     Plaintiffs restate and reallege the foregoing paragraphs as if the same were repeated verbatim herein.

70.     "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the government for a redress of grievances." U.S. Const. amend I.

71.     By reason of the aforementioned acts, policies, practices, procedures, and/or customs, created, adopted, and enforced under color of state law, the Defendant has deprived Plaintiffs of their right to freedom of speech in violation of the Free Speech and Assembly Clauses of the First Amendment as applied to the states and their political subdivisions under the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

72.     Defendant's actions, as set forth in this Complaint, injured Plaintiffs in a way likely to chill a person of ordinary firmness from further participation in conduct protected by the First Amendment.

73.     Plaintiffs desire and intend to organize Responsible Politicking in the form of both indoor and outdoor events, including but not limited to, rallies, meetings, election challenger training, and discussions regarding the state of the nation and the upcoming election.

74.     Plaintiffs have taken concrete steps to hold these events, including contacting venues and raising funds to pay for their events.

75.     Plaintiffs expect that based on the size of their respective groups and the purposes for which these events will be held (i.e. political rallies, election challenger training) that attendance at the events will exceed that allowed by the Governor's executive orders.

76.     Plaintiffs cannot in good conscience hold their events if doing so might subject their members or event attendees to criminal penalties.

77.     Plaintiffs' ability to effectively advance their jointly held political and electoral goals are impeded or outright prohibited by the Governor's orders

78.     These events and electoral efforts constitute core political speech and are afforded robust protection under the First Amendment.

79.     The Governor's orders, including but not limited to EO 2020-160, constitute direct restrictions on Plaintiffs' right to engage in protected speech and assembly and therefore violate the First Amendment.

80.     Direct restrictions on Plaintiffs' rights to engage in protected speech and assembly, including core political speech, are subject to strict scrutiny. The restrictions must be narrowly tailored to achieve a compelling government interest.

81.     The Governor's executive orders are not narrowly tailored to achieve a compelling government interest and thus cannot pass Constitutional muster.

82.     Alternatively, if the Governor's orders do not constitute direct restrictions on Plaintiffs' right to speak and assemble[15], the orders constitute unlawful time, place, and manner restrictions on speech and assembly.

83.     The orders are not narrowly tailored to serve a significant government interest.

84.     The orders do not leave open ample alternative channels for communicating the Plaintiffs' messages. There is no substitute for in-person retail politics, particularly in an election year. It is essential for EIF, for example, to hold in-person events in order to recruit, energize, and train volunteers for the grueling work of staying inside at a polling (or absentee-ballot-counting) location for an entire day. It is essential for One Nation, which does not have the funds to run TV or radio ads, mount online campaigns, or send out mass mailings, to come to Michigan communities and recruit and inspire its supporters in person. An outright prohibition on indoor meetings with more than 10 people leaves open essentially no alternative channels for in-person or, for that matter, effective, communication. An outright prohibition on meetings in excess of 100 people regardless of venue and regardless of whether the event is held indoors or outdoors leaves open essentially no alternative channels for in-person or effective communication.

85.     Virtual methods of communication are more costly and require both the speaker and the audience to have compatible technology to communicate. Communication is also less effective over virtual channels, and cannot generate the recruits, understanding, and enthusiasm that in-person communication can.

---

[15]     Plaintiffs do not concede that the Governor's orders, including EO 2020-160, are not direct restrictions on speech and plead this only as an alternative theory of relief.

86.    The prohibitions in the Governor's orders disproportionately impact grassroots groups and groups with limited financial means, as any remaining avenues of communication left available by the orders are cost prohibitive.

87.    The Governor's orders prohibit Plaintiffs from reaching their intended audiences.

88.    As a direct and proximate result of Defendant's violation of the Free Speech and Free Assembly Clauses of the First Amendment as set forth in this Complaint, Plaintiffs have suffered irreparable harm, including but not limited to the loss of their fundamental constitutional rights, entitling them to declaratory and injunctive relief against the Defendant.

**COUNT II: VIOLATION OF PLAINTIFFS' FIRST AMENDMENT RIGHTS, 42 U.S.C. § 1983: OVERBREADTH**

89.    Plaintiffs restate and reallege the foregoing paragraphs as if the same were repeated verbatim herein to the extent they are not inconsistent with this section.

90.    During a State of Emergency, which the Governor has the power to and did declare, the Governor has exercised the power to write whatever speech restrictions she wants.

91.    These restrictions are applicable for as long as she believes is necessary, as reflected by her subsequent declarations of states of emergency extending for over five months (so far).

92.    The Governor may revise, rescind, and amend these orders whenever she desires to do so.

93.    The restrictions the Governor put in place via her orders, including EO 2020-160, on their face cover a broad amount of conduct, including some conduct that can constitutionally be prohibited but other conduct that cannot be prohibited.

94.    The constitutionally protected conduct is far too substantial compared to any legitimate sweep of the orders—that is, the conduct that constitutionally could be prohibited. The

10 person indoor and 100 person outdoor attendance limits imposed by EO 2020-160 regulate significant amounts of First Amendment-protected conduct in the State of Michigan.

95.     The restriction the Governor has imposed covers such an extensive range of conduct that in practice it cannot and will not be enforced against every person who is technically in violation of the terms of the order.

96.     The restrictions in her orders, including EO 2020-160, cover both conduct that can plainly be prohibited and conduct that is protected by the First Amendment and cannot be prohibited.

97.     The overbreadth is real and substantial judged in relation to the order's plainly legitimate sweep.

98.     It is physically impossible to enforce the orders as written, including EO 2020-160, against all actors across the entire state, even if the Governor was omniscient and knew of all activities of all residents.

99.     Substantial discretion will have to be used to determine where, how, when, and against whom enforcements efforts and resources should be directed.

100.    The Governor and other enforcement authorities will have to make decisions about what to enforce based in part on whether citizens make complaints and based in part on whether the authorities decide to enforce.

101.    The restriction comes with a vague carveout that lets the Governor decide whether or not to enforce the restriction against certain groups. The carveout by its own terms is based on the First Amendment and the separation of powers doctrine. However, the carveout contains no objective guidelines.

102.    The Governor implicitly acknowledges that her orders, including EO 2020-160, are at odds with individual constitutional rights, as evidenced by her inclusion of a carveout in her orders related to protected conduct. The carveout in EO 2020-160, which is substantially similar to the carveout in the Governor's prior orders, states:

> 13. Separation of powers. Nothing in this order should be taken to interfere with or infringe on the powers of the legislative and judicial branches to perform their constitutional duties or exercise their authority. Similarly, nothing in this order shall be taken to abridge protections guaranteed by the state or federal constitution under these emergency circumstances.

103.    This vague carveout lets the Governor decide whether or not to enforce the restriction against certain groups. The carveout by its own terms is based on the First Amendment and the separation of powers doctrine. However, the carveout contains no objective guidelines.

104.    The vagueness of the carveout is belied by the Governor's own interpretation and enforcement of the provision.

105.    The Frequently Asked Questions related to EO 2020-160 state that the carveout applies only to outdoor activities.

> Q: Does Executive Order 2020-160 prohibit persons from engaging in *outdoor activities* that are protected by the First Amendment to the United States Constitution?
>
> A: No. Persons may engage in expressive activities protected by the First Amendment within the State of Michigan, but must adhere to social distancing measures recommended by the Centers for Disease Control and Prevention, including remaining at least six feet from people from outside the person's household.[16]

106.    On March 31, 2020, pursuant to the Governor's Stay at Home Order, which contained no accommodations for constitutionally protected activity, police arrested a pro-life

---

[16]    *See* Executive Order 2020-160 FAQs, available online at https://www.michigan.gov/coronavirus/0,9753,7-406-98178_98455-535202--,00.html (emphasis added).

protestor engaged in protected speech on a public sidewalk in Detroit. That man sued Governor Whitmer for violating his First Amendment rights. Shortly thereafter, Governor Whitmer entered into a Stipulated Order and settlement with the protestor, acknowledging for the first time that the protestor's constitutionally protected activity – which also occurred outdoors -- was not prohibited by the Governor's orders in effect at that time.[17]

107.   After attending a march in early June associated with the Black Lives Matter movement, Governor Whitmer was heavily criticized for violation her own orders and not heeding the same advice and restrictions which she doled out to the public. The Governor's office first responded to criticism by claiming that she had maintained social distancing, but numerous pictures show social distancing was not maintained, even though many attendees (and Whitmer) wore masks. Her office then claimed that the Governor did not violate her own order because peaceful protests are protected by the Constitution.[18]

108.   To Plaintiffs' knowledge, the Governor has never acknowledged an exception for constitutionally protected activity conducted indoors.

109.   In fact, just this summer, in *CH Royal Oak LLC v. Gretchen Whitmer, et al.,* which involved a challenge to EO 2020-110 by a theater that intended to show a presentation in celebration of the Juneteenth holiday, the Governor took the position that the restrictions in her executive orders can and do apply to ban political speech and association if that activity is being conducted indoors.[19]

110.   There is no way that a reasonable person can predict whether the exception will be granted or not to any given activity.

---

[17]   *See* Ex. G, Stipulated Order and Notice of Settlement in *Belanger, et al., v. Whitmer, et. al.* at ¶3 ("Defendants agree that Executive Order 2020-21 does not prohibit the conduct of Plaintiffs that is alleged in the Complaint.").
[18]   At least those protests in which the Governor participates.
[19]   *CH Royal Oak, LLC v. Whitmer*, No. 1:20-CV-570, 2020 WL 4033315 (W.D. Mich. July 16, 2020)

111.    Full discretion regarding whether or not to enforce the restrictions lies with the Governor and those acting under her or at her direction.

112.    The Governor has in fact given differing views on what the exception allows, as outlined above.

113.    The only ways to take advantage of the exception are to ask for the Governor's advance permission or to engage in costly and time-consuming litigation. The only way to challenge the Governor's decision, or to adjudicate the question of whether the activity can be conducted, is to litigate. Because the subject matter of the restriction is in-person events tied to the November election, which cannot be completely planned out and then litigated to resolution months in advance of the event, this means that most parties have no recourse at all.

114.    Additionally, if a person or group seeks out the Governor to ask permission to hold particular event, there are no objective criteria that apply. Likewise, if a person or groups resorts to a lawsuit, the Governor may decide to zealously pursue enforcement to prohibit protected speech[20] or capitulate and allow such speech.[21]

115.    The concentration of such authority in a single person – the Governor – without any objective standards to rein in the Governor's discretion offends due process. The temptation to engage in arbitrary enforcement is simply too great to vest unbridled discretion in one individual. The Governor has retained the ability to decide retrospectively whether conduct is prohibited and can be criminally punished or, alternatively, that the same conduct falls within an exception and is therefore permissible.

116.    Ordinary people of reasonable firmness will be chilled from engaging in any activity that may be covered, because they cannot predict whether an exemption will be granted.

---

[20]     *See, e.g., CH Royal Oak, LLC v. Whitmer*, No. 1:20-CV-570, 2020 WL 4033315 (W.D. Mich. July 16, 2020).

[21]     *See* Ex. G, Stipulated Order and Notice of Settlement in *Belanger, et al., v. Whitmer, et. al.*

The cost of determining whether an exception applies entails expensive litigation or holding an event and running the risk that attendees may be cited for violating the order. The practical effect of this system is that constitutionally protected events will not take place.

117.    The overbreadth of the Governor's orders has chilled Plaintiffs from engaging in protected speech and assembly.

## COUNT III: VIOLATION OF PLAINTIFFS' FIRST AMENDMENT RIGHTS, 42 U.S.C. § 1983: VOID FOR VAGUENESS

118.    Plaintiffs restate and reallege the foregoing paragraphs as if the same were repeated verbatim herein to the extent they are not inconsistent with this section.

119.    During a State of Emergency, which the Governor has the power to declare and did declare, the Governor has exercised the power to write whatever speech restrictions she wants.

120.    These restrictions are applicable for as long as she believes is necessary, as reflected by her subsequent declarations of states of emergency extending for over five months (so far).

121.    The Governor may revise, rescind, and amend these orders whenever she desires to do so.

122.    The Governor implicitly acknowledges that her orders, including EO 2020-160, are at odds with individual constitutional rights, as evidenced by her inclusion of a carveout in her orders related to protected conduct. The carveout in EO 2020-160, which is substantially similar to the carveout in the Governor's prior orders, states:

> 13. Separation of powers. Nothing in this order should be taken to interfere with or infringe on the powers of the legislative and judicial branches to perform their constitutional duties or exercise their authority. Similarly, nothing in this order

shall be taken to abridge protections guaranteed by the state or federal constitution under these emergency circumstances.

123.    This vague carveout lets the Governor decide whether or not to enforce the restriction against certain groups. The carveout by its own terms is based on the First Amendment and the separation of powers doctrine. However, the carveout contains no objective guidelines.

124.    The vagueness of the carveout is belied by the Governor's own interpretation and enforcement of the provision.

125.    The Frequently Asked Questions related to EO 2020-160 state that the carveout applies only to outdoor activities.

> Q: Does Executive Order 2020-160 prohibit persons from engaging in *outdoor activities* that are protected by the First Amendment to the United States Constitution?
>
> A: No. Persons may engage in expressive activities protected by the First Amendment within the State of Michigan, but must adhere to social distancing measures recommended by the Centers for Disease Control and Prevention, including remaining at least six feet from people from outside the person's household.[22]

126.    On March 31, 2020, pursuant to the Governor's Stay at Home Order, which contained no accommodations for constitutionally protected activity, police arrested a pro-life protestor engaged in protected speech on a public sidewalk in Detroit. That man sued Governor Whitmer for violating his First Amendment rights. Shortly thereafter, Governor Whitmer entered into a Stipulated Order and settlement with the protestor, acknowledging for the first time that

---

[22]    *See* Executive Order 2020-160 FAQs, available online at https://www.michigan.gov/coronavirus/0,9753,7-406-98178_98455-535202--,00.html (emphasis added).

the protestor's constitutionally protected activity – which also occurred outdoors -- was not prohibited by the Governor's orders in effect at that time.[23]

127.   After attending a march in early June associated with the Black Lives Matter movement, Governor Whitmer was heavily criticized for violation her own orders and not heeding the same advice and restrictions which she doled out to the public. The Governor's office first responded to criticism by claiming that she had maintained social distancing, but numerous pictures show social distancing was not maintained, even though many attendees (and Whitmer) wore masks. Her office then claimed that the Governor did not violate her own order because peaceful protests are protected by the Constitution.[24]

128.   To Plaintiffs' knowledge, the Governor has never acknowledged an exception for constitutionally protected activity conducted indoors.

129.   In fact, just this summer in the *CH Royal Oak LLC v. Gretchen Whitmer, et al.* which involved a challenge to EO 2020-110, the Governor took the position that the restrictions in her executive orders can and do apply to constitutionally protected activity if that activity is being conducted indoors.[25]

130.   There is no way that a reasonable person can predict whether the exception will be granted or not to any given activity.  People of common intelligence must necessarily guess at its meaning.

131.   Full discretion regarding whether or not to enforce the restrictions lies with the Governor and those acting under her or at her direction.

---

[23]     *See* Ex. G, Stipulated Order and Notice of Settlement in *Belanger, et al., v. Whitmer, et. al.* at ¶3 ("Defendants agree that Executive Order 2020-21 does not prohibit the conduct of Plaintiffs that is alleged in the Complaint.").
[24]     At least those protests in which the Governor participates.
[25]     *CH Royal Oak, LLC v. Whitmer*, No. 1:20-CV-570, 2020 WL 4033315 (W.D. Mich. July 16, 2020)

132.    As the above examples reflect, the Governor has in fact given differing views on what the exception allows. Any clarity from the Governor regarding the applicability of the exemption typically comes after the event in question takes place or an enforcement proceeding has commenced.

133.    The Governor's orders and the constitutional exception fail to define with sufficient definiteness that ordinary people can understand what conduct is prohibited.

134.    The Governor's orders and the constitutional exception encourage arbitrary and discriminatory treatment.

135.    The Governor's orders and the constitutional exception inhibit the exercise of First Amendment freedoms and cause speakers to steer far wider of the unlawful zone than if the boundaries of the forbidden areas were clearly marked.

136.    One of the only avenues to determine whether or not the exception applies is by resorting to expensive, time consuming litigation.

137.    Ordinary people of reasonable firmness will be chilled from engaging in any activity that may be covered, because they cannot predict whether an exemption will be granted. The cost of determining whether an exception applies entails expensive litigation or holding an event and running the risk that attendees may be cited for violating the order. The practical effect of this system is that constitutionally protected events will not take place.

138.    The vagueness of the constitutional exception in the Governor's orders has chilled Plaintiffs from engaging in protected speech and assembly.

**COUNT IV: VIOLATION OF PLAINTIFFS' FIRST AMENDMENT RIGHTS, 42 U.S.C.
§ 1983: UNLAWFUL PRIOR RESTRAINT**

139.    Plaintiffs restate and reallege the foregoing paragraphs as if the same were repeated verbatim herein to the extent they are not inconsistent with this section.

140.   During a State of Emergency, which the Governor has the power to declare and did declare, the Governor has exercised the power to write whatever speech restrictions she wants.

141.   These restrictions are applicable for as long as she believes is necessary, as reflected by her subsequent declarations of states of emergency extending for over five months (so far).

142.   The Governor may revise, rescind, and amend these orders whenever she desires to do so.

143.   The restrictions the Governor put in place via her orders, including EO 2020-160, on their face cover a broad amount of conduct, including some conduct that can constitutionally be prohibited but other conduct that cannot be prohibited.

144.   The constitutionally protected conduct is far too substantial compared to the conduct that constitutionally can be prohibited. The restriction the Governor has imposed covers such an extensive range of conduct that in practice it will not be enforced against everyone. Substantial discretion will have to be used to determine where, how, when, and against home enforcements efforts and resources should be directed.

145.   It is physically impossible to enforce the orders as written, including EO 2020-160, against all actors across the entire state, even if the Governor was omniscient and knew of all activities of all residents.

146.   Authorities will have to make decisions about what to enforce, based in part on whether citizens make complaints, and based in part on whether the authorities decide to enforce.

147.   The restriction also contains a vague carveout that lets the Governor decide whether or not to enforce the restriction against certain groups. The carveout by its own terms is

based on the First Amendment and the separation of powers doctrine. However, the carveout contains no objective guidelines. There is no way that a reasonable person can predict whether the exception will be granted or not to any given activity. Full discretion regarding whether or not to enforce the restrictions lies with the Governor and those acting under her or at her direction.

148.    The Governor's outright prohibition on gatherings with attendance in excess of the limits in her orders, with a limited and vague exception that effectively requires Michiganders to secure advance permission before being assured that they can lawfully undertake the activity, constitutes an unlawful prior restraint.

149.    The Governor's order purports to prospectively ban indoor gatherings in excess of 10 people and outdoor gatherings in excess of 100 people. Gatherings of any type, regardless of venue, are banned if the attendance exceeds 100 people.

150.    In interpreting and enforcing the Governor's orders, both the Ingham County Prosecuting Attorney and the Chief Public Health Officer of the Detroit Health Department explicitly told Plaintiffs that they could not hold their events because of the Governor's executive orders.

151.    Plaintiffs' ability to exercise their First Amendment rights by engaging in retail politics via events that exceed these attendance limits are subject to the prior approval of the Governor. Even if there is no explicit permit system in place under the Governor's regime, the constitutional exception, the publicly available FAQs, and the Governor's history of selectively enforcing or allowing certain activities are all implicit invitations to seek permission from the Governor to hold an event.

152.    Despite these implicit invitations, it is impossible for a person to know what factors the Governor may consider in determining whether or not to grant permission. There are no such standards outlined in the Governor's orders, statutes, rules, or in any publicly available resource.

153.    The granting or denial of permission to hold a particular event rests solely in the discretion of the Governor.

154.    The only method to determine whether an event is permitted is to engage in expensive, time-consuming, and unpredictable litigation.

155.    Ordinary people of reasonable firmness will be chilled from engaging in any activity that may be covered, because they cannot predict whether an exemption will be granted. The cost of determining whether an exception applies entails expensive litigation or holding an event and running the risk that attendees may be cited for violating the order. The practical effect of this system is that constitutionally protected events will not take place.

156.    As a direct and proximate result of Defendant's violation of the Free Speech and Free Assembly Clauses of the First Amendment as set forth in this Complaint, Plaintiffs have suffered irreparable harm, including but not limited to the loss of their fundamental constitutional rights, entitling them to declaratory and injunctive relief against the Defendant.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Election Integrity Fund and One Nation Michigan respectfully request this Court:

A.  Declare and adjudge that:

    a.  Executive Order 2020-160 is unconstitutional as applied to Plaintiffs' planned in-person Responsible Politicking as outlined in Paragraphs 43 and 45 above;

b. Executive Order 2020-160 is unconstitutional as applied to Plaintiffs' planned in-person Responsible Politicking that is substantially similar to those events outlined in Paragraphs 43 and 45 above;

c. The Governor's prohibitions on in-person indoor and outdoor gatherings, including prohibitions on Responsible Politicking, directly restrict Plaintiffs' Freedom of Speech and Freedom of Assembly and therefore violate the First Amendment to the Constitution;

    i. Alternatively, that the Governor's prohibitions on in-person indoor and outdoor gatherings, including prohibitions on Responsible Politicking, are unlawful time, place, and manner restrictions which infringe on Plaintiffs' Freedom of Speech and Freedom of Assembly and therefore violate the First Amendment to the Constitution;

d. The Governor's prohibitions on in-person indoor and outdoor gatherings are overbroad and regulate substantially more conduct than permitted by the Constitution;

e. The Governor's prohibitions on in-person gatherings are void for vagueness;

f. The Governor's prohibitions on in-person indoor and outdoor gatherings, including prohibitions on Responsible Politicking, constitute unlawful prior restraints which infringe on Plaintiffs' Freedom of Speech and Freedom of Assembly and therefore violate the First Amendment to the Constitution;

B. Enjoin the Governor and all those acting in concert with her or at her direction from prohibiting Plaintiffs from holding the events outlined in Paragraphs 43 and 45 above,

or any substantially similar events, under the authority of EO 2020-160 or any future

restrictions which are substantially similar to the restrictions in EO 2020-160.

C.  Enjoin the Governor and all those acting in concert with her or at her direction from

citing, prosecuting, punishing, or otherwise enforcing the in-person attendance limits

in EO 2020-160 or any future restrictions which are substantially similar against

Plaintiffs as a result of Plaintiffs holding the events outlined in Paragraphs 43 and 45,

or any substantially similar events.

D.  Enjoin the Governor and all those acting in concert with her or at her direction from

entering or enforcing any provisions in her executive orders which prohibit

Responsible Politicking, including but not limited to EO 2020-160(7).

E.  Grant Plaintiffs their attorneys' fees under 42 U.S.C. § 1988.

F.  Grant such other and further relief as this Court deems just and proper.


Dated: August 24, 2020

Respectfully submitted,

Edward D. Greim
Special Counsel, Thomas More Society
Missouri Bar No. 54034
GRAVES GARRETT, LLC
1100 Main Street, Suite 2700
Kansas City, Missouri 64105
Tel.: (816) 256-3181
Fax: (816) 222-0534
edgreim@gravesgarrett.com

ATTORNEY FOR PLAINTIFFS

## VERIFICATION

I, Glen Sitek, on behalf of the Election Integrity Fund, verify under penalty of perjury that I have read the above complaint and its contents. I also verify that, to the best of my knowledge and recollection, the matters stated in the complaint are true and correct.

Executed this 24th day of August, 2020.

Glen Sitek, Vice President- Election Integrity Fund

I, Dr. Linda Lee Tarver, on behalf of One Nation Michigan, verify under penalty of perjury that I have read the above complaint and its contents. I also verify that, to the best of my knowledge and recollection, the matters stated in the complaint are true and correct.

Executed this 24th day of August, 2020.

Dr. Linda Lee Tarver, President- One Nation Michigan

Debra Haas
Notary Public of Michigan
Oakland County
Expires 02/14/
Acting in the County of

8-24-2020