IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN

| | | |
|---|---|---|
| ELECTION INTEGRITY FUND, *et al.*, | ) | |
| | ) | Case No. 1:20-cv-00805 |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| GRETCHEN WHITMER, in her official | ) | **ORAL ARGUMENT** |
| capacity as Governor of Michigan, | ) | **REQUESTED** |
| | ) | |
| Defendant. | ) | |

**EXPEDITED CONSIDERATION REQUESTED**


**SUGGESTIONS IN SUPPORT OF
<u>PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION</u>**


**GRAVES GARRETT, LLC**

<u>*/s/ Edward D. Greim*</u>
Edward D. Greim
Special Counsel, Thomas More Society
Missouri Bar No. 54034
GRAVES GARRETT, LLC
1100 Main Street, Suite 2700
Kansas City, Missouri 64105
Tel.: (816) 256-3181
Fax: (816) 222-0534
edgreim@gravesgarrett.com

*Attorney for Plaintiffs*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................ii

INTRODUCTION ....................................................................................................1

STATEMENT OF FACTS .........................................................................................2

    a.    Plaintiffs ......................................................................................................2

            i.    Election Integrity Fund ......................................................................2

            ii.    One Nation Michigan ......................................................................3

    b.    Defendant ....................................................................................................3

            i.    Governor Gretchen Whitmer ...........................................................3

    c.    History of the Governor's executive orders related to COVID-19 .............4

    d.    A vague constitutional proviso is added to the Governor's orders .............5

    e.    The Governor inconsistently interprets and applies her Orders to First
          Amendment protective activities ..............................................................6

    f.    EO 2020-160 bans most in-person gatherings regardless of the precautions
          taken against COVID-19 ............................................................................8

    g.    Plaintiffs' Planned Activities ....................................................................9

    h.    Plaintiffs' requests for guidance from government officials reveal a credible
          threat of prosecution if they hold their events as planned, and demonstrate
          that officials are not applying any exception for constitutionally protected
          activity ......................................................................................................11

    i.    Plaintiffs have experienced, and will continue to experience, irreparable harm
          because the Governor's orders have and will continue to prevent Plaintiffs
          from engaging in speech and conduct protected by the First Amendment ....15

            i.    Plaintiffs have already canceled some events because of the
                Governor's prohibitions, the lack of clarity in her orders, and
                the threat of prosecution if the events are held ..............................15

            ii.    Plaintiffs are unable to plan future events because of the
                prohibitions in the Governor's Order and the Governor's failure
                to grant advance permission under her exception for constitutionally
                protected activity ...........................................................................15

iii. The prohibition on in-person events is particularly harmful to Plaintiffs because the Governor's emphasis on mail in voting renders political speech more important and impactful as voters cast their ballots weeks ahead of Election Day .................... 16

ARGUMENT .................... 17

I. Standard for preliminary relief in First Amendment cases .................... 17

II. Plaintiffs should be granted a preliminary injunction allowing them to gather to hold their events .................... 18

A. Plaintiffs are likely to succeed on the merits of their First Amendment claims, eliminating the need for the Court to consider the remaining factors .................... 18

1. The Governor's Executive Orders, which prohibit most in-person gatherings during a general election, constitute direct restrictions on speech which cannot survive strict scrutiny .................... 18

2. Alternatively, the Governor's restrictions on in-person gatherings are unconstitutional time, place, and manner restrictions because they do not leave open ample alternative channels of communication .................... 20

3. The Governor's restrictions on in-person gatherings are overbroad because they deter significantly more conduct than can be justified under the First Amendment .................... 23

4. The Governor's restrictions on in-person gatherings are void for vagueness .................... 25

5. The Governor's restrictions on in-person gatherings constitute unlawful prior restraints on speech .................... 27

6. *Jacobson* does not save an executive order which unconstitutionally infringes on the First Amendment .................... 28

B. If the Court does consider the other three factors beyond likelihood of the success on the merits, they weigh in favor of granting a preliminary injunction .................... 31

1. The loss of First Amendment freedoms for any period of time constitutes irreparable harm .................... 31

2. The public interest factors weigh in favor of granting an injunction .................... 32

C. Conclusion .................... 33

# TABLE OF AUTHORITIES

**Cases**

*Ass'n of Cmty. Organizations for Reform Now v. City of Dearborn,*
      696 F. Supp. 268 (E.D. Mich. 1988) ............................................................. 22

*Bates v. City of Little Rock,*
      361 U.S. 516, 522-23 (1960) ....................................................................... 19

*Bays v. City of Fairborn,*
      668 F.3d 814, 819 (6th Cir. 2012) ......................................................... 18, 31

*Bd. of Airport Comm'rs of City of Los Angeles v. Jews for Jesus, Inc.,*
      482 U.S. 569 (1987) ..................................................................................... 22

*Buckley v. Valeo,*
      424 U.S. 1, 14 (1976) ............................................................................ 19, 32

*Bullock v. Carter,*
      405 U.S. 134 (1972) ..................................................................................... 18

*Burson v. Freeman,*
      504 U.S. 191 (1992) ..................................................................................... 22

*CH Royal Oak, LLC v Whitmer,*
      No. 1:20-CV-570, 2020 WL 4033315, at *1 (WD Mich July 16, 2020) ....... 6

*Cincinnati v. Discovery Network, Inc.,*
      507 U.S. 410, 424–426 (1993) .................................................................... 33

*Citizens United v. Fed. Election Comm'n,*
      558 U.S. 310, 340 (2010) ............................................................................ 20

*City of Chicago v. Morales,*
      527 U.S. 41, 52 (1999) .......................................................................... 25, 26

*City of Houston, Tex. v. Hill,*
      482 U.S. 451, 459 (1987) ............................................................................ 23

*City of Ladue v. Gilleo,*
      512 U.S. 43, 52–53 (1994) .......................................................................... 33

*Clark v. Cmty. for Creative Non-Violence,*
      468 U.S. 288, 293 (1984) ............................................................................ 20

*Cleveland Area Bd. of Realtors v. City of Euclid,*
  88 F.3d 382 (6th Cir. 1996) ............................................................. 22

*Connally v. General Construction Co.,*
  269 U.S. 385, 391 (1926) ................................................................. 25

*Connection Distrib. Co. v. Holder,*
  557 F.3d 321, 336 (6th Cir. 2009) .................................................... 23

*Consolidated Edison Co. of N.Y. v. Public Serv. Comm'n of N.Y.,*
  447 U.S. 530, 538 (1980) ................................................................. 27

*Dayton Area Visually Impaired Persons, Inc. v. Fisher,*
  70 F.3d 1474, 1490 (6th Cir. 1995) .................................................. 32

*Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville and Davidson Cnty.,*
  274 F.3d 377, 400 (6th Cir.2001) ..................................................... 31

*Elrod v. Burns,*
  427 U.S. 347, 373  (1976) ........................................................... 31, 32

*FW/PBS, Inc. v. City of Dallas,*
  493 U.S. 215, 225-27 (1990) ............................................................ 27

*Gannett Co., Inc. v. DePasquale,*
  443 U.S. 368, 383 (1979) ................................................................. 32

*Giaccio v. Pennsylvania,*
  382 U.S. 399, 402–403 (1966) .......................................................... 25

*G & V Lounge, Inc. v. Michigan Liquor Control Comm'n,*
  23 F.3d 1071, 1079 (6th Cir.1994) ............................................... 31, 32

*Hadley v. Junior College Dist.,*
  397 U.S. 50 (1970) ........................................................................... 18

*Jacobson v. Massachusetts,*
  197 U.S. 11 (1905) ....................................................................... 29-31

*Kolender v. Lawson,*
  461 U.S. 352, 357 (1983) ................................................................. 25

*Lanzetta v. New Jersey,*
  306 U.S. 451, 453 (1939) ............................................................ 25, 26

*Maryville Baptist Church, Inc. v. Beshear*,
    957 F.3d 610, 611 (6th Cir. 2020) ......................................................... 30

*McCullen v. Coakley*,
    573 U.S. 464, 488-89 (2014) ................................................................ 22

*Meyer v. Grant*,
    486 U.S. 414, 424 (1988) .................................................................... 22

*Mills v. Alabama*,
    384 U.S. 214, 218 (1966) .................................................................... 19

*Newsom v. Norris*,
    888 F.2d 371, 378 (6th Cir.1989) ........................................................ 32

*Nken v. Holder*,
    556 U.S. 418, 434, 129 S. Ct. 1749, 173 L.Ed.2d 550 ........................ 30

*Ohio Republican Party v. Brunner*,
    543 F.3d 357, 361 (6th Cir. 2008) ....................................................... 18

*Platt v. Bd. of Commissioners on Grievances & Discipline of Ohio Supreme Court*,
    894 F.3d 235, 245 (6th Cir. 2018) ......................................................... 4

*Promotions, Ltd. v. Conrad*,
    420 U.S. 546, 559 (1975) .................................................................... 27

*Reynolds v. Sims*,
    377 U.S. 533 (1964) ........................................................................... 18

*Richmond Newspapers, Inc. v. Virginia*,
    448 U.S. 555, 575 (1980) .................................................................... 19

*Risbridger v. Connelly*,
    275 F.3d 565, 572 (6th Cir.2002) ........................................................ 25

*Saieg v. City of Dearborn*,
    641 F.3d 727, 740 (6th Cir. 2011) ....................................................... 22

*Schickel v. Dilger*,
    925 F.3d 858, 880 (6th Cir.) ............................................................... 23

*Schickel v. Troutman*,
    140 S. Ct. 649, 205 L. Ed. 2d 388 (2019) ........................................... 23

*Smith v. Goguen*,
  415 U.S. 566, 572–73 (1974) .................................................................. 25

*Southeastern Promotions, Ltd. v. Conrad*,
  420 U.S. 546, 553 (1975) ....................................................................... 27

*Turner Broad. Sys., Inc. v. F.C.C.*,
  520 U.S. 180, 189 (1997) ....................................................................... 21

*United Jewish Org. v. Carey*,
  430 U.S. 144 (1977) ............................................................................... 18

*United States v. Reese*,
  92 U.S. 214, 221 (1876) ......................................................................... 27

*United States v. Stevens*,
  559 U.S. 460, 480 (2010) ....................................................................... 24

*United States v. Williams*,
  553 U.S. 285 (2008) ............................................................................... 23

*Watchtower Bible & Tract Soc'y of New York, Inc. v. Village of Stratton*,
  536 U.S. 150, 168-69 (2002) .................................................................. 21

*Women's Med. Prof'l Corp. v. Voinovich*,
  130 F.3d 187, 193 (6th Cir. 1997) ......................................................... 32

**Constitution**

Const 1963 art 1 § 5 ...................................................................................... 4


**Other Authorities**

Emergency Management Act,
  1976 PA 390 .............................................................................................. 4

Emergency Powers of the Governor Act,
  1945 PA 302 .............................................................................................. 4

**INTRODUCTION**

The upcoming general election presents both an opportunity and a challenge for Plaintiffs, Election Integrity Fund ("EIF") and One Nation Michigan ("One Nation"). It presents an opportunity because the coming weeks will see Michiganders casting their ballots. This is the time to reach out to potential new members, allies, and recipients of Plaintiffs' political speech. Michiganders will never be more attuned to politics, receptive to Plaintiffs' message, and likely to become inspired to join Plaintiffs and help spread their message. It also presents a challenge, especially for EIF, because voting problems in Michigan's primary election shows that EIF must recruit, train, and mobilize hundreds of new members to observe and protect the integrity of the November elections. As of now, none of this activity is possible.

Plaintiffs' activities are impossible because Michigan's Governor has banned all indoor political meetings of more than 10 people, and all outdoor meetings of more than 100. It does not matter if attendees wear masks and socially distance. It does not matter how big the venue is. The ban, in short, covers most traditional political assembly during the few weeks when it is most needed, even though the same concentrations of people can gamble at casinos, go to bars and restaurants, and shop. The Governor provided an exception for activity she believes the constitution protects in an "emergency," but in some ways, this murky reservation of executive power is worse than no exception at all. Plaintiffs' experience shows that only the Governor can grant advance permission under this exception, and if any objective criteria apply, only she knows them.

The Governor's ban on political assembly, therefore, violates the First and Fourteenth Amendments in various ways.

- As a direct restriction on speech, it fails strict scrutiny.

1

- As a time-place-manner restriction, it is not narrowly tailored and does not leave alternative channels of communication.

- It is overbroad, because it covers far too much expressive conduct compared to its legitimate sweep (restricting parties where COVID allegedly spread), and leaves the Governor unfettered discretion to grant exceptions;

- It is vague, because the "constitutional" exception is vague, and local enforcement officials defer to the Governor to say whether a particular political assembly is covered because even they cannot understand how it applies;

- It is an unconstitutional prior restraint, because the Governor retains sole authority to decide when the "constitutional" exception applies, the criteria for when it does apply are known only to the Governor, the exception is applied unevenly, and these circumstances require groups to either seek the Governor's advance permission to hold an event, cancel it, or litigate.

The Governor could have burdened far less protected speech and assembly during the crucial weeks when this year's General Election will unfold, while still combating the alleged problem with the spread of COVID at parties. This Court should preliminarily enjoin enforcement of the Governor's order against Plaintiffs' Responsible Politicking. This includes indoor and outdoor events, such as those planned by Plaintiffs and described at ¶¶ 44 and 46 of their Complaint, where Plaintiffs "provide for social distancing and also… have masks and hand sanitizer available for use by attendees." Complaint, ¶ 45 (Dkt. No. 1).

### STATEMENT OF FACTS

    **a. Plaintiffs**
        **i. Election Integrity Fund**

Plaintiff Election Integrity Fund ("EIF") is a Michigan nonprofit entity formed to promote social welfare. Verified Complaint ("VC") 63. EIF's primary purposes include maintaining the integrity of electoral processes, preserving the purity of elections, and guarding against the abuse of the elective franchise in the state of Michigan. VC63. EIF members served as election challengers in Michigan's August 4, 2020 election. VC63. EIF desires and has made plans to engage in retail politics, including rallies, meetings, and other activities. VC63. EIF intends to plan and hold these events in a responsible manner, allowing social distancing and providing masks and hand sanitizer for attendees. VC44, 45, 63. This retail politicking, planned and held with the aforementioned precautions against the spread of COVID-19, are hereinafter called, "Responsible Politicking". Responsible Politicking includes meetings, rallies, and events in advance of the November 3 election that would violate the Governor's executive orders, specifically the attendance limits in EO 2020-160. VC63.

### ii.  One Nation Michigan

Plaintiff One Nation Michigan is a Michigan unincorporated association. VC64. One Nation's primary purposes include promoting reasonable and responsible dialogue on race anchored by recognizing diverse peoples' commonality as individuals with intrinsic value and the importance that this intrinsic value be reflected in just laws which respect individual liberty. VC64**.** One Nation desires and has made plans to engage in Responsible Politicking in advance of the November 3 election that would violate the Governor's executive orders, specifically the attendance limits in EO 2020-160. VC46, 47, 64.

### b.  Defendant
#### i.  Governor Gretchen Whitmer

Defendant Gretchen Whitmer is the Governor of the State of Michigan. Governor Whitmer has entered over 120 Executive Orders as part of her response to the COVID-19 pandemic,

including EO 2020-160.[1] These are the source of Plaintiffs' injury, and if they are declared invalid as applied to the types of gatherings Plaintiffs are planning ("Responsible Politicking"), the Plaintiffs would be free to hold these events without fear of prosecution. VC59. Declaratory and/or injunctive relief against Governor Whitmer will afford Plaintiffs complete relief.

### c.  History of the Governor's executive orders related to COVID-19.

Nearly six months ago, on March 10, 2020, the Governor issued EO 2020-4, which declared a state of emergency in Michigan "to address the COVID-19 pandemic." EO 2020-4. The declaration cited three distinct sources of authority: section 1, article 5 of the Michigan Constitution of 1963; the Emergency Management Act, 1976 PA 390; and the Emergency Powers of the Governor Act of 1945, 1945 PA 302. EO 2020-4. The Governor renewed her declaration several times, including EOs 2020-33, 67, 68, and 165. The State of Michigan presently remains in a "state of emergency" due to the Governor's declaration. *See* EO 2020-165.

On March 23, 2020, Governor Whitmer entered her first stay at home order, EO 2020-21 ("Temporary requirement to suspend activities that are not necessary to sustain or protect life."). The Governor's "stay-at-home" orders generally offered the following rationale:

> To suppress the spread of COVID-19, to prevent the state's health care system from being overwhelmed, to allow time for the production of critical test kits, ventilators, and personal protective equipment, to establish the public health infrastructure necessary to contain the spread of infection, and to avoid needless deaths, it is reasonable and necessary to direct residents to remain at home or in their place of residence to the maximum extent feasible.

*Id.* Subject to certain exceptions, the stay-at-home orders made it a misdemeanor to willfully violate any of the following provisions:

---

[1]    Plaintiffs respectfully request the Court take judicial notice of all of the Governor's executive orders issued after EO 2020-4. Under Federal Rule of Evidence 201(b), a "court may take judicial notice of at least some documents of public record." *Platt v. Bd. of Commissioners on Grievances & Discipline of Ohio Supreme Court*, 894 F.3d 235, 245 (6th Cir. 2018)(citations omitted). All Executive Orders referenced herein are attached to Ex. A, Declaration of Edward D. Greim.

2. Subject to the exceptions in section 7, all individuals currently living within the State of Michigan are ordered to stay at home or at their place of residence. Subject to the same exceptions, all public and private gatherings of any number of people occurring among persons not part of a single household are prohibited.

3. All individuals who leave their home or place of residence must adhere to social distancing measures recommended by the Centers for Disease Control and Prevention, including remaining at least six feet from people from outside the individual's household to the extent feasible under the circumstances.

4. No person or entity shall operate a business or conduct operations that require workers to leave their homes or places of residence except to the extent that those workers are necessary to sustain or protect life or to conduct minimum basic operations.

*Id.* The stay at home order did not contain any exceptions for political rallies or protests, get out the vote efforts, voter registration, or other retail politicking that typically occurs throughout a general election year. These basic prohibitions remained unchanged in several successive stay-at-home orders. See EOs 2020-42; 59; 70 (adding mask mandate); 77 (adding constitutional proviso); 92 (on May 18, 2020, retaining constitutional proviso; dividing state into regions, and allowing, in two rural regions, "social gatherings of up to 10 people" and the reopening of retail stores, offices, and restaurants and bars with limited seating); and 96 (on May 21, 2020, extending the 10-person allowance on social gatherings statewide).

### d.  A vague constitutional exception is added to the Governor's orders.

Eventually, the Governor added a constitutional exception to her orders, which stated: "Nothing in this order should be taken to interfere with or infringe on the powers of the legislative and judicial branches to perform their constitutional duties or exercise their authority. Similarly, nothing in this order shall be taken to abridge protections guaranteed by the state or federal constitution under these emergency circumstances." *See* EO 2020-92(17) (entered May 18, 2020). The Governor's "Frequently Asked Questions" section of her website interprets the provision as follows:

Q: Does Executive Order 2020-110 prohibit persons from engaging in *outdoor activities* that are protected by the First Amendment to the United States Constitution?

A: No. Persons may engage in expressive activities protected by the First Amendment within the State of Michigan, but must adhere to social distancing measures recommended by the Centers for Disease Control and Prevention, including remaining at least six feet from people from outside the person's household.

*See* Executive Order 2020-110 FAQs (emphasis added). The FAQ guidance, which by its own terms does not apply to indoor gatherings, has been in effect since at least EO 2020-21, even in circumstances where the constitutional proviso was not included in the executive order itself.

### e. The Governor inconsistently interprets and applies her Orders to First Amendment protected activities.

Since declaring a State of Emergency in March, Governor Whitmer and her executive orders have been at odds with the First Amendment. On March 31, 2020, pursuant to the Governor's Stay at Home Order, which contained no accommodations for constitutionally protected activity, police arrested a pro-life protester engaged in protected speech on a public sidewalk in Detroit. That man sued Governor Whitmer for violating his First Amendment rights. Shortly thereafter, Governor Whitmer entered into a Stipulated Order and settlement with the protester, acknowledging for the first time that his particular constitutionally protected activity was not prohibited by the Governor's orders.[2]

On June 18, under the authority of the Governor's executive order, the State Attorney General threatened to prosecute a movie theater that announced its plans to hold a "socially-distanced film festival" to participate in and honor the Juneteenth holiday. *See CH Royal Oak, LLC*

---

[2]        *See* Ex. B, Stipulated Order and Notice of Settlement in Belanger, et al., v. Whitmer, et. al. at ¶3 ("Defendants agree that Executive Order 2020-21 does not prohibit the conduct of Plaintiffs that is alleged in the Complaint.").

*v Whitmer*, No. 1:20-CV-570, 2020 WL 4033315, at *1 (W.D. Mich. July 16, 2020). Faced with this threat, the theater was forced to cancel its event. *Id.*

On June 22, Governor Whitmer suggested that she would use her asserted power over public gatherings to block an indoor Trump rally, citing the continuing requirements of wearing a face covering and the continuing limits on the size of gatherings.[3] Similarly, during an appearance on "The View," over a month earlier, on May 13, 2020, Whitmer criticized protesters who had gathered to oppose her stay-at-home orders, saying the protestors made it "much more precarious" and "in a perverse way, make it likelier that we are going to have to say in a stay-home posture."[4] Yet in between these two statements, on Thursday, June 4, Whitmer "stood shoulder to shoulder with some Detroit march participants," activists who marched against perceived racism and police violence, making up a "rolling quarter-mile of humanity."[5] At the time, Governor Whitmer was widely perceived to be vying for the Democratic Vice Presidential nomination. The Governor's office first responded to criticism by claiming that she had maintained social distancing, but numerous pictures show social distancing was not maintained, even though many attendees (and Whitmer) wore masks. Her office then claimed that the Governor did not violate her own order because peaceful protests are protected by the Constitution.[6]

Now, in EO 2020-160, Governor Whitmer has ordered extreme limits on the number of people that can join together for any common purpose or organized event, including Responsible Politicking and political speech and assembly. After some County Sheriffs questioned the legality

---

[3]    Collins, *Governor Whitmer Threatens to Block Trump Rallies in Michigan*, WBCK (Jun. 22, 2020), <https://wbckfm.com/governor-whitmer-threatens-to-block-trump-rallies-in-michigan/>
[4]    Mauger and Dickson, *With little social distancing, Whitmer marches with protesters*, The Detroit News (Jun. 4, 2020)    <https://www.detroitnews.com/story/news/local/michigan/2020/06/04/whitmer-appears-break-social-distance-rules-highland-park-march/3146244001/>.
[5]    *Id.*
[6]    *Id.* (Whitmer spokeswoman Tiffany "Brown said the unity march didn't violate [the Governor's] latest order because it states, 'Nothing in this order shall be taken to abridge protections guaranteed by the state or federal constitution.' 'That includes the right to peaceful protest.'")

of her orders, the Governor issued an Executive Directive ordering all state agencies to enforce

her executive orders, including event attendance restrictions, where local officials refuse to do so.

*See* Executive Directive 2020-08. The Michigan State Police *must* enforce violations of her orders

in the same manner as any other violation of a law written by the Legislature. Executive Directive

2020-08(4).

> **f.   EO 2020-160 bans most in-person gatherings regardless of the precautions taken against COVID.**

On July 29, 2020, Governor Whitmer issued Executive order 2020-160, her "Amended

Safe Start Order." The Governor justified the Order by citing the rise in Michigan's per capita rate

of new daily cases of COVID. Specifically, the Governor blamed the rise in cases on "large social

gatherings, often attended by young people", referencing "a single house Party in Saline; an

outbreak at a Lansing bar… and a sandbar party at Torch Lake over the July 4 weekend." EO

2020-160.

Based on this rationale, the Governor ordered that "social gathering[s] or organized

event[s] among persons not part of the same household" would be limited to 10 people if indoors

and 100 people if outdoors. EO 2020-160(7)(a)(1)-(4). The 10 person limit on indoor gatherings

applies to all indoor venues, regardless of the size of the venue and regardless of whether

precautions are taken to prevent the spread of COVID-19, such as masks and social distancing. A

willful violation of the Executive Order, including the attendance limits on social gatherings and

organized events, is a misdemeanor. EO 2020-160(17).

In the same order and at the same time the Governor justified these stringent restrictions

because of a risk that COVID might spread from "large" public gatherings, she also allowed

Detroit casinos to open subject to a 15% capacity limit. See EO 2020-160 ("I am taking the

occasion, too, to allow for the reopening of the Detroit casinos, subject to a 15% capacity limit and

strict workplace safeguards."). All three casinos in Detroit are permitted to have more than 10 people indoors under the Order.[7]

EO 2020-160 acknowledges and attempts to address its own constitutional conflicts through an exception entitled "Separation of powers." It states: "…[N]othing in this order shall be taken to abridge protections guaranteed by the state or federal constitution under these emergency circumstances." EO 2020-160(13). The EO suggests that "these emergency circumstances" impose limits on federally-guaranteed rights, but does not explain what those limits are or what qualifies as "protections guaranteed by the state or federal constitution **under these emergency circumstances**." Under the order's plain terms, an attendee at an 11 person indoor political meeting or a 101 person outdoor rally is subject to criminal penalties. A political rally of more than 100 people is banned throughout the State of Michigan, regardless of venue.

EO 2020-160 has no expiration date. It will restrict organized events in Michigan for the foreseeable future, including in the weeks and months leading up to the November 3rd election.

### g.   Plaintiffs' Planned Activities.

Plaintiffs EIF, One Nation, and their respective members desire to exercise their fundamental rights to assemble and speak in furtherance of their shared political and electoral goals by holding in-person events between now and the November election. VC43. Both Plaintiffs intend for all of their events to provide for social distancing and also intend to have masks and hand sanitizer available for use by attendees.VC45, 47.

Plaintiff EIF and its members have devoted time and resources to planning events in advance of the November election, including the following:

---

[7]    According to David Tsai, President and COO of MGM Grand Detroit, "the 15% capacity rule means that roughly 1,800 people are allowed on the casino floor at any one time." *See* Reindl, *Ready or not,  Detroit's three casinos reopen Wednesday with capacity restrictions*, Detroit Free Press (Aug. 5, 2020), <https://www.freep.com /story/money/business/2020/08/05/greektown-detroit-motorcity-casino-hotel-mgm-grand-open/5573007002/>

Tuesday, September 29: An indoor training meeting, in Ingham County, MI for 200-250 people to focus on training poll challengers for the November election.

Tuesday, October 27: An indoor meeting event in Rochester Hills, MI for approximately 200-250 attendees to rally, provide answers to last-minute questions, provide materials to poll watchers/challengers, and assign final precinct posts.

VC44. EIF also plans on holding outdoor rallies which it expects will draw attendance in excess of the limits imposed by the Governor's orders. VC45. Whether EIF holds these events as planned depends on the outcome of this litigation. See Ex. C, Declaration of Glen Sitek ("Sitek Dec."), ¶5.

Plaintiff One Nation and its members have devoted time and resources planning events to engage in dialogue regarding race and unity in advance of the November election and to develop coherent political and electoral goals related to these discussions. VC46. These events include meetings on September 11, 2020 in Rochester Hills, MI and an October 2, 2020 meeting in Lansing, MI. VC46. One Nation also plans on holding outdoor rallies which it expects will draw attendance in excess of the limits imposed by the Governor's orders. VC47. Whether One Nation holds these events as planned depends on the outcome of this litigation. See Ex. D, Declaration of Dr. Linda Lee Tarver ("Tarver Dec."), ¶5.

Plaintiffs had also planned other events prior to commencing this litigation. Sitek Dec., ¶7; Tarver Dec. ¶7. EIF had planned two other events. VC44. The first was supposed to be held on Monday August 24, consisting of an indoor reception/recruitment event for approximately 100-120 attendees in Ingham County, MI to bring together like-minded individuals who are concerned about the integrity of the ballot box. VC44. The second was an indoor debrief in Rochester Hills, MI for 50-75 attendees on August 31. VC44. This event was supposed to bring together people who worked as poll watchers and poll challengers in the August primary and in previous years. VC44. EIF planned to hear testimonials of past years, strategies for the future, and to form a policy

10

to combat voter fraud in November. VC44. One Nation had also planned a meeting in Detroit, MI on August 28, 2020. VC46.

Because events of this type were prohibited under the Governor's order and both EIF and One Nation feared that its members and event attendees would be criminally penalized under EO 2020-160 if these events were held, they canceled these events. Sitek Dec. ¶12, 17; Tarver Dec., ¶12, 17. Due to the ongoing prohibitions and the threat of prosecution under EO 2020-160, Plaintiffs will have to continue to cancel their planned in person events. VC76; Sitek Dec. ¶7; Tarver Dec. ¶7.

> **h. Plaintiffs' requests for guidance from government officials reveal a credible threat of prosecution if they hold their events as planned, and demonstrate that officials are not applying any exception for constitutionally protected activity.**

In seeking to abide by the law and the Governor's executive orders, on or about August 17, 2020, Plaintiffs sent identical letters to Governor Whitmer, Attorney General Nessel, and the county prosecutors for the counties in which the proposed events are to be held, including Ingham, Wayne, and Oakland Counties. VC 48; *see also* Ex. E, EIF Letter; Ex. F, One Nation Letter. These letters described the organizations and the events they were planning (the same events outlined above in *Plaintiffs' Planned Activities*), and then asked for a response from each of the recipients as to whether or not the proposed events would run afoul of the Governor's Executive Orders. VC48. Plaintiffs planned to use the responses to help them to determine which of their planned events they could hold, if any. VC48.

On or about August 17, 2020, Plaintiffs EIF and One Nation each sent a copy of their respective letter to the Ingham County Prosecutor's Office regarding the events they were planning as outlined above. VC49. In its letter, Plaintiff EIF informed the Prosecutor's Office that it was planning to hold two events in Ingham County.  VC50. The first was an August 24, 2020 indoor

reception and recruitment event for 100-120 people to "bring together like-minded individuals who are concerned about the integrity of the ballot box." VC50. The second was a September 29 training meeting to train poll challengers for the November election, with an expected attendance of 200- 250 people. VC50. The letter made clear that both events would provide for social distancing and masks and hand sanitizer would be provided. VC50. EIF requested an answer from the Prosecutor as to whether the events were permitted under the Governor's executive orders. VC50.

In its letter, Plaintiff One Nation informed the Prosecutor's Office that it was planning to hold a meeting in Lansing on October 2 to further its purpose of healing racial divides and promoting unity in the United States. VC51. One Nation requested an answer from the Prosecutor as to whether the events were permitted under the Governor's executive orders and whether the Ingham County Prosecutor would enforce the orders via citation or criminal complaint. VC51.

In response to Plaintiffs' separate queries regarding their respective events in Ingham County, Carol Siemon, the Ingham County Prosecutor, responded to both groups in a single email asking for more information about the planned events, including the size of the rooms in which the events would be held. VC52; Ex. G, First Aug. 18, 2020 Email from Carol Siemon to Susan Allen (EIF) and Dr. Tarver (One Nation). Ms. Siemon noted that "[a] perhaps significant factor that was not mentioned in either of your letters is the capacity of the specific venues you plan to use. Social distancing in a ballroom with a capacity for 500 persons would potentially be a very different issue from using a smaller capacity room, for example." VC52; Ex. G. Ms. Siemon also communicated to the groups that her office does "enforce the governor's executive orders (EO) via a citation or criminal complaint, but only if that is the last resort to guarantee adherence and public safety." VC52; Ex. G.

12

Before Plaintiffs had a chance to respond to Ms. Siemon's additional queries, she sent a second email informing Plaintiffs that none of the events outlined in their letters would comply with the Governor's executive orders. VC53; Ex. H, Second First Aug. 18, 2020 Email from Carol Siemon to Susan Allen (EIF) and Dr. Tarver (One Nation). Hence, not only were the events outright prohibited, the events could not take place without subjecting the attendees to potential criminal prosecution. In this second correspondence, Ms. Siemon also forwarded an opinion from "my public health director" with which she said she consulted regarding Plaintiffs' inquiries. The forwarded opinion stated:

> "The EO only allows 10 indoors. Even in a huge ballroom. Bars and restaurants are 50% capacity. Indoor gatherings are at 10. So these events aren't happening. Lansing Center is not holding any meetings or conferences. Same with Henry Center on campus and so on. I had that one interpreted by the state as well."

VC53; Ex. H. This response from the Ingham County Prosecuting Attorney herself reflects an explicit and credible threat of prosecution if Plaintiffs carry out these events as planned. VC54.

One Nation sent a copy of its letter to the Wayne County Prosecuting Attorney as well, specifically requesting an opinion on One Nation's plan to hold an indoor meeting in Detroit on August 28. VC55. On August 20, 2020, in response to that letter, One Nation representative Linda Tarver received an email from Denise Fair, Chief Public health Officer of the Detroit Health Department. VC55; Ex. I, Aug. 20, 2020 email from Denise Fair to Dr. Tarver (One Nation). Ms. Fair's email stated:

> In response to your request to hold an indoor event in Detroit and in accordance with Executive Order 2020-160, subsection 7 (3), the described One Nation MI event on August 28, 2020 in Detroit would only be permissible if there are less than 10 people with appropriate social distancing and enforcement of masks. See below for the referenced section of the Executive Order. This part of the Executive Order refers directly to indoor social gatherings or organized events, which would involve bringing together persons from multiple households at the same time for a discrete, shared or group experience in a single room, space, meeting hall, or other indoor space.

VC55; Ex. I. Dr. Tarver responded to Ms. Fair, indicating that One Nation believed it could accomplish six foot social distancing if it limited attendance to 150 people and asked if such an event would be permissible if attendees wore masks. VC56; Ex. J, August 21, 2020 email from Denise Fair to Dr. Tarver (One Nation. Ms. Fair responded, stating that "[e]ven with masks, the event with 150 people inside or outside will go against the Governor's Executive order." VC56; Ex. J.

On August 17, 2020, Plaintiffs EIF and One Nation sent copies of their respective letters to Governor Gretchen Whitmer, Attorney General Dana Nessel, and Oakland County Prosecuting Attorney Jessica Cooper requesting a response from each of them by August 21, 2020. VC57. Plaintiffs did not receive responses from any of these officials on that date, or before the filing of this suit. VC57.

At least one official responsible for enforcing the Governor's Executive Orders with respect to each planned gathering has made clear that they are enforcing them strictly and to the letter, without any exceptions for political events even where participants wear masks and socially distance. VC58. No official is applying the Governor's purported "constitution in an emergency" proviso to allow in-person, retail politicking of more than 10 people indoors or more than 100 people outdoors, regardless of any other factors or precautions. VC58. Therefore, the Governor's Executive Orders, including but not limited to EO 2020-160, are the source of Plaintiffs' injury, and if those Executive Orders are declared invalid as applied to the types of gatherings Plaintiffs are planning ("Responsible Politicking"), then Plaintiffs would be free to hold these events and engage in Responsible Politicking without fear of reprisal, citation, or prosecution by the state. VC59.

      **i.   Plaintiffs have experienced, and will continue to experience, irreparable harm because the Governor's orders have and will continue to prevent Plaintiffs from engaging in speech and conduct protected by the First Amendment.**

          **i.   Plaintiffs have already canceled some events because of the Governor's prohibitions, the lack of clarity in her orders, and the threat of prosecution if the events are held.**

Plaintiffs have already cancelled some of their planned events because of their fear of prosecution under the Governor's orders, as well as the uncertainty regarding whether their planned events fall within the Constitutional exception to the Order. Sitek Dec. ¶7. EIF planned to hold in-person events on August 24 and August 31. VC44. EIF canceled these events because they were prohibited by the Governor's order and the Governor did not respond to EIF's request for guidance as to whether it could hold its events. Sitek Dec. ¶7. EIF also was not willing to risk that the attendees would be prosecuted under EO 2020-160, as conveyed by the Ingham County Prosecutor and the Detroit Health Department. Sitek Dec. ¶¶7, 8, 9, 10, 17. One Nation planned to hold an in-person meeting on August 28th. VC46. One Nation canceled this meeting because it was prohibited by the Governor's order and the Governor did not respond to One Nation's request for guidance as to whether it could hold its events. Tarver Dec. ¶¶7, 12. One Nation also was not willing to risk that the attendees would be prosecuted under EO 2020-160, as conveyed by the Ingham County Prosecutor and the Detroit Health Department. Tarver Dec. ¶¶7, 17.

          **ii.  Plaintiffs are unable to plan future events because of the prohibitions in the Governor's Order and the Governor's failure to grant advance permission under her exception for constitutionally protected activity.**

Although Plaintiffs believe their planned events are protected by the First Amendment, it is unclear if and how the constitutional exception in 2020-160 is being applied. Sitek Dec. ¶¶8, 10, 11, 13; Tarver Dec. ¶¶8, 10, 11, 13. The local officials to whom Plaintiffs reached out for permission and guidance told Plaintiffs that the Governor's order prohibited them from holding

their events as planned. VC49-56. Thus, the Governor's order is being applied so that the only person who can grant the Governor's constitution-citing "exception" is the Governor herself. Sitek Dec. ¶11; Tarver Dec. ¶11. Plaintiffs and others cannot hold any events under the Governor's constitutional exception without first seeking permission from the Governor to do so. *Id.*

Here, Plaintiffs requested advance permission from the Governor to avail themselves of this exception but did not receive permission, or any response at all. VC48, 57; Sitek Dec. ¶12; Tarver Dec. ¶12. Thus, the Governor's restrictions on in-person events, and her failure to grant permission under her constitutional exception, has caused Plaintiffs to cancel the protected activities they already had planned and to forego planning new activities between now and the election. Sitek Dec. ¶12; Tarver Dec. ¶12. Plaintiffs feel compelled to continue cancelling their planned events and to refrain from planning any new events because it appears that, whatever the constitutional exception means, the Governor will not apply it to their situation and they will be cited for holding the events. Sitek Dec. ¶14-17; Tarver Dec. ¶14-17. Plaintiffs are deterred from holding the events because the Governor has declared it the law of the state that the events not be held, and has refused to grant advance permission under her exception. Sitek Dec. ¶12, 15; Tarver Dec. ¶12, 15. The threat of subsequent punishment if they do hold the events also deters Plaintiffs. Sitek Dec. ¶17; Tarver Dec. ¶17.

> ### iii. The prohibition on in-person events is particularly harmful to Plaintiffs because the Governor's emphasis on mail in voting renders political speech more important and impactful as voters cast their ballots weeks ahead of Election Day.

Governor Whitmer has encouraged Michiganders to vote by absentee ballot, which Plaintiffs believe makes it even more important that they engage in Responsible Politicking in the

months leading up to the election.[8] VC60. Unlike other years in which the vast majority of ballots would be cast on Election Day, hundreds of thousands or millions of votes will be cast in the weeks leading up to November 3rd. VC60. Early voting in Michigan via mail-in ballot begins in just a few weeks, on September 21, 2020. VC60. In Michigan's August 4 election, a record number of ballots -- over 1.2 million-- were cast before election day, nearly three times the number cast in advance of the August 2016 election.[9] VC60.

As the Michigan electorate complies with the Governor's insistence that they cast absentee ballots leading up to Election Day, her executive orders prevent those same voters from gathering to speak about the candidates and issues on which they are voting. VC61. Michiganders will soon be casting ballots to choose their representatives and support or oppose issues of the utmost importance, while at the same time political speech, including Responsible Politicking, is being stifled by the Governor's executive orders. VC62. The emphasis on absentee voting makes political speech even more valuable in the months leading up to the election and renders the prohibition on engaging in such conduct all the more offensive to the First Amendment.

## ARGUMENT

### I.    Standard for preliminary relief in First Amendment cases

A trial court may issue a preliminary injunction under Federal Rule of Civil Procedure 65. In determining whether to issue a preliminary injunction, courts consider four factors: (1) the threat of irreparable harm to the moving party; (2) balancing this harm with any injury an injunction

---

[8]    Press Release, Office of Governor Gretchen Whitmer, Governor Whitmer Joins Coalition of Governors to Protect Voting Rights and Voter Access (2020), <https://www.michigan.gov/whitmer/0,9309,7-387-90487-537248--,00.html> (last visited Aug. 20, 2020) ("I encourage everyone who can to make sure you're registered to vote and to request your absentee ballot as soon as possible."); Press Release, Office of Michigan Secretary of State Jocelyn Benson, Benson to mail postcards encouraging voters to apply online to vote from home (2020), <https://www.michigan.gov/sos/0,4670,7-127--536718--,00.html> (last visited Aug. 20, 2020).
[9]    Press Release, Office of Michigan Secretary of State Jocelyn Benson, Bring absent voter ballots to clerk offices and drop boxes, <https://www.michigan.gov/sos/0,4670,7-127-1640_9150-535497--,00.html> (last visited Aug. 20, 2020).

would inflict on other interested parties; (3) the probability that the movant would succeed on the merits; and (4) the effect on the public interest. *Ohio Republican Party v. Brunner*, 543 F.3d 357, 361 (6th Cir. 2008). In First Amendment cases, however, "the crucial inquiry is usually whether the plaintiff has demonstrated a likelihood of success on the merits. This is so because ... the issues of the public interest and harm to the respective parties largely depend on the constitutionality of the [state action]." *Bays v. City of Fairborn*, 668 F.3d 814, 819 (6th Cir. 2012) (internal citation omitted).

## II.   Plaintiffs should be granted a preliminary injunction allowing them to gather to hold their events

The pivotal question on each count is whether Plaintiffs have established a likelihood of success on the merits of their constitutional claims. A preliminary injunction should issue because Defendant's orders, actions, and threatened enforcement violate Plaintiffs' First Amendment Rights. With respect to each of Plaintiffs' claims, as discussed below, the sweeping prohibitions in the Governor's orders – including an outright ban on in-person gatherings of 100 or more people as millions of Michigan citizens debate and cast votes on who should govern the state and country– fail to leave sufficient breathing room for speech and assembly. They cannot survive scrutiny.

**A. Plaintiffs are likely to succeed on the merits of their First Amendment claims, eliminating the need for the Court to consider the remaining factors.**

**1.   The Governor's Executive Orders, which prohibit most in-person gatherings during a general election, constitute direct restrictions on speech which cannot survive strict scrutiny.**

Plaintiffs' proposed activities are protected by the First Amendment's guarantees of free speech and assembly. At its core, the First Amendment protects the right to espouse political views and associate for political purposes.[10] It affords the broadest protection to such political expression

---

[10]      See, e. g., *United Jewish Org. v. Carey*, 430 U.S. 144 (1977); *Bullock v. Carter*, 405 U.S. 134 (1972); *Hadley v. Junior College Dist.*, 397 U.S. 50 (1970); *Reynolds v. Sims*, 377 U.S. 533 (1964).

in order "to assure (the) unfettered interchange of ideas for the bringing about of political and social changes desired by the people." *Buckley v. Valeo*, 424 U.S. 1, 14 (1976). "Although First Amendment protections are not confined to the exposition of ideas, there is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs…"*Mills v. Alabama*, 384 U.S. 214, 218 (1966) (internal citations omitted). "These expressly guaranteed freedoms share a common core purpose of assuring freedom of communication on matters relating to the functioning of government." *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 575 (1980). Like freedom of speech, "the right of peaceable assembly was considered by the Framers of our Constitution to lie at the foundation of a government based upon the consent of an informed citizenry—a government dedicated to the establishment of justice and the preservation of liberty." *Bates v. City of Little Rock*, 361 U.S. 516, 522–23 (1960).

Plaintiffs have made plans to engage in precisely this type of protected speech and assembly. EIF plans to hold events to discuss the integrity of the state's electoral processes, how the group may help guard against the abuse of the franchise, and to recruit and train election challengers to participate in the electoral process. VC44; Sitek Dec., ¶¶3-6. One Nation plans to hold events that discuss the relationship between race and politics in order to develop and implement concrete plans to harness diversity as an asset, rather than treating it as a liability. VC46; Tarver Dec., ¶¶3-6. Both groups wish to associate and assemble to discuss and influence government affairs, actions which are at the heart of the First Amendment.

However, the Governor's orders, specifically EO 2020-160, directly restrict this protected speech and assembly. Laws that burden political speech are "subject to strict scrutiny," which requires the Government to prove that the restriction "furthers a compelling interest and is

narrowly tailored to achieve that interest." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 340 (2010) (citations omitted).

Here, the Governor cited recent outbreaks at parties and bars, claiming the in-person event prohibitions were to curtail social gatherings for the good of the community in order "to restart our economy, open our schools, and avoid a second wave." *See* EO 2020-160. The Governor must demonstrate (1) that this stated interest is compelling and (2) that preventing indoor gatherings in excess of 10 people, including Responsible Politicking, is narrowly tailored to achieve that interest. Assuming for the sake of this motion that the interest is compelling, she cannot show narrow tailoring. There is no reason to believe Plaintiffs' proposed Responsible Politicking is more dangerous than currently allowed activities, such as a bar or restaurant at 50% capacity (which may have attendance equal to Plaintiffs' planned activities), or an indoor casino floor of over 1,000 people. But Responsible Politicking is completely banned during the few weeks and months when it is most valuable: while general election votes are being solicited, discussed, and counted. For this reason alone, the Order cannot survive strict scrutiny.

**2. Alternatively, the Governor's restrictions on in-person gatherings are unconstitutional time, place, and manner restrictions because they do not leave open ample alternative channels of communication.[11]**

Even if the Court decides the Governor's restrictions on in-person gatherings are not direct restrictions on speech, they are invalid as unlawful time, place, and manner restrictions. A time, place, or manner restriction on expression must be reasonable and is only valid if it is content neutral, narrowly tailored to serve a significant governmental interest, and leaves open ample alternative channels for communication of the information. *Clark v. Cmty. for Creative Non-*

---

[11]    Plaintiffs do not concede this point and maintain that the ban on in-person activities is a direct restriction on speech subject to strict scrutiny.

*Violence*, 468 U.S. 288, 293 (1984). These requirements are conjunctive. *See, e.g., Watchtower Bible & Tract Soc'y of New York, Inc. v. Village of Stratton*, 536 U.S. 150, 168–69 (2002) (invalidating an ordinance that served a substantial government interest because it was not narrowly tailored—without discussing whether ample alternative channels of communication existed). Thus, in-person event prohibitions must both be narrowly tailored and leave open ample alternative channels for speech.

As discussed above, the Governor's restrictions on in-person gatherings, including most retail politicking, are not narrowly tailored to achieve the stated government interest: avoiding large social gatherings to prevent the spread of COVID. They "burden substantially more speech than necessary to further those interests." *Turner Broad. Sys., Inc. v. F.C.C.*, 520 U.S. 180, 189 (1997).

Banning indoor gatherings in excess of 10 people and any gathering in excess of 100 people covers far more than the stated goal of limiting large social gatherings, such as the parties cited in EO 2020-160. Meanwhile, bars, restaurants, casinos, and retail establishments are all operating, subject to the same precautions that Plaintiffs would observe, with far more than 10 people present. By failing to permit comparable sized groups from engaging in Responsible Politicking while adhering to the same precautions, the order burdens substantially more speech than is necessary to achieve the stated interest.

Further, the Governor's restrictions do not leave open adequate alternative methods of communication, preventing Plaintiffs from reaching their intended audience. While Defendant may suggest that Plaintiffs rally and train members using email or programs such as Zoom, those are qualitatively different than, and usually inferior to, in-person means. "[O]ne-on-one communication is "the most effective, fundamental, and perhaps economical avenue of political

discourse." *McCullen v. Coakley*, 573 U.S. 464, 488–89 (2014) (citing *Meyer v. Grant*, 486 U.S. 414, 424 (1988)). Additionally, remote or online communication is more costly, which may prevent groups with already limited resources from communicating altogether. Sitek Dec. ¶19; Tarver Dec. ¶19. Remote means of communication also make it more difficult to reach new listeners. *Id.* Plaintiffs, like many other grassroots organizations, rely on in-person gatherings and recruitment events to garner supporters to their cause. *Id.* "An alternative is not ample if the speaker is not permitted to reach the intended audience." *Saieg v. City of Dearborn*, 641 F.3d 727, 740 (6th Cir. 2011) (citations omitted).

More fundamentally, an absolute prohibition on in-person gatherings is far more restrictive than the typical time, place, or manner restriction, which only limits one facet of how speech and assembly occurs, rather than banning it outright.[12] The Governor's order bans most in-person political meetings no matter how, when, or where it takes place, and even if precautions against COVID-19 are taken. Such bans on assembly are more akin to the absolute prohibition struck down by the Supreme Court in *Bd. of Airport Comm'rs of City of Los Angeles v. Jews for Jesus, Inc.*, 482 U.S. 569 (1987). "On its face, the resolution at issue in this case reaches the universe of expressive activity, and, by prohibiting all protected expression, purports to create a virtual 'First Amendment Free Zone' at LAX." *Id.* at 575. The Governor's ban goes almost as far, creating a "First Amendment Free Zone" in the State of Michigan unless speech and assembly takes place under highly restrictive requirements imposed by the Governor.

---

[12]     Compare sweeping prohibition on in-person gatherings in EO 2020-160 to *Burson v. Freeman*, 504 U.S. 191, (1992) (regulating place only by prohibiting campaigning within 100 feet of polling place); *Cleveland Area Bd. of Realtors v. City of Euclid*, 88 F.3d 382 (6th Cir. 1996) (striking down law regulating manner only by restricting size, number, and placement of signs in residential neighborhoods); *Ass'n of Cmty. Organizations for Reform Now v. City of Dearborn*, 696 F. Supp. 268 (E.D. Mich. 1988) (enjoining enforcements of an ordinance regulating only time during which door to door solicitation could take place).

Because the Governor's ban on most in-person events, including in-person Responsible Politicking, burdens substantially more speech than is necessary to further any government interest and fails to leave open ample alternative methods of communicating, it fails under the First Amendment.

### 3. The Governor's restrictions on in-person gatherings are overbroad because they deter significantly more conduct than can be justified under the First Amendment.

Assuming the State has some interest in regulating gatherings to prevent the spread of COVID, the Governor's order prohibits and deters substantially more conduct than can be justified under the First Amendment. The sweeping nature of the Governor's order also ensures that it cannot be enforced in an evenhanded manner, opening the door to discriminatory enforcement. "A law is overbroad under the First Amendment if it 'reaches a substantial number of impermissible applications' relative to the law's legitimate sweep." *Schickel v. Dilger*, 925 F.3d 858, 880 (6th Cir.), *cert. denied sub nom. Schickel v. Troutman*, 140 S. Ct. 649, 205 L. Ed. 2d 388 (2019) (internal citations omitted). Due to the risk that "enforcement of an overbroad law" may "deter[ ] people from engaging in constitutionally protected speech" and may "inhibit[ ] the free exchange of ideas," the courts will strike a law on its face "if it prohibits a substantial amount of protected speech" both "in an absolute sense" and "relative to the [provision's]  plainly legitimate sweep." *Connection Distrib. Co. v. Holder*, 557 F.3d 321, 336 (6th Cir. 2009) (citing *United States v. Williams*, 553 U.S. 285 (2008)). Laws with criminal penalties, like EO 2020-160, must be scrutinized especially closely. *City of Houston, Tex. v. Hill*, 482 U.S. 451, 459 (1987).

"The first step in overbreadth analysis is to construe the challenged [provision]; it is impossible to determine whether a statute reaches too far without first knowing what the [provision] covers." *United States v. Williams*, 553 U.S. 285, 293 (2008). Here, EO 2020-160 bans all in-person social gatherings and planned events if attendance exceeds 10 people indoors or 100

people outdoors. EO 2020-160(7). A violation of the order, including the attendance limits, is criminalized as a misdemeanor. EO 2020-160(17). The Order also states: "…nothing in this order shall be taken to abridge protections guaranteed by the state or federal constitution under these emergency circumstances." EO 2020-160(13). However, as discussed above, this constitutional exception has not been applied consistently by the Governor, nor have the officials charged with enforcing the orders applied the exception to permit constitutionally protected activity, so that advance permission from the Governor herself is required before any group can safely avail itself of the exception.

The cumulative effect of the prohibitions and the failure to apply the "exception" for constitutionally protected activity is simple: Responsible Politicking and other First Amendment protected activity cannot occur unless under the capacity limits, while at the same time much commercial activity that brings together more than 10 people indoors is permitted. The murky constitutional exception cannot save the order. *United States v. Stevens*, 559 U.S. 460, 480 (2010) ("[T]he First Amendment protects against the Government; it does not leave us at the mercy of *noblesse oblige*. We would not uphold an unconstitutional statute merely because the Government promised to use it responsibly.").

Under the Order, the First Amendment is subject to a capacity limit. First Amendment protected activity in excess of that capacity limit—more than 10 indoors or 100 outdoors who socially distance and wear masks—is criminal. Thus, the in-person attendance limits prohibit a substantial amount of protected speech both in an absolute sense and relative to the statute's plainly legitimate sweep. It is overbroad.

24

**4. The Governor's restrictions on in-person gatherings are void for vagueness.**

The Governor's prohibition on in-person gatherings read in conjunction with the exception for constitutionally protected activity creates an unconstitutionally vague prohibition on First Amendment activity. A law "may be impermissibly vague because it fails to establish standards for the police and public that are sufficient to guard against the arbitrary deprivation of liberty interests." *City of Chicago v. Morales*, 527 U.S. 41, 52 (1999). The void for vagueness doctrine arises from two distinct interests: fair notice and a requirement that the lawmaker sets "reasonably clear guidelines for law enforcement officials and triers of fact in order to prevent 'arbitrary and discriminatory enforcement.'" *Smith v. Goguen*, 415 U.S. 566, 572–73 (1974); *accord Risbridger v. Connelly*, 275 F.3d 565, 572 (6th Cir.2002) (quoting *Kolender v. Lawson*, 461 U.S. 352, 357 (1983)) ("[T]he void-for vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement."). Both of these considerations are inextricably intertwined with the requirements of due process.

"Due process requires that all 'be informed as to what the State commands or forbids,' *Lanzetta v. New Jersey*, 306 U.S. 451, 453 (1939), and that 'men of common intelligence' not be forced to guess at the meaning of the criminal law. *Connally v. General Construction Co.*, 269 U.S. 385, 391 (1926).

Here, the Governor's ban on in-person gatherings, as well as her inconsistent interpretation and enforcement of her orders to prevent constitutionally protected activity, renders EO 2020-160 impermissibly vague. Michiganders (and Plaintiffs) are left to guess as to whether their Responsible Politicking is unlawful or falls within the "constitutional" exception. "It is established that a law fails to meet the requirements of the Due Process Clause if it is so vague and standardless that it leaves the public uncertain as to the conduct it prohibits...." *Giaccio v. Pennsylvania*, 382

25

U.S. 399, 402–403 (1966). The purpose of the fair notice requirement is to enable the ordinary citizen to conform his or her conduct to the law, *City of Chicago*, 527 U.S. at 58, for "[n]o one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes." *Lanzetta v. New Jersey*, 306 U.S. 451, 453 (1939).

Here, Plaintiffs cannot plan future events or hold their planned events because it is unclear whether the Governor's "exception" applies, and the only person who knows is the Governor herself. For example, the plain text of the exception is not limited only to certain types of protected activity (such as outdoor activity). EO 2020-160(13). Yet the Governor has *interpreted* her exception to only apply to some outdoor activity, and even then, that interpretation sometimes comes only after the fact, when the Governor knows the identity of those who associated and the cause they were advancing. VC105-6. Other officials interpreting and enforcing the Order are not applying the constitutional proviso at all, deferring solely to the Governor. VC58. If those officials cannot understand the exceptions, how can an ordinary citizen?

EO 2020-160 is also impermissibly vague because it establishes no standards for those who enforce the order, inviting discriminatory and arbitrary enforcement based on whether the enforcer agrees with the speech or conduct at issue. The order "necessarily entrusts lawmaking to the moment-to-moment judgment of the policeman on his beat." *City of Chicago*, 527 U.S. at 60. The order delegates absolute discretion to the Governor as to what is truly prohibited by the order and if an exception should apply. As Plaintiffs' experience shows, local officials look to the author of the order – the Governor – for standards, but find none. This unfettered discretion renders the entire system of enforcement subject to discriminatory and arbitrary application. Through the combined operation of the general in-person gathering prohibition and its exemptions, the government might seek to select the "permissible subjects for public debate" and thereby to "control ... the search for

political truth." *Consolidated Edison Co. of N.Y. v. Public Serv. Comm'n of N.Y.*, 447 U.S. 530, 538 (1980). The First Amendment requires more: a standard that can be uniformly understood by those who must follow it and those who must apply it alike.

A person attempting to comply with the law is left to get permission from the Governor (by writing a letter and hoping for a response) or from a court (by prospectively litigating whether the event falls within the constitutional exception). The Constitution does not permit a lawmaker to "set a net large enough to catch all possible offenders, and leave it to the courts to step inside and say who could be rightfully detained, and who should be set at large." *United States v. Reese*, 92 U.S. 214, 221 (1876). The Order, construed with its exception, is void for vagueness.

### 5. The Governor's restrictions on in-person gatherings constitute unlawful prior restraints on speech

A "prior restraint" exists when speech is conditioned upon the prior approval of public officials. *See, e.g., Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 553 (1975) (denial of use of public forum without procedural safeguards is unconstitutional prior restraint). Although prior restraints "are not unconstitutional per se," they come to court bearing a heavy presumption against their validity. *Id.* at 558 (citations omitted). Prior restraints are presumptively invalid because they typically involve "two evils that will not be tolerated": (1) the risk of censorship associated with the vesting of unbridled discretion in government officials; and (2) "the risk of indefinitely suppressing permissible speech" when a licensing law fails to provide for the prompt issuance of a license. *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 225-27 (1990) (plurality op.). The settled rule is that a system of prior restraint "avoids constitutional infirmity only if it takes place under procedural safeguards designed to obviate the dangers of a censorship system." *See. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 559 (1975).

27

The Governor's outright prohibition on most gatherings, with a limited and vague exception that effectively requires Michiganders to secure her advance permission before being assured that they can lawfully undertake the activity, constitutes an unlawful prior restraint. Plaintiffs' ability to exercise their First Amendment rights by engaging in retail politics via events that exceed tight attendance limits are subject to the prior approval of the Governor. Even if there is no formalized permit system in place, a permit system exists in fact. It exists in fact because of the interplay of the constitutional exception; the Governor's publicly available FAQs; the Governor's history of selectively enforcing and approving or allowing certain activities; and the reality that local officials follow the letter of the underlying prohibition, leaving the Governor as the only official who can permit an activity as falling within the constitutional exception. It is impossible for Michigan citizens to know what factors the Governor may consider in determining whether to grant permission. None appear in the Governor's orders, statutes, rules, or in any publicly available resource. The granting or denial of permission to hold a particular event, then, rests solely in the Governor's discretion, and the only method to determine whether an event is permitted is to either secure an exception from her prior restraint, or to engage in expensive, time-consuming, and unpredictable litigation, as Plaintiffs have been forced to do here.

Thus, the Governor's Order is unconstitutional for the additional reason that it functions as a prior restraint on political speech and assembly, and there are no standards that control the Governor's exercise of her discretion in permitting or refusing the application of the "constitutional" exception.

**6.** *Jacobson* **does not save an executive order which unconstitutionally infringes on the First Amendment.**

Defendant may argue that even if her Order would ordinarily violate the constitution, she can sharply limit political speech and assembly during a general election because of the

coronavirus. Her Order itself suggests as much, providing that "nothing in this order shall be taken to abridge protections guaranteed by the state or federal constitution *under these emergency circumstances…*" In *Jacobson v. Massachusetts*, 197 U.S. 11 (1905), the Supreme Court rebuffed a substantive due process challenge to a statute requiring vaccination for smallpox. *Id.* at 13. But *Jacobson* cannot save the Governor's Order. That Court began its analysis by noting that there are constitutional limits on a state's police powers:

> The mode or manner in which [police powers] are to be accomplished is within the discretion of the state, subject, of course, so far as Federal power is concerned, only to the condition that no rule prescribed by a state, nor any regulation adopted by a local governmental agency acting under the sanction of state legislation, shall contravene the Constitution of the United States, nor infringe any right granted or secured by that instrument. A local enactment or regulation, even if based on the acknowledged police powers of a state, must always yield in case of conflict with the exercise by the general government of any power it possesses under the Constitution, or with any right which that instrument gives or secures.

*Id.* at 25 (citations omitted). The Court went on to acknowledge that the measures taken in the name of the public health must be "justified by the necessities of the case." *Id.* at 28. Here, Plaintiffs ask this Court to exercise its power to enforce the First Amendment, a specifically-enumerated right. If the Governor cites COVID to limit in-person gatherings, that restriction must be limited to what is reasonably required to combat the identified threat while protecting fundamental rights, as *Jacobson* demands. As shown above, a century of post-*Jacobson* cases that (unlike *Jacobson*) actually apply the First Amendment now provide a framework for making this inquiry: where core political speech and assembly is seriously burdened, the state must show a compelling interest and, at the very least, narrow tailoring. Further, more nuanced doctrines have developed for First Amendment injuries that also impair procedural due process, including the overbreadth, vagueness, and prior restraint problems pled here. Thus, *Jacobson* does not instruct that an "emergency" justifies a single official in assuming the sole authority for weeks, months or

years on end to decide what forms of political assembly are constitutional, with no published criteria or standards. [13]

The Sixth Circuit has recognized *Jacobson*'s limitations. Earlier this year in a challenge to a Kentucky order prohibiting mass gatherings, including church services, the Court explicitly acknowledged *Jacobson* but enjoined the order pending appeal.[14] *See Maryville Baptist Church, Inc. v. Beshear*, 957 F.3d 610, 611 (6th Cir. 2020). The court took issue with the order's disparate treatment of comparable religious and non-religious activities. *Id.* at 613. By way of example, the court noted, "The orders permit uninterrupted functioning of typical office environments, which presumably includes business meetings. How are in-person meetings with social distancing any different from drive-in church services with social distancing?" *Id.* (internal citations and quotations omitted). The court did not "doubt the Governor's sincerity in trying to do his level best to lessen the spread of the virus or his authority to protect the Commonwealth's citizens", but opined that:

> [R]estrictions inexplicably applied to one group and exempted from another do little to further these goals and do much to burden religious freedom. Assuming all of the same precautions are taken, why is it safe to wait in a car for a liquor store to open but dangerous to wait in a car to hear morning prayers? Why can someone safely walk down a grocery store aisle but not a pew? And why can someone safely interact with a brave deliverywoman but not with a stoic minister? The Commonwealth has no good answers.

*Id.*

The same analysis applies here: the Governor's order inexplicably applies to groups like the Plaintiffs who wish to engage in indoor Responsible Politicking yet do not apply to others who are permitted to gather under comparable physical circumstances in casinos, or at bars and

---

[13]    "While the law may take periodic naps during a pandemic, we will not let it sleep through one." *Maryville Baptist Church, Inc. v. Beshear*, 957 F.3d 610, 615 (6th Cir. 2020).
[14]    The standard for a stay pending appeal is the same as a preliminary injunction. *See Maryville Baptist Church,* 957 F.3d at 612 (citing *Nken v. Holder*, 556 U.S. 418, 434, 129 S.Ct. 1749, 173 L.Ed.2d 550 (2009)) (identifying same four factors).

restaurants. Assuming all the same precautions are taken, why is it safer to go to the bar than to a training session to become an election challenger? Why can someone safely shoot craps with 1800 other Michiganders but not meet with 10 others to discuss the upcoming election? Neither the Governor nor *Jacobson* can provide a suitable answer to these questions.

**B.  If the Court does consider the other three factors beyond likelihood of success on the merits, they weigh in favor of granting a preliminary injunction.**

Because Plaintiffs have demonstrated that they are likely to succeed on the merits of their First Amendment claims, the Court need not consider the three remaining factors. *Bays,* 668 F.3d at 819. However, if they are considered, each factor – irreparable harm to Plaintiffs, lack of harm to others, and the public interest – weigh in favor of granting Plaintiffs' requested injunctive relief. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns,* 427 U.S. 347, 373 (1976). Moreover, "if the plaintiff shows a substantial likelihood that the challenged law is unconstitutional, no substantial harm to others can be said to inhere its enjoinment", for "'it is always in the public interest to prevent violation of a party's constitutional rights.'" *Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville and Davidson Cnty.,* 274 F.3d 377, 400 (6th Cir.2001) (quoting *G & V Lounge, Inc. v. Michigan Liquor Control Comm'n,* 23 F.3d 1071, 1079 (6th Cir.1994)).

1.  **The loss of First Amendment freedoms for any period of time constitutes irreparable harm.**

The First Amendment to the Constitution of the United States guarantees the rights of citizens to be free from laws which "abridge[e] the freedom of speech, or of the press; or the right of the people peaceably to assemble." U.S. Const. amend. I. Plaintiffs are unable to engage in retail politicking because of the Governor's order. Retail politicking, including political rallies, meetings, and other events to further electoral goals are core political speech protected by the First

Amendment. *See Buckley*, 424 U.S. at 14. A government-imposed prohibition on these protected activities due to EO 2020-160 constitutes an ongoing loss of First Amendment freedoms. It is well-settled that "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod,* 427 U.S. at 373; *see also Newsom v. Norris,* 888 F.2d 371, 378 (6th Cir.1989). Thus, Plaintiffs will continue to experience irreparable harm absent injunctive relief.

### 2. The public interest factors weigh in favor of granting an injunction.

While the public surely has an interest in combating COVID-19, that interest does not trump the First Amendment rights of Plaintiffs and others to engage in Responsible Politicking. "[I]t is always in the public interest to prevent the violation of a party's constitutional rights." *G & V Lounge, Inc. v. Michigan Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994) (citing *Gannett Co., Inc. v. DePasquale,* 443 U.S. 368, 383 (1979). "[T]he public as a whole has a significant interest in ensuring equal protection of the laws and protection of First Amendment liberties. Thus, the public interest would be advanced by issuance of a preliminary injunction enjoining enforcement of those portions of the challenged [orders] that are of questionable constitutionality." *Dayton Area Visually Impaired Persons, Inc. v. Fisher*, 70 F.3d 1474, 1490 (6th Cir. 1995). The public interest is served by the *exercise* of these rights, not just merely by the fact that the rights themselves are not actively being violated. Because the public interest is served both by the exercise of First Amendment rights and the absence of infringements on those same rights, this factor weighs in favor of injunctive relief. Additionally, neither the Governor nor the people of the State of Michigan have a legally protectable interest in enforcing an unconstitutional executive order and therefore cannot be harmed if enforcement is enjoined. *See Women's Med.*

*Prof'l Corp. v. Voinovich*, 130 F.3d 187, 193 (6th Cir. 1997) *("*[I]f a [law] is unconstitutional on its face, the State may not enforce the statute under any circumstances.").

Finally, although she has not done so in EO 2020-160, it is both possible and feasible for the Governor to permit retail politicking that is conducted in a responsible manner, i.e. Responsible Politicking, which furthers the State's interest while preserving citizens' constitutional rights. This proposition is supported by the fact that the Governor permits some gatherings in excess of 10 people to occur indoors, provided that precautions (i.e. masks, social distancing) are taken to hold the event in a responsible manner. Plaintiffs propose to do precisely that: to gather in rooms large enough to socially distance, with masks and hand sanitizer available to attendees. There is no rational basis why no more than 10 people can gather indoors for a political rally, but dozens or hundreds of people may gather indoors for others reasons, such as gambling in a Detroit casino. "Exemptions from an otherwise legitimate regulation of a medium of speech may be noteworthy for a reason quite apart from the risks of viewpoint and content discrimination: They may diminish the credibility of the government's rationale for restricting speech in the first place. See, *e.g., Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 424–426 (1993)." *City of Ladue v. Gilleo*, 512 U.S. 43, 52–53 (1994).

Because the Governor has no legitimate interest in enforcing an unconstitutional executive order and it is feasible for the Governor to accommodate protected First Amendment activity while also advancing her self-declared priorities related to combatting COVID-19, the Governor would not be harmed by the injunctive relief requested.

### C.  Conclusion

For the foregoing reasons, Plaintiffs respectfully request that the Court grant their motion and enter the requested injunctive relief.

33

Respectfully submitted this 4th day of September, 2020.

GRAVES GARRETT, LLC

*/s/ Edward D. Greim*
Edward D. Greim
Special Counsel, Thomas More Society
Missouri Bar No. 54034
GRAVES GARRETT, LLC
1100 Main Street, Suite 2700
Kansas City, Missouri 64105
Tel.: (816) 256-3181
Fax: (816) 222-0534
edgreim@gravesgarrett.com

*Attorney for Plaintiffs*

## CERTIFICATE OF COMPLIANCE

Pursuant to LCivR 7.2(b)(ii), I, Edward D. Greim, certify that this brief contains 10, 790 words exclusive of the case caption, cover sheets, any table of contents, any table of authorities, the signature block, attachments, exhibits, and affidavits as calculated by Microsoft Word 2019.

Respectfully submitted this 4th day of September, 2020.

GRAVES GARRETT, LLC

*/s/ Edward D. Greim*
Edward D. Greim
Special Counsel, Thomas More Society
Missouri Bar No. 54034
GRAVES GARRETT, LLC
1100 Main Street, Suite 2700
Kansas City, Missouri 64105
Tel.: (816) 256-3181
Fax: (816) 222-0534
edgreim@gravesgarrett.com

*Attorney for Plaintiffs*

34

## <u>CERTIFICATE OF SERVICE</u>

I, Edward D. Greim, certify that on September 4, 2020, a copy of the foregoing was filed with the Clerk of the Court using the CM/ECF system, which sent notification to the following via e-mail:

Neil Anthony Giovanatti
Samantha Loree Reasner
Assistant Attorney General
Michigan Department of Attorney General
Health, Education & Family Services Division
P.O. Box 30758
Lansing, MI 48909
(517) 335-7603
giovanattin@michigan.gov
reasners@michigan.gov

Respectfully submitted this 4th day of September, 2020.

**GRAVES GARRETT, LLC**

*/s/ Edward D. Greim*
Edward D. Greim
Special Counsel, Thomas More Society
Missouri Bar No. 54034
GRAVES GARRETT, LLC
1100 Main Street, Suite 2700
Kansas City, Missouri 64105
Tel.: (816) 256-3181
Fax: (816) 222-0534
edgreim@gravesgarrett.com

*Attorney for Plaintiffs*