UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ELECTION INTEGRITY FUND AND
ONE NATION MICHIGAN,

       Plaintiffs,

v

GRETCHEN WHITMER, in her official
capacity as GOVERNOR OF THE
STATE OF MICHIGAN,

       Defendant.

Case No. 1:20-cv-00805

HON. PAUL J. MALONEY

MAG. PHILLIP J. GREEN

**ORAL ARGUMENT REQUESTED**

---

Edward D. Greim
Graves Garrett, LLC
Special Counsel, Thomas More Society
Missouri Bar No. 54034
Attorney for Plaintiffs
1100 Main Street, Suite 2700
Kansas City, MO 64105
(816) 256-3181
edgreim@gravesgarrett.com

Neil Giovanatti (P82305)
Samantha Reasner (P81148)
Michigan Dep't of Attorney General
Assistant Attorneys General
Attorneys for Defendant
P.O. Box 30758
Lansing, MI 48909
(517) 335-7603
GiovanattiN@michigan.gov
ReasnerS@michigan.gov

---

**DEFENDANT'S BRIEF IN SUPPORT OF HER
MOTION TO DISMISS IN LIEU OF AN ANSWER**

# TABLE OF CONTENTS

<u>Page</u>

Table of Contents.................................................................................................i

Introduction ....................................................................................................... 1

Statement of Facts ............................................................................................. 3

Standard of Review .......................................................................................... 10

Argument .......................................................................................................... 10

I.     Plaintiffs lack standing to contest the 100-person limitation for outdoor
events............................................................................................................ 10

II.    The crowd-size limitation for indoor events is entitled to deference
under *Jacobson v Massachusetts.* ...................................................... 11

     A.    *Jacobson* deference applies and forecloses Plaintiffs' challenges
to the crowd-size limitation on indoor events. ...................................... 14

     B.    Plaintiffs' arguments miss the mark and fail to overcome the
great deference owed under *Jacobson.* .................................................. 17

III.   Even if *Jacobson* does not apply to the crowd-size limitation for indoor
events, the limitation passes constitutional muster, and Plaintiffs fail
to state a claim. ........................................................................................... 20

     A.    The crowd-size limitation is not a prior restraint................................ 20

          1.    The crowd-size limitation for indoor events does not
regulate the expressive element of Plaintiffs' conduct.............. 21

          2.    The misdemeanor penalty contained in the executive
orders constitutes a subsequent punishment............................ 26

     B.    The crowd-size limitation is a content neutral time, place, and
manner restriction.................................................................................. 27

          1.    The challenged limitation is content neutral and
intermediate scrutiny applies. .................................................... 27

          2.    The crowd-size limitation is a reasonable time, place, or
manner restriction that withstands intermediate scrutiny....... 29

     C.    The crowd-size limitation is not unconstitutionally overbroad............ 33

    D.    The separate of powers provision does not render the crowd-size limitation unconstitutionally vague. ..................................................... 35

Conclusion and Relief Requested ................................................................... 39

Certificate of Compliance With Local Civil Rule (b)(i) ............................... 39

Certificate of Service .................................................................................... 40

## INTRODUCTION

The seriousness of the COVID-19 pandemic is beyond dispute.  It has claimed thousands of lives in Michigan alone and hundreds of thousands worldwide.  And it is not done taking its toll—particularly in the United States, which has been experiencing an alarming resurgence of the virus in many states.  Thanks to limited and temporary limitations on in-person work and activities, Michigan has had more success than most in staving off the rampant spread of the virus and thus far averting the dramatic spike in infections seen elsewhere in the country.  This has required nimble action by the Governor and this State's top public health officials, who have been constantly and carefully evaluating and calibrating the restrictions to meet the ever-changing needs and circumstances presented by this pandemic.

Plaintiffs allege constitutional violations as a result of one of these restrictions—the limitation on the number of individuals who may gather for indoor events and social gatherings.  Since June 1, 2020, events and gatherings have been limited to 10 people at a time indoors and 100 people at a time outdoors for most of the State.  This regulation is generally applicable and has been crucial in preventing the spread of the virus.

Here, Plaintiffs only allege plans to hold indoor events, yet purportedly seek to challenge both the indoor and outdoor crowd-size limitations on events and gatherings.  Plaintiffs' allegations are inadequate to challenge the outdoor limitation, and Plaintiffs lack standing to pursue such challenge.

Plaintiffs also cannot sustain a First Amendment challenge against the crowd-size limitation for indoor events and gatherings.  The well-settled rule of law

1

from *Jacobson v. Commonwealth of Massachusetts,* 197 U.S. 11 (1905), permits a state, in times of public health crises, to reasonably restrict the rights of businesses and individuals alike in order to secure the safety of the community.  The restriction that Plaintiffs challenge is part of a broader network of response efforts to suppress the spread of COVID-19 and avoid many needless deaths.  Under *Jacobson*'s highly deferential review, Plaintiffs' claims fail.

Even under more generic First Amendment scrutiny, Plaintiffs' claims still fail as a matter of law.  The government may impose reasonable time, place, or manner restrictions on protected speech if the restrictions are content neutral, narrowly tailored to serve a significant government interest, and leave open ample channels for communication of the information.  Executive Order (E.O.) 2020-160, and its successor, E.O. 2020-176, temporarily limit the size of indoor events and gatherings to serve the vital government interest of minimizing the spread of COVID-19.  The regulation is content neutral; in fact, it is not directed at speech at all.  It is also narrowly tailored and leaves ample alternative methods of speech: the limitation expands to 100 people for outdoor events, which have a lower risk of contagion, and places no limits on the number of events Plaintiffs could hold or their ability to hold virtual events.  The 10-person limitation on indoor events is also in no way a "prior restraint" as it does not restrain or target any expressive conduct.  Nor is it unconstitutionally overbroad or vague.  Whatever the legal rubric, Plaintiffs' claims lack merit, and this Court should dismiss the complaint in its entirety.

## STATEMENT OF FACTS

**The nature of the COVID-19 pandemic.**

The facts surrounding the COVID-19 pandemic are well-established.  SARS-CoV-2 is similar to other coronaviruses (a large family of viruses that cause respiratory illnesses), but the strain is novel.  There is no general or natural immunity built up in the population (meaning everyone is susceptible), no vaccine, and no known treatment to combat the virus itself (as opposed to treatment to mitigate its symptoms).

It is widely known and accepted that COVID-19, the disease that results from the virus, is highly contagious, spreading easily from person to person via "respiratory droplets."[1]  Experts agree that being anywhere within six feet of an infected person puts you at a high risk of contracting the disease.[2]  But even following that advice is not a sure-fire way to prevent infection.  The respiratory droplets from an infected person can land on surfaces and be transferred many hours later to the eyes, mouth, or nose of others who touch the surface.  Moreover, since many of those infected experience only mild symptoms, a person could spread

---

[1] World Health Organization, *Transmission of SARS-CoV-2:  implications for infection prevention precautions* (July 9, 2020), available at https://www.who.int/news-room/commentaries/detail/transmission-of-sars-cov-2-implications-for-infection-prevention-precautions (attached as Ex. A).

[2] Centers for Disease Control and Prevention, *Social Distancing, Keep a Safe Distance to Slow the Spread* (July 15, 2020), available at https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/social-distancing.html (attached as Ex. B).

the disease before he even realizes he is sick.[3]  Most alarmingly, a person with COVID-19 could be not yet symptomatic, but still spread the disease.[4]

Because there is no way to immunize or treat for COVID-19, the Centers for Disease Control and Prevention (CDC) have indicated that the best way to prevent illness is to "avoid being exposed."[5]  In keeping with this advice, governmental entities have stressed the critical import of "social distancing," the practice of avoiding public spaces and limiting travel and in-person interactions.[6]

With this in mind, the CDC explained that "[i]ndoor spaces are more risky than outdoor spaces where it might be harder to keep people apart and there's less ventilation."[7]  Indeed, studies show that "sharing indoor space is a major SARS-CoV-2 infection risk."[8]  For example, one preliminary study showed that "[t]he odds that a primary case transmitted COVID-19 in a closed environment was 18.7 times

---

[3] Nathan W. Furukawa, *et al.*, *Evidence Supporting Transmission of Severe acute Respiratory Syndrome Coronavirus 2 While Presymptomatic or Asymptomatic* (July 2020), https://wwwnc.cdc.gov/eid/article/26/7/20-1595_article (explaining that "[o]ne report suggested that up to 13% of infections may be transmitted during the presymptomatic period of illness") (attached as Ex. C).

[4] *Id.* (noting that "an increasing number of reports have indicated that some infected persons may not exhibit signs or symptoms of illness, including persons who are presymptomatic (SARS-CoV-2 RNA is detectable before symptom onset) or asymptomatic (SARS-CoV-2 RNA is detectable but symptoms never develop)").

[5] (Ex. B.)

[6] (*Id.*)

[7] CDC, *Deciding to Go Out* (September 11, 2020), available at https://www.cdc.gov/coronavirus/2019-ncov/daily-life-coping/deciding-to-go-out.html (attached as Ex. D).

[8] Hua Qian, *et al.*, *Indoor transmission of SARS-CoV-2* (April 7, 2020), available at https://www.medrxiv.org/content/10.1101/2020.04.04.20053058v1.full.pdf (attached as Ex. E).

greater compared to an open air environment."[9]  Additionally, the *time* in which a person spends in one place affects the rate of transmission—the CDC noted that "spending *more time* with people who may be infected increases your risk of becoming infected" and infecting others.[10]

**The Governor's response to the COVID-19 pandemic.**

On March 10, 2020, in response to the growing pandemic in Michigan, Governor Whitmer declared a state of emergency and invoked the emergency powers available to the Governor under Michigan law.[11]  On March 13, 2020, she issued E.O. 2020-5, which prohibited assemblages of 250 or more people in a single shared space with limited exceptions.  Yet, even in the face of the social distancing recommendations and the six-foot rule, on Saturday, March 14, 2020, the public was out in droves.  Two days later, Governor Whitmer ordered various places of public accommodation, like restaurants, bars, exercise facilities, and movie theatres, to close their premises to the public.  And, on March 17, 2020, she issued an order

---

[9] Hiroshi Nishiura, *et al.*, *Closed environments facilitate secondary transmission of coronavirus disease 2019* (April 16, 2020), available at https://www.medrxiv.org/content/10.1101/2020.02.28.20029272v2 (attached as Ex. F); *see also* Lorenz G. Buonanno, *et al.*, *Quantitative assessment of the risk of airborne transmission of SARS-CoV-2 infection:  Prospective and retrospective applications* (September 6, 2020), available at https://www.sciencedirect.com/science/article/pii/S0160412020320675?via%3Dihub (attached as Ex. G).

[10] (Ex. D.)

[11] All executive orders issued by the Governor can be accessed at https://www.michigan.gov/whitmer/0,9309,7-387-90499_90705---,00.html.

rescinding E.O. 2020-5, changing the cap on assemblages to 50 persons in a single shared indoor space and expanding the scope of exceptions from that cap.

On March 23, 2020, Governor Whitmer issued E.O. 2020-21, which essentially ordered all persons not performing essential or critical infrastructure job functions to stay in their place of residence, other than to obtain groceries, care for loved ones, engage in outdoor activity consistent with social distancing, and other limited exceptions.  The order also prohibited, with limited exceptions, all public and private gatherings of any number of people that are not part of a single household.

Over the weeks that followed, Governor Whitmer reissued Stay Home, Stay Safe orders periodically, adjusting their scope as needed and appropriate to match the ever-changing circumstances presented by this pandemic.  The complementary restrictions on access to certain places of public accommodation also remained in place.  For example, on May 21, 2020, Governor Whitmer issued E.O. 2020-96, which permitted social gatherings of no more than 10 people.  (E.O. 2020-96(8)(a)(21).)  On June 1, 2020, Governor Whitmer issued E.O. 2020-110, which continued the incremental reopening of the State by removing what was left of the default "stay home" requirement and replacing previous restrictions with narrower and more permissive limitations on certain gatherings, events, and businesses. (E.O. 2020-110.)  Included in E.O. 2020-110 was the first iteration of the crowd-size limitations on events and social gatherings at issue in this case, capping indoor

events and gatherings at 10 people and outdoor events and gatherings at 100 people.  (E.O. 2020-110(5)-(6).)

Additional orders followed, continuing the incremental reopening, each maintaining the similar 10-person and 100-person restrictions on the number of attendees permitted at indoor and outdoor events and gatherings respectively, for the majority of the State.[12]  Pertinent to this case, E.O. 2020-160, issued on July 29, 2020, made these 10-person/100-person limitations applicable statewide, explaining that the State's "progress in suppressing the disease . . . appear[ed] to have stalled" at least in part because of "super-spreading events at large social gatherings." (E.O. 2020-160(7), Preamble.)

After Plaintiffs' filed their Complaint, on September 3, 2020, Governor Whitmer issued E.O. 2020-176, which rescinded E.O. 2020-160.[13]  E.O. 2020-176 continues the 10-person crowd-size limitations for indoor events and gatherings across the State.  (E.O. 2020-176(6)(a); see also E.O. 2020-181.)  It also maintains the 100-person limitation for outdoor events and gatherings, except in Regions 6

---

[12] On June 5, 2020, Governor Whitmer issued E.O. 2020-115, which applied to and lifted many restrictions in Regions 6 (northern Lower Peninsula) and 8 (Upper Peninsula), including increasing the permitted number of people at indoor social gatherings to 50 people and for outdoor social gatherings to 250 people.  (E.O. 2020-115(7)(a).)

[13] In the Complaint and Plaintiffs' motion for preliminary injunction, Plaintiffs challenge the restrictions in E.O. 2020-160.  To the extent this action is limited to E.O. 2020-160, Plaintiffs' claims are moot because E.O. 2020-160 is no longer in effect.  *See Chafin v. Chafin*, 568 U.S. 165, 172 (2013) (claims moot "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome") (cleaned up); *Ky. Right to Life, Inc. v. Terry*, 108 F.3d 637, 644 (6th Cir 1997) (the legislative repeal of a statute renders a case challenging that statute moot).

(northern Lower Peninsula) and 8 (Upper Peninsula), where the limitation has increased to 250 people.  (*Id.* ¶¶ (6)(a), (8)(a).)

**Plaintiffs' Complaint and motion for preliminary injunctive relief.**

Plaintiff Election Integrity Fund (EIF) alleges that it is a nonprofit entity and its "primary purpose" is "maintain[ing] the integrity of electoral processes, preserving the purity of elections, and guarding against the abuse of the elective franchise." (Compl. ¶ 63, PageID.17.)  EIF also alleges that it planned to hold events—all indoors—on August 24, August 31, September 29, and October 27.  (*Id.* ¶ 44, PageID.11.)  The events would focus on "poll challengers," including training, strategizing, and providing information for such "poll challengers" in advance of the November general election.  (*Id.* ¶ 44, PageID.11.)

Plaintiff One Nation Michigan alleges that it is an unincorporated association and that its "primary purpose" is "promoting reasonable and responsible dialogue on race . . . ."  (*Id.* ¶ 64, PageID.17.)  One Nation states that it planned to host meetings—again, all indoors—on August 28, September 11, and October 2.  (*Id.* ¶ 46, PageID.12.)  One Nation's events would allegedly include discussions "regarding race and unity in advance of the November election . . . ."  (*Id.* ¶ 46, PageID.12.)

Plaintiffs contend that the crowd-size limitation for indoor events and gatherings contained in E.O. 2020-160 (now E.O. 2020-176) would inhibit their ability to host their planned indoor events with over 10 people, thereby infringing on their First Amendment speech rights.  Their complaint alleges:  (1) the E.O. is a violation of Plaintiffs' first amendment rights as a direct restriction or as an

8

unlawful time, place, and manner restriction (*id.* ¶¶ 79, 82, PageID.19-20); (2) the

E.O is a violation of the first amendment's overbreadth doctrine (*id.* ¶ 97,

PageID.22); (3) the E.O. is void for vagueness (*id.* ¶ 133, PageID.29); and (4) the

E.O. is a violation of Plaintiffs' first amendment rights as an unlawful prior

restraint (*id.* ¶ 148, PageID.31).

      For the reasons stated below, Plaintiffs' complaint should be dismissed in its

entirety.

9

## STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 12(b)(6), "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up).  This "plausibility" review is "a context-specific task" that requires the reviewing court to determine whether the plaintiff has not just "alleged," but pleaded facts sufficient to "show[]," an entitlement to relief that is actually plausible, and not merely "conceivable" or "possible."  *Id.* at 679, 680. "[F]acts that are merely consistent with a defendant's liability" are not enough.  *Id.* at 678.  And in making this assessment, courts are only to consider facts that are truly well pleaded:  they are not to take as true "legal conclusions," including when "couched as a factual allegation," nor "mere conclusory statements" or "naked assertions devoid of further factual enhancement."  *Id.* at 678–79 (cleaned up).

## ARGUMENT

### I.     Plaintiffs lack standing to contest the 100-person limitation for outdoor events.

To the extent Plaintiffs challenge the 100-person limitation for outdoor events covering most of the Lower Peninsula (E.O. 2020-176(6)(a)), they lack standing to pursue this claim.

Plaintiffs "must demonstrate standing for each claim [they] seek[] to press and for each form of relief that is sought." *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017) (internal quotations omitted).  To demonstrate

standing, Plaintiffs must allege a "concrete and particularized" injury that is traceable to the challenged action. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560 (1992).

While Plaintiffs passingly allege, in cursory and conclusory fashion, that they "intend[] to hold outdoor rallies which [they] expect[] will draw attendance in excess of the limits imposed by the Governor's orders" (Compl. ¶¶ 45, 47, PageID.11–12), they do not allege that they are actually planning to host an outdoor event, let alone an outdoor event with over 100 people in attendance.  Each of the events that Plaintiffs allege they planned are indoor events.  (*Id.* ¶¶ 44, 46, PageID.11–12.)

Thus, as Plaintiffs do not allege any injury traceable to the 100-person limitation on outdoor events, Plaintiffs fail to establish standing to challenge the outdoor limitation.  *See Iqbal*, 556 U.S. at 678–79 (making clear that "mere conclusory statements" or "naked assertions devoid of further factual enhancement" are inadequate to state a claim for relief) (cleaned up).

## II.   The crowd-size limitation for indoor events is entitled to deference under *Jacobson v Massachusetts.*

The crowd-size limitation for indoor events is a proper exercise of the authority given to the States to combat a public health crisis.  It has long been recognized that state actors, when faced with "great danger[ ]," are permitted great latitude to secure the public health.  *Jacobson*, 197 U.S. at 29; *see also S. Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613, 1613–14 (2020) (Roberts, C.J., concurring) (recognizing state officials' "broad" latitude in managing COVID-

19 restrictions).  As *Jacobson* and *South Bay* reflect, the Supreme Court, recognizing the separation of powers and the limits on the judiciary to invade the authority of a co-equal branch, has steadfastly refused to "usurp the functions of another branch of government" by second-guessing the executive's exercise of police power in such circumstances.  *Jacobson*, 197 U.S. at 28; *see also S. Bay*, 140 S. Ct. at 1614 (holding that executive judgment in managing COVID-19 "should not be subject to second-guessing by an unelected federal judiciary, which lacks the background, competence, and expertise to assess public health and is not accountable to the people") (internal quotations omitted).  Indeed, as the Sixth Circuit recently reaffirmed, "the police power retained by the states empowers state officials to address pandemics such as COVID-19 largely without interference from the courts."  *League of Independent Fitness Facilities and Trainers v. Whitmer*, 814 F. App'x 125, 127 (6th Cir. 2020) ("*LIFFT*").

Since the start of the COVID-19 pandemic, courts around the country have applied *Jacobson*'s deferential standard to orders intended to combat the virus that implicate enumerated constitutional rights, including those under the First Amendment.  *See, e.g.*, *S. Bay*, 140 S. Ct. at 1614 (applying *Jacobson* to claims under the Free Exercise Clause); *LIFFT*, 814 F. App'x at 127 (applying *Jacobson* to equal protection claims); *In re Abbott*, 954 F.3d 772, 784 (5th Cir. 2020) (applying *Jacobson* to substantive due process claims); *Geller v. De Blasio*, No. 20 CV 3566, 2020 WL 2520711, at *3, 4–5 (S.D.N.Y. May 18, 2020) (applying *Jacobson* to First Amendment speech claims challenging the restrictions on gatherings for political

protests); *Martin v Warren*, No. 20-CV-6538, 2020 WL 5035612 (W.D.N.Y. Aug. 26, 2020) (denying motion for PI challenging the constitutionality of an E.O. restricting gatherings and reasoning that First Amendment challenge must be reviewed "through the 'lens' of *Jacobson*").

As this ever-growing body of caselaw reflects, while the State's authority during this pandemic is not limitless, *Jacobson* mandates that deference to the State's decisionmaking is paramount, and that courts abstain from interfering with restrictions imposed in response to the pandemic unless there is "no real or substantial relation" between the restriction and public health and safety, or the restriction is "beyond all question, a plain palpable invasion of rights." *Jacobson*, 197 U.S. at 31.

As the Sixth Circuit explained, overcoming *Jacobson* deference is "no easy task." *LIFFT*, 814 F. App'x at 128.  The challenged restriction is presumed constitutional and it is "incumbent upon Plaintiffs to negate 'every conceivable basis which might support' it" under a rational basis review.  *Id.* at 128 (quoting *Armour v. City of Indianapolis*, 566 U.S. 673, 681 (2012)).  This analysis requires a plaintiff to "disprove all possible justifications for the [o]rder regardless whether those justifications actually motivated the Governor's decisionmaking."  *Id.* (citation omitted).  And the restriction "need not be the most effective or least restrictive measure possible to attempt to stem the spread of COVID-19."  *Id.* at 129 (citation omitted).  As this Court has aptly summarized, "[u]nder *Jacobson*, the Court cannot second-guess the executive's power during a pandemic unless the executive

promulgates a completely baseless rule."  *CH Royal Oak, LLC v. Whitmer*, No. 1:20-cv-570, 2020 WL 4033315, at \*6 (W.D. Mich. July 16, 2020) (citing *LIFFT*).

### A.  *Jacobson* deference applies and forecloses Plaintiffs' challenges to the crowd-size limitation on indoor events.

There is no viable path for Plaintiffs around *Jacobson*'s well-settled rule and the great deference it affords to the Governor's decisions and actions in response to this pandemic.  The 10-person limitation for indoor events is by no means "completely baseless."  *Id.*  To the contrary, it plainly has a "real or substantial relation" to protecting public health during this pandemic and is not "beyond all question, a plain, palpable invasion of rights secured by the fundamental law."  *Jacobson*, 197 U.S. at 31.

First, the 10-person crowd-size limitation for indoor events has a "real and substantial relation" to slowing the spread of COVID-19.  As the CDC has explained, "[i]ndoor spaces are more risky than outdoor spaces where it might be harder to keep people apart and there's less ventilation."[14]  Indeed, at least one study has found that "[t]he risk of infection indoors is almost 19 times higher than in open-air environment."[15]  And this risk only increases further based on the number of people present and the duration of their congregation.[16]  Accordingly, the Governor's executive orders have, among other things, placed number caps and

---

[14] (Ex. D.)

[15] (Ex. F.)

[16] (Ex. D.)

social distancing requirements on events and social gatherings—with significantly tighter restrictions for indoor ones than outdoor ones, commensurate with the level of risk each type generally poses.  These limitations plainly have a "real or substantial relation" to suppressing the spread of COVID-19.

For the second *Jacobson* inquiry, the 10-person limitation for indoor social events is not "beyond all question, a plain, palpable invasion" of Plaintiffs' rights. *Jacobson*, 197 U.S. at 31.  In their motion for preliminary injunction, Plaintiffs contended that their First Amendment speech rights are "specifically-enumerated rights."  (Pls.' Memo. at 29, PageID.104.)  But Plaintiffs do not allege—and cannot demonstrate—a fundamental right to gather indoors with more than 10 people at a time, particularly when ample other options remain available for Plaintiffs to exercise their speech rights.  And more fundamentally, *Jacobson* is clear that its deferential standard of review applies to alleged infringements of "*all* rights," including those "secured by the fundamental law."  *Jacobson*, 197 U.S. at 26, 31 (emphasis added).  Correspondingly, courts have frequently upheld against First Amendment challenges a variety of crowd-size limitations and other measures taken in response to the public health needs created by this pandemic, including stay home orders and temporary bans on gatherings of *any* size.  *See, e.g.*, *Geller*, 2020 WL 2520711, at *3, 4–5 (declining to enjoin New York City officials from

enforcing a restriction on all non-essential gatherings where the plaintiff sought to conduct a political protest and raised First Amendment speech claims).[17]

Moreover, as discussed in greater detail below, the 10-person limitation is generally applicable, content-neutral, and allows for ample other speech activities, including outdoor events with up to 100 attendees at a time, successive indoor events with up to 10 attendees at a time, and virtual meetings of any size. Thus, Plaintiffs cannot articulate a First Amendment violation, let alone a violation that is "beyond all question, plain" and "palpable."

For these reasons, *Jacobson* deference applies to, and forecloses, Plaintiffs' challenge to the crowd-size limitation for indoor events. Plaintiffs' claims, therefore, fail as a matter of law and must be dismissed.

---

[17] *See also, e.g.*, *Illinois Republican Party v. Pritzker*, No. 20-2175, 2020 WL 5246656 (7th Cir. Sept. 3, 2020); *CH Royal Oak*, 2020 WL 4033315; *Lebanon Valley Auto Racing Corp. v. Cuomo*, No. 1:20-CV-0804, 2020 WL 4596921 (N.D.N.Y. Aug. 11, 2020); *Murphy v. Lamont*, No. 3:20-CV-0694, 2020 WL 4435167 (D. Conn. Aug. 3, 2020); *Geller v. Cuomo*, No. 20 Civ. 4653, 2020 WL 4463207 (S.D.N.Y. Aug. 3, 2020); *Antietam Battlefield v. Hogan*, No. CCB-20-1130, 2020 WL 2556496 (D. Md. May 20, 2020). This includes challenges under the religion clauses of the First Amendment. *See, e.g.*, *S. Bay*, 140 S. Ct. 1613; *Cavalry Chapel Dayton Valley v. Sisolak*, No. 19A1070, __ S.Ct. __, 2020 WL 4251360 (July 24, 2020); *Elim Romanian Pentecostal Church v. Pritzker*, 962 F.3d 341 (7th Cir. June 16, 2020); *Harvest Rock Church, Inc. v. Newsom*, No. LACV 20-6414, 2020 WL 5265564 (C.D. Cal. Sept. 2, 2020); *Whitsitt v. Newsom*, No. 2:20 CV 00691, 2020 WL 4818780 (E.D. Cal. Aug. 19, 2020); *High Plains Harvest Church v. Polis*, No. 1:20-CV-01480, 2020 WL 4582720 (D. Colo. Aug. 10, 2020); *Cavalry Chapel of Bangor v. Mills*, No. 1:20-cv-00156, 2020 WL 2310913 (D. Maine May 9, 2020); *Cross Culture Christian Center v. Newsom*, No. 2:20-cv-00832, 2020 WL 2121111 (E.D. Cal. May 5, 2020); *Cassell v. Snyders*, No. 20 C 50153, 2020 WL 2112374 (N.D. Ill. May 3, 2020).

**B.      Plaintiffs' arguments miss the mark and fail to overcome the great deference owed under *Jacobson*.**

In resisting this conclusion, Plaintiffs, in their previously filed motion for preliminary injunction, argued that the indoor events limitation "inexplicably applies" to Plaintiffs but not to casinos, restaurants, and bars.  (Pls.' Memo. at 30–31, PageID.105–06.)  This misses the mark, legally and factually, for three reasons.

First, it ignores that, while the crowd-size limitation on events and gatherings does not govern these establishments' operations across the board, the limitation does still apply to them; these establishments are no more capable than Plaintiffs of hosting an indoor event or gathering exceeding 10 people.  That is because of the difference in risk posed by events and gatherings, on the one hand, and these establishments' general operations, on the other.  Accompanying guidance makes this point, and its rationale, perfectly clear:

> The separate capacity limits applicable to restaurants, food courts, cafes, coffeehouses, bars, taverns, brew pubs, breweries, microbreweries, distilleries, wineries, tasting rooms, special licensees, clubs, and like places do not allow for larger social gatherings or events to take place by reason of the fact that they are held at such venues.  A central risk of a large social gathering or event is that the people who have congregated for that gathering or event will interact with one another over a long period of time.  That same level of risk is not present among people who happen to be in the same establishment and are seated at different tables.[18]

---

18 E.O. 2020-176 FAQ, https://www.michigan.gov/coronavirus/0,9753,7-406-98178_98455-538942--,00.html; E.O. 2020-160 FAQ, https://www.michigan.gov/coronavirus/0,9753,7-406-98178_98455-535202--,00.html.  Plaintiffs also ignore that, in allowing casinos to resume limited operations throughout the state, the Governor explained that casinos "have been operating safely across most of the country and in tribal areas in Michigan," in contrast to the "super-spreading" problems that have continued to flare from gatherings.  (E.O. 2020-160, Preamble, p. 1.)

Second, as this guidance reflects, these establishments' general operations are governed by strict occupancy and other safety restrictions contained in separate executive orders.  (*See, e.g.*, E.O. 2020-175(8), (15) (current restaurant, bar, and casino restrictions)); E.O. 2020-161(8), (15) (previous restaurant, bar, and casino restrictions)).  While Plaintiffs, at times, generally gesture toward this fact when invoking these other establishments, they do not suggest that they plan to abide by all the restrictions that these establishments must follow.  Instead, it seems Plaintiffs simply want to choose for themselves what measures they view as sufficiently safe for their indoor meetings.

Third, and most fundamentally, even if Plaintiffs' offered comparison had some merit, it hardly "disprove[s] all possible justifications" for the crowd-size limitation on indoor events, as it must under *Jacobson*.  *LIFFT*, 814 F. App'x at 128.  To be constitutional, the crowd-size limitation "need not be the most effective or least restrictive measure possible to attempt to stem the spread of COVID-19."  *Id.* at 129 (citation omitted).  Plaintiffs may question the limitation's wisdom or efficacy, and they may prefer a different rule (or none at all).  But none of that bears on the legal viability of their claims.  "Shaping the precise contours of public health measures entails some difficult line-drawing.  Our Constitution wisely leaves that task to officials directly accountable to the people."  *Id.*  Plaintiffs have not alleged that the crowd-size limitation for indoor events is "completely baseless," *CH Royal Oak*, 2020 WL 4033315, at *6, and has "*no* real or substantial relation"

18

to suppressing the spread of COVID-19, *Jacobson*, 197 U.S. at 31 (emphasis added)—as they must to state a plausible claim for relief.

Plaintiffs also relied on *Maryville Baptist Church, Inc. v. Beshear*, 957 F.3d 610 (6th Cir. 2020) (*see* Pls.' Memo. at 30, PageID.105), but that analogy fares no better.  In *Maryville*, the Sixth Circuit struck down, under the Free Exercise Clause, an executive order in Kentucky that banned all gatherings for religious worship, regardless of whether they were indoors or outdoors and regardless of the number of congregants, while providing "exceptions for comparable secular activities."  *Maryville*, 957 F.3d at 611, 614.  *Maryville* involved a different constitutional right than is at issue here, and the categorical prohibition it struck down is miles from the crowd-size limitation challenged in this case.  This limitation does not prohibit Plaintiffs from meeting in-person or engaging in any form of expressive activity; it simply places a cap on how many people can gather in person for those meetings at one time.  And as discussed, contrary to Plaintiffs' characterization, there are no "exceptions" from the limitation for casinos, bars, and restaurants, nor are those establishments' general operations "comparable" in terms of risk.

Indeed, *Maryville* itself seems to belie Plaintiffs' attempted reliance on it, noting that, if the "problem [wa]s numbers" in attendance at religious gatherings, "then there is a straightforward remedy: *limit the number of people who can attend a service at one time*."  *Id.* at 615 (emphasis added).  This is precisely what the Governor's executive orders do here.  And as ample caselaw confirms, such

limitations are a sound and fully constitutional response to the threat posed by COVID-19.  *See, e.g.*, *Cavalry Chapel*, __ S.Ct. __, 2020 WL 4251360 (letting stand a COVID-19 crowd-size limitation applicable to religious services regardless of a venue's size or the social distancing measures implemented, while allowing casinos and other entertainment facilities to open at 50 percent of their maximum capacity); n 18, *supra*.

Given the wide latitude and deference owed to the State's actions under *Jacobson* and the clear rational basis supporting the temporary restriction on the number of attendees at indoor events and gatherings, Plaintiffs' claims must be dismissed.

**III.    Even if *Jacobson* does not apply to the crowd-size limitation for indoor events, the limitation passes constitutional muster, and Plaintiffs fail to state a claim.**

**A.    The crowd-size limitation is not a prior restraint.**

Plaintiffs allege that the crowd-size limitation for indoor events functions as a prior restraint.  (Compl. ¶¶ 139–156, PageID.29–32.)  Generally, prior restraints are presumed invalid because they are "tantamount to censorship and thought control."  *Polaris Amphitheater Concerts, Inc. v. City of Westerville*, 267 F.3d 502, 506 (6th Cir. 2001) (citing *Near v. Minnesota*, 283 U.S. 697, 713 (1931)).  But this limitation is not a prior restraint for two reasons:  (1) the limitation does not regulate the expressive element of Plaintiffs' speech, and (2) the misdemeanor penalty contained in the executive orders is a subsequent punishment.

### 1.    The crowd-size limitation for indoor events does not regulate the expressive element of Plaintiffs' conduct.

A prior restraint "exists when the exercise of a First Amendment right depends on the prior approval of public officials." *Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville,* 274 F.3d 377, 400 (6th Cir. 2001); *see also Polaris*, 267 F.3d at 508 ("The essence of the prior restraint doctrine is censorship—a system in which bureaucrats screen material and remove from it parts that are considered too harmful or offensive for public consumption."). But "[n]ot every governmental action that affects future expression is a prior restraint." *CH Royal Oak*, 2020 WL 4033315, at *3. Rather, while the First Amendment protects a broad range of speech and conduct, the prohibition on prior restraints only applies to "conduct with a significant expressive element that drew the legal remedy in the first place." *Arcara v. Cloud Books, Inc.*, 478 U.S. 697, 706 (1986). Here, Plaintiffs' potential unlawful action is the holding of events with over 10 people indoors at one time, and not the planned expressive activity at any such events. Thus, the prior restraint doctrine does not apply.

In *Arcara v. Cloud Books, Inc.*, 478 U.S. 697, 699 (1986), the Supreme Court assessed a constitutional challenge arising from the closure of an adult bookstore following an investigation that revealed that it was being used for the solicitation of prostitution. *Id.* This discovery "formed the basis of a civil complaint . . . seeking closure of the premises" under a state law that declared buildings used in the solicitation of prostitution to be nuisances. *Id.* The bookstore then challenged the

imposition of the closure remedy as an infringement of its constitutionally protected bookselling activities.  *Id.* at 700.

     In reviewing the bookstore's First Amendment claim, the Court noted its earlier holding in *United States v. O'Brien*, 391 U.S. 367, 376 (1968), which provided that "when 'speech' and 'nonspeech' elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms."  *Arcara*, 478 U.S. at 700.  The Court nevertheless concluded that the *O'Brien* test for evaluating the validity of the government's interest in imposing incidental limitations on expression simply was not implicated by the closure of the bookstore. *Id.* at 705.  It explained:

> [W]e have not traditionally subjected every criminal and civil sanction imposed through legal process to 'least restrictive means' scrutiny simply because each particular remedy will have some effect on the First Amendment activities of those subject to sanction.  Rather, we have subjected such restrictions to scrutiny only where it was conduct with a significant expressive element that drew the legal remedy in the first place, . . . or where a statute based on a nonexpressive activity has the inevitable effect of singling out those engaged in expressive activity . . . .

*Id.* at 706–07.  Accordingly, the Court held that the case before it "involve[d] neither situation" and concluded that "the First Amendment is not implicated by the enforcement of a public health regulation of general application against the physical premises in which respondents happen to sell books."  *Id.*

     This holding makes clear that a sanction imposed, or threatened to be imposed, pursuant to a generally applicable law does not trigger First Amendment scrutiny—even where the sanction results in a burden on expression.  *See CH Royal*

*Oak*, 2020 WL 4033315, at \*3–4 (analyzing *Acara*).  And this makes sense.  As explained in *Arcara*, "every civil and criminal remedy imposes some conceivable burden on First Amendment protected activities."  *Arcara*, 478 U.S. at 706; *see also City of Dallas v. Stanglin*, 490 U.S. 19, 25 (1989) ("It is possible to find some kernel of expression in almost every activity a person undertakes—for example, walking down the street or meeting one's friends at a shopping mall—but such a kernel is not sufficient to bring the activity within the protection of the First Amendment."). Indeed, "[o]ne liable for a civil damages award has less money to spend on paid political announcements or to contribute to political causes, yet no one would suggest that such liability gives rise to a valid First Amendment claim."  *Arcara*, 478 U.S. at 706 (citation omitted).  Therefore, a restriction or government action is subject to First Amendment scrutiny only where (1) "it was conduct with a significant expressive element that drew the legal remedy in the first place," or (2) "where a statute based on a nonexpressive activity has the inevitable effect of singling out those engaged in expressive activity."  *Id.* at 706–07.

Neither situation is present here.  Under E.O. 2020-176 (and previously E.O. 2020-160), Plaintiffs are temporarily unable to host events with over 10 people indoors at one time or 100 people outdoors at one time.  This limitation has *nothing* to do with the political nature or expressive elements of Plaintiffs' alleged events; rather, it is directed at protecting the public health by prohibiting events and gatherings with crowd sizes that present a heightened risk of infection.  Thus, the

speech component is immaterial.  What matters is reasonably limiting sustained

congregations of people, particularly indoors, in the midst of a pandemic.

This Court, in *CH Royal Oak*, similarly determined that the temporary

restriction on opening a movie theater did not regulate the expressive conduct of an

indoor film festival that the theater intended to host.  2020 WL 4033315, at *4–5.

Rather, the restriction was "directed at protecting the public health by keeping

business that present a heightened risk of coronavirus infection from opening."  *Id.*

at *4.  It "d[id] not matter what kind of event [the theater] had planned to throw"

because, even though the "film festival certainly ha[d] an expressive element," "it

[wa]s not the speech of the festival" that was regulated but "simply the congregation

of large crowds, indoors, for hours at a time."  *Id.*  The same analysis applies here:

the orders' limitation is directed at preventing the spread of the virus from events

and gatherings and is unrelated to the type or purpose of the event or gathering.

Like in *Ancara*, Plaintiffs may not "claim special protection from governmental

regulations of general applicability simply by virtue of [its] First Amendment

protected activities."  *Ancara*, 478 U.S. at 705.

Nor is there evidence or allegations that the limitation has the "inevitable

effect of singling out" Plaintiffs or anyone else engaged in expressive activities.  *Id.*

at 707.  To the contrary, it is content neutral and generally applicable.

Plaintiffs contend that the inclusion of a "[s]eparation of powers" provision in

E.O. 2020-160, which is also included in E.O. 2020-176, creates an exception to the

crowd-size limitation and that somehow Governor Whitmer is the only person who

can determine if the purported exception applies.  (Compl. ¶¶ 123, 130–31, 134, PageID.27–29.)  But this provision does not create an exception to the crowd-size limitation—or, for that matter, to any other portion of the executive orders.  As this Court instructed in *CH Royal Oak*, the separation of powers provision simply "preserve[s] the *Jacobson* framework."  2020 WL 4033315, at *6 (finding that the provision "protect[s] individuals' constitutional rights to the extent that they are protected under *Jacobson*").[19]  Plaintiffs' attempt to manufacture an exception to the crowd-size limitation by referencing the separation of powers provision is accordingly unsupported.

The crowd-size limitation for indoor events is unambiguous and does not lend itself to selective enforcement based on the expressive content of the event or gathering.  As Plaintiffs have conceded, "the reality [is] that local officials follow the letter of the underlying prohibition" regarding the number of people who may gather indoors.  (Pls.' Memo. at 28, PageID.103.)  And Plaintiffs' allegations regarding their interactions with local officials reflect uniform enforcement of the indoor event limitation.  (*See* Compl. ¶¶ 49–58, PageID.12–15.)  Thus, even in Plaintiffs' experience, there is no selective enforcement or "singling out" based on their expressive conduct.  *Arcara*, 478 U.S. at 707; *see also CH Royal Oak*, 2020 WL 4033315, at *5 ("EO 2020-110 does not have the 'inevitable effect' of singling out expressive activity.").  Plaintiffs also do not allege that the Governor somehow

---

[19] *CH Royal Oak* addressed the separation of powers provision in E.O. 2020-110, which is substantively identical to the provision in E.O. 2020-160 and E.O. 2020-176.  *Compare* E.O. 2020-110(15) *with* E.O. 2020-160(13) and E.O. 2020-176(13).

granted prior approval for any indoor events or gatherings.  In fact, Plaintiffs again concede that, "[t]o Plaintiffs' knowledge," the Governor has "never acknowledged an exception" for such.  (Compl. ¶ 128, PageID.28.)

Therefore, as the crowd-size limitation for indoor events and gatherings generally applies regardless of the expressive conduct of any such event or gathering, it does not create a prior restraint.

### 2.     The misdemeanor penalty contained in the executive orders constitutes a subsequent punishment.

As its name suggests, "[t]he term prior restraint is used 'to describe administrative and judicial orders *forbidding* certain communications when issued in advance of the time that such communications are to occur.'"  *Alexander v. United States*, 509 U.S. 544, 550 (1993) (emphasis added).  Thus, "[a]n action taken after the speech is expressed, like a punishment for disfavored speech, is not a prior restraint."  *Novak v. City of Parma*, 932 F.3d 421, 432 (6th Cir. 2019) (citing *Alexander*, 509 U.S. at 554).

The penalty for "a willful violation" of the executive orders, including the crowd-size limitation for indoor events and gatherings, is a misdemeanor violation. (E.O. 2020-160(17); E.O. 2020-176(18).)  This penalty is a subsequent punishment as it only occurs after the willful violation.  *See CH Royal Oak*, 2020 WL 4033315, at *5.  Plaintiffs do not allege that they would somehow be punished in advance of their planned indoor meetings.

For these reasons, Plaintiffs have not stated a plausible claim that the crowd-size limitation contained in E.O. 2020-160 or E.O. 2020-176 constitutes a prior restraint.  Plaintiffs' claims fail as a matter of law and must be dismissed.

**B.     The crowd-size limitation is a content neutral time, place, and manner restriction.**

In addition to contesting the crowd-size limitation for events and gatherings as a prior restraint, Plaintiffs also allege that the limitation violates their First Amendment rights by adversely impacting their "ability to effectively advance their jointly held political and electoral goals."  (Compl. ¶ 77, PageID.19; *see also id.* ¶¶ 69–88, PageID.18–21.)  Though Plaintiffs assert that the Court should apply strict scrutiny to the limitation, the limitation is a content neutral regulation and therefore, at most, intermediate scrutiny should apply.

**1.     The challenged limitation is content neutral and intermediate scrutiny applies.**

The Supreme Court has long held that regulations that target speech based on its content are subject to strict scrutiny.  *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015); *Turner Broad. Sys. v. FCC*, 512 U.S. 622, 641–42 (1994).  However, "[i]n contrast, regulations that are unrelated to the content of speech are subject to an intermediate level of scrutiny, because in most cases they pose a less substantial risk of excising certain ideas or viewpoints from the public dialogue."  *Id.* (citing *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984)).

The main inquiry to determine if a regulation is content neutral or content based is "whether the government has adopted [the] regulation of speech because of [a] disagreement with the message it conveys." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989); *see also Reed*, 576 U.S. at 163.  If the regulation "confer[s] benefits or impose[s] burdens on speech without reference to the ideas or views expressed are in most instances content-neutral." *Turner*, 512 U.S. at 643.

Here, E.O. 2020-160 and E.O. 2020-176 are first and foremost public health regulations.  The orders are calculated to slow the spread of COVID-19, thereby saving the lives of Michigan residents.  Even a cursory review reveals that the executive orders nowhere reference speech or communication; instead, they contain words and phrases that are generally associated with conduct.  In other words, E.O. 2020-160 and E.O. 2020-176 target the spread of COVID-19 in a content-neutral fashion.

The crowd-size limitation for events and gatherings likewise applies neutrally.  The limitation does not "draw[ ] distinctions based on the message," *Reed*, 576 U.S. at 156, "distinguish among different speakers, allowing speech by some but not others," *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 340 (2010), or, in its application, "require enforcement authorities to examine the content of the message that is conveyed to determine whether a violation has occurred," *McCullen v. Coakley*, 573 U.S. 464, 479 (2014) (internal quotation omitted).  Instead, the limitation applies to events and gatherings regardless of the content of their messages.

28

Plaintiffs do not argue that the crowd-size limitation is content based. Rather, Plaintiffs contend that any burden on political speech—whether content neutral or content based—is subject to strict scrutiny.  (*See* Compl. ¶¶ 78, 80, PageID.19.)  Putting aside whether the meetings that Plaintiffs allege they have planned should be considered political speech, caselaw is clear that, even for regulations that in some way burden potential political speech, a regulation is subject to intermediate scrutiny if it is content neutral.  *See McCullen*, 573 U.S. at 480–81 (content neutral regulation on location of political speech related to abortion subject to intermediate scrutiny); *see also, e.g., CH Royal Oak*, 2020 WL 4033315, at *5–6 (applying intermediate scrutiny to an order that allegedly impinged on a movie theater's political speech); *Geller*, 2020 WL 2520711, at *4 (applying intermediate scrutiny to a content neutral restriction on all social gatherings, including political protests).

Because the crowd-size limitation is content neutral, intermediate scrutiny at most should apply.

> **2.      The crowd-size limitation is a reasonable time, place, or manner restriction that withstands intermediate scrutiny.**

Intermediate scrutiny requires that restrictions that burden speech "are narrowly tailored to serve a significant government interest, and . . . leave open ample alternative channels for communication of the information."  *Ward*, 491 U.S. at 791 (quoting *Clark*, 468 U.S. at 293).

Here, the crowd-size limitation for indoor events and gatherings certainly serves a significant government interest in attempting to reduce the spread of COVID-19 within indoor settings, where the virus is the most easily transmitted. From *Jacobson* through *LIFFT*, courts have consistently recognized that the State has a significant interest in protecting public health and limiting the spread of disease.  Plaintiffs do not allege otherwise.  (*See* Compl. ¶¶ 82–84, PageID.20.)

The crowd-size limitation is also "narrowly tailored to serve" the interest of reducing the spread of the virus.  *Ward*, 491 U.S. at 791.  For this requirement, "the Supreme Court has repeatedly noted that 'when a content-neutral regulation does not entirely foreclose any means of communication, it may satisfy the tailoring requirement even though it is not the least restrictive or least intrusive means of serving the statutory goal.'"  *CH Royal Oak*, 2020 WL 4033315, at *5 (quoting *Hill v. Colorado*, 530 U.S. 703, 726 (2000)).  This requirement is met if the regulation "promotes a substantial government interest that would be achieved less effectively absent the regulation."  *Ward*, 491 U.S. at 798–99.  Here, the limitation promotes the State's interest in reducing the spread of COVID-19, and this State interest would be "less effectively" achieved absent the regulation given that the virus is known to spread in large indoor gatherings.  *Id.*; *see also CH Royal Oak*, 2020 WL 4033315, at *5 ("[T]he government interest of protecting the public from the coronavirus would be achieved less effectively if large groups were permitted to gather for sustained periods.").

Moreover, the temporary crowd-size limitation does not in any way foreclose Plaintiffs' ability to host meetings and spread their messages.  They could host online events without restriction, they could host multiple outdoor events with up to 100 attendees, and they could host multiple indoor events with 10 people or less.

In their motion for preliminary injunction, Plaintiffs contended that the crowd-size limitation is not sufficiently tailored because bars, restaurants, casinos, and other businesses are allowed to have more than 10 people indoors.  (Pls.' Memo. at 21, PageID.96.)  But as discussed, that comparison is factually inapt and disregards (1) the distinctions in risk of COVID-19 spread presented by these establishments' general business operations and by events and social gatherings, (2) the corresponding fact that these establishments are subject to the crowd-size limitation for any events and gatherings they themselves host, and (3) the further fact that these establishments must follow other extensive safety restrictions, including substantially reduced occupancy.  (*See, e.g.*, E.O. 2020-175(16)(b) (casinos limited to 15% occupancy).)

More fundamentally, the comparison is legally irrelevant; to be adequately tailored, the crowd-size limitation need not be "'the least restrictive or least intrusive means of serving'" the State's goal.  *CH Royal Oak*, 2020 WL 4033315, at *5 (quoting *Hill*, 530 U.S. at 726).  And, Plaintiffs do not allege that the effort to reduce the spread of the virus is impaired, rather than furthered, by the crowd-size limitation or that they somehow lack any other means to share their message.  Thus, the narrowly tailored requirement is satisfied.

Finally, the crowd-size limitation on indoor gatherings and events leaves open alternative channels of expression.  As discussed, Plaintiffs could host their events in numerous different manners without violating the limitation.  As the Sixth Circuit has held, "[a]n alternative channel of communication can be adequate even when the speaker is denied its best or favored means of communication." *Harrington v. City of Brentwood*, 726 F.3d 861, 865 (6th Cir. 2013).  While Plaintiffs may prefer to have large, indoor, in-person events, alternative channels to communicate their messages are amply available, including virtual meetings, staggered indoor meetings not exceeding the 10-person threshold, and outdoor meetings of substantially larger size.  And although Plaintiffs aver that virtual meetings can be expensive and are less effective than in-person communications (Compl. ¶¶ 84-85, PageID.20), they allege nothing in support of that conclusory claim nor, more fundamentally, do they contend that virtual meetings are unavailable.  They simply prefer indoor meetings with more than 10 people in attendance at one time.  But the First Amendment does not entitle Plaintiffs to their first choice in that regard.  *Harrington*, 726 F.3d at 865; *see also City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 43, 47 (1986) (holding that the First Amendment did not require the government to ensure alternative channels at "bargain prices").

Accordingly, the crowd-size limitation for indoor events and gatherings meets intermediate scrutiny.  Plaintiffs' claims fail as a matter of law and must be dismissed.

**C.      The crowd-size limitation is not unconstitutionally overbroad.**

Under the First Amendment's overbreadth doctrine, an individual may bring

a facial challenge to a regulation on the basis that its "very existence may cause

others not before the court to refrain from constitutionally protected speech or

expression." *Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973).  If a law is

determined to violate the overbreadth doctrine, the enforcement of the law is

"forbidden until and unless a limiting construction or partial invalidation so

narrows it as to remove the seeming threat or deterrence to constitutionally

protected expression." *Id.* at 613.  But, importantly, because the application of the

overbreadth doctrine operates to completely forbid enforcement of the law at issue,

it is considered "strong medicine" and "has been employed by the Court sparingly

and only as a last resort." *Id.*

Application of the overbreadth doctrine is also "less rigid" when the law at

issue regulates conduct in a "neutral, noncensorial manner." *Id.* at 614.

Overbreadth challenges rarely succeed when the law "is not specifically addressed

to speech or to conduct necessarily associated with speech (such as picketing or

demonstrating)." *Virginia v. Hicks*, 539 U.S. 113, 124 (2003).  Where the law at

issue regulates conduct, the "overbreadth of a [law] must not only be real, but

*substantial* as well, judged in relation to the [law's] plainly legitimate sweep."

*Broadrick*, 413 U.S. at 615 (emphasis added).

The burden to demonstrate that substantial overbreadth exists rests on the

plaintiff.  *Hicks*, 539 U.S. at 122; *Connection Distrib. Co. v. Holder*, 557 F.3d 321,

337 (6th Cir. 2009) ("[T]he question is not whether the claimant can imagine some

overbreadth; it is whether the claimant can show substantial overbreadth.").  And, to meet the burden of showing substantial overbreadth, the plaintiff is prohibited from "leveraging a few alleged unconstitutional applications of the statute into a ruling invalidating the law in all of its applications."  *Connection Distrib. Co.*, 557 F.3d at 340.

Here, Plaintiffs fail to meet their burden to show that the crowd-size limitation for indoor events and gatherings is substantially overbroad.  They summarily conclude that the limitation prohibits "constitutionally protected conduct" to an extent that "is far too substantial compared to any legitimate sweep of the orders—that is, the conduct that constitutionally could be prohibited." (*See* Compl. ¶ 94, PageID.21.)  Plaintiffs, however, ignore that the limitation does not prohibit any conduct or speech—it simply caps the number of people who can be gathering in person at one time, in a manner commensurate with the risk of infection posed by that gathering.  And their allegations never identify what exactly they view as falling within and beyond the limitation's "legitimate sweep," explain what makes that purported disparity unconstitutionally "substantial," or otherwise provide anything beyond conclusory conjecture and bare assertions to support their claim of overbreadth.

And, in any event, the limitation is not substantially overbroad.  As discussed above, it is content neutral, generally applicable, and designed to further the State's legitimate—indeed, compelling—interest in suppressing the spread of

this highly contagious, potentially fatal, and as-yet untreatable virus.  The limitation is well tailored to its purpose and fully constitutional.

Accordingly, the "strong medicine" of invalidating the crowd-size limitation under the overbreadth doctrine is not warranted, and Plaintiffs' claims should be dismissed.

> **D.**      **The separate of powers provision does not render the crowd-size limitation unconstitutionally vague.**

Distinct from the First Amendment analyses discussed above, Plaintiffs also allege that the "[s]eparation of powers" provision in the executive orders renders the crowd-size limitation for indoor events "void for vagueness."  (*See* Compl. ¶¶ 118–38, PageID.26–29.)  As discussed, this provision states, in relevant part, that "nothing in this order shall be taken to abridge protections guaranteed by the state or federal constitution under these emergency circumstances."  (E.O. 2020-160(13); E.O. 2020-176(13).)  This claim of unconstitutional vagueness fails.

Courts apply a two-part test to determine whether a law is unconstitutionally vague:  first, the law must give a person of "ordinary intelligence a reasonable opportunity to know what is prohibited, so that [they] may act accordingly[;]" and second, the standards of enforcement must be precise enough to avoid "involving so many factors of varying effect that neither the person to decide in advance nor the jury after the fact can safely and certainly judge the result."  *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972) (internal citation omitted).

Here, Plaintiffs offer nothing meaningful to suggest that the crowd-size limitation for indoor events and gatherings cannot be understood by a person of ordinary intelligence or that it provides an unconstitutionally imprecise standard of enforcement.  The limitation is clear:  10 people at a time for indoor events and gatherings.  (*See* E.O. 2020-160(7)(a); E.O. 2020-176(6)(a).)

Instead, Plaintiffs attempt to manufacture ambiguity about this limitation by referencing the separation of powers provision.  But this provision is likewise easily understood by a person of ordinary intelligence and can be precisely enforced.

As this Court previously explained, the separation of powers provision "preserve[s] the *Jacobson* framework."  *See CH Royal Oak*, 2020 WL 4033315, at *6. The Court described the provision as "protect[ing] individuals' constitutional rights to the extent that they are protected under *Jacobson*."  *Id.*  Thus, the purpose of the separation of powers provision is not to create exceptions to the crowd-size limitation—or any other sections of E.O. 2020-160 or 2020-176—but to acknowledge the constitutional guarantees afforded under *Jacobson* even in the time of a global pandemic.  A person of ordinary intelligence would not jump to invent an exception to the specific and clear crowd-size limitation for indoor events and gatherings based on this general separation of powers provision.  And Plaintiffs' forced overreading of the separation of powers provision does not create uncertainty or vagueness.[20]

---

[20] Indeed, as discussed, Plaintiffs do not have a viable claim, even absent *Jacobson* deference, that the orders' crowd-size limitation infringes on any First Amendment rights that may attach to their planned indoor meetings.  Thus, no matter how the

In addition, Plaintiffs allege nothing that shows any unconstitutional vagueness in how the separation of powers provision interacts with the enforcement of the crowd-size limitation as to their planned indoor events.  Indeed, the only allegation Plaintiffs offer of purported enforcement of this limitation demonstrates a clear standard for enforcement.  Both the Ingham County prosecutor and the City of Detroit Health Department provided Plaintiffs with the same answer when Plaintiffs requested to exceed the crowd-size limitation for their planned indoor meetings—no, Plaintiffs could not hold their indoor events beyond the limitation. (Compl. Exs. C, D, E, F, PageID.45–54.)  So, Plaintiffs do not need to "guess" whether they may hold their events indoors beyond the crowd-size limitation—as the plain text of executive orders provides, and as law enforcement has uniformly advised Plaintiffs, they cannot.  (Compl. ¶ 130, PageID.28.)

Plaintiffs likewise  pleaded nothing to show that law enforcement is selectively enforcing the crowd-size limitation for indoor events and gatherings due to the separation of powers provision, or that there is "arbitrary and discriminatory enforcement" of the indoor events limitation as a result of that provision.  *Grayned*, 408 U.S. at 108.

At bottom, Plaintiffs are trying to use the doctrine of vagueness to secure an exemption from a limitation it understands, but simply disagrees with and would

---

separation of powers provision may be read, it has no bearing on the permissibility of Plaintiffs' planned meetings.  Correspondingly, removing the provision—and thereby eliminating any purported confusion that might flow from it—would not render those meetings any more permissible under the orders or any more constitutionally protected.

rather not follow.  This, they cannot do.  Plaintiffs' claims fail and must be dismissed.

## CONCLUSION AND RELIEF REQUESTED

Defendant Governor Whitmer respectfully requests that the Court grant her motion, dismiss Plaintiffs' complaint in its entirety, and grant the Governor such other and further relief as the Court deems just and appropriate.

Respectfully submitted,

/s/ Neil Giovanatti
Neil Giovanatti (P82305)
Samantha Reasner (P81148)
Michigan Dep't of Attorney General
Assistant Attorneys General
Attorneys for Defendant
P.O. Box 30758
Lansing, MI 48909
(517) 335-7603
GiovanattiN@michigan.gov
ReasnerS@michigan.gov

Dated:  September 21, 2020

## CERTIFICATE OF COMPLIANCE WITH LOCAL CIVIL RULE (b)(i)

I certify that the above brief is 9,364 words in length including all headings, footnotes, citations, and quotations.  This brief was created using Microsoft Word.

/s/ Neil Giovanatti
Neil Giovanatti (P82305)
Assistant Attorney General
Attorney for Defendant

**CERTIFICATE OF SERVICE**

I certify that on September 21, 2020, I electronically filed the foregoing

papers with the Clerk of the Court using the ECF system, which will provide

electronic copies to counsel of record, and I certify that my secretary has mailed by

U.S. Postal Service the papers to any non-ECF participant.


/s/ *Neil Giovanatti*
Neil Giovanatti
Assistant Attorney General
Attorney for Defendant