## IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN

ELECTION INTEGRITY FUND, *et al.*,  )
                                                   )     Case No. 1:20-cv-00805
       Plaintiffs,  )
                                                   )     Hon. Paul J. Maloney
v.  )
                                                 )     Mag. Phillip J. Green
GRETCHEN WHITMER, in her official  )
     capacity as Governor of Michigan,  )     **ORAL ARGUMENT**
                                                 )     **REQUESTED**
       Defendant.  )

## PLAINTIFFS' REPLY IN SUPPORT OF
## <u>MOTION FOR PRELIMINARY INJUNCTION</u>

**GRAVES GARRETT, LLC**

*/s/ Edward D. Greim*
Edward D. Greim
Special Counsel, Thomas More Society
Missouri Bar No. 54034
GRAVES GARRETT, LLC
1100 Main Street, Suite 2700
Kansas City, Missouri 64105
Tel.: (816) 256-3181
Fax: (816) 222-0534
edgreim@gravesgarrett.com

*Attorney for Plaintiff*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................................iii

ARGUMENT ..............................................................................................................1

    I.      The Governor's Orders do have arbitrary and content-based exceptions,
          and she cannot now claw back admissions she has made elsewhere. .....................1

    II.    The Governor's Orders are Unconstitutional under Traditional
          First Amendment Analysis. .........................................................................4

         A.    The gathering restrictions under the Governor's orders are
             based on the content of the expressive activity involved. ...........................4

              i.    The Governor's briefing reveals that the expressive
                    activity associated with a group event draws the
                    Orders' penalties and prohibitions. ....................................4

              ii.    The restrictions punish speech based on its content
                    as non-religious and non-commercial. ................................5

         B.    Even a content-neutral Order would fail as a time, place, and
             manner restriction because it is not narrowly tailored and fails
             to preserve ample alternatives. ....................................................6

         C.    The Orders are void for vagueness because an ordinary citizen
             cannot reconcile the plain text of the Constitutional Exception
             with the Governor's differing interpretation and enforcement
             of that provision. ......................................................................7

         D.    Regardless of whether the Constitutional Exception exists,
             the Orders are overbroad because they regulate substantially
             more speech and assembly than the State can justify under the
             First Amendment. ....................................................................7

         E.    The in-person gathering restrictions operate as prior restraints
             by prospectively prohibiting some events based on the expressive
             purpose for which the event is held. ...........................................8

    III.   *Jacobson* does not save the Governor's otherwise unconstitutional
          restrictions. .................................................................................9

         A.    Under *Jacobson*, courts should still apply the last century
             of law specifying the required scrutiny where plaintiffs allege
             constitutional injuries. ..............................................................9

i

B.    *South Bay* does not control.............................................................11

IV.    All factors weight in favor of preliminary relief..............................12

V.    Plaintiffs have standing to challenge the 100-person outdoor
attendance restriction...................................................................13

CONCLUSION........................................................................................14

CERTIFICATE OF COMPLIANCE.............................................................15

CERTIFICATE OF SERVICE....................................................................16

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Adams & Boyle, P.C. v. Slatery*,
    956 F.3d 913 (6th Cir. 2020) ........................................................................... 9

*Alexander v. United States,*
    509 U.S. 544 (1993) ...................................................................................... 8

*Arcara v. Cloud Books, Inc.,*
    478 U.S. 697 (1986) .................................................................................. 4, 8

*Bays v. City of Fairborn*,
    668 F.3d 814 (6th Cir. 2012) ......................................................................... 12

*Calvary Chapel Dayton Valley v. Sisolak*,
    No. 19A1070, 2020 WL 4251360 (U.S. July 24, 2020) .......................................... 12

*CH Royal Oak, LLC v. Whitmer*,
    No. 1:20-CV-570, 2020 WL 4033315 (W.D. Mich. July 16, 2020) ............................ 10

*City of Chicago v. Morales*,
    527 U.S. 41 (1999) ....................................................................................... 7

*Cty. of Butler v. Wolf*,
    No. 2:20-CV-677, 2020 WL 5510690 (W.D. Pa. Sept. 14, 2020) ....................... 10, 11

*Déjà vu of Nashville, Inc. v. Metro. Gov't of Nashville and Davidson Cnty.*,
    274 F.3d 377 (6th Cir. 2001) ......................................................................... 13

*Detroit Unity Fund v. Whitmer*,
    No. 20-1817, 2020 WL 5230726 (6th Cir. Sept. 2, 2020) ........................................ 3

*Elrod v. Burns*,
    427 U.S. 347 (1976) .................................................................................... 12

*Fair and Equal Michigan, et al. v. Benson, et al.*,
    No. 20-000095-MM ...................................................................................... 2

*Giaccio v. Pennsylvania*,
    382 U.S. 399 (1966) ..................................................................................... 7

*In re Rutledge*,
    956 F.3d 1018 (8th Cir. 2020) ....................................................................... 10

*Jacobson v. Massachusetts*,
　　197 U.S. 11 (1905) .......................................................................*passim*

*Kishore v. Whitmer*,
　　No. 20-11605, 2020 WL 3819125 (E.D. Mich. July 8, 2020) .................3

*League of Indep. Fitness Facilities & Trainers, Inc. v. Whitmer*,
　　814 F. App'x 125 (6th Cir. 2020) ....................................................9, 10

*League of Indep. Fitness Facilities & Trainers, Inc. v. Whitmer*,
　　1:20-CV-458, 2020 WL 3421229 (W.D. Mich. June 19, 2020) ..............10

*Maryville Baptist Church, Inc. v. Beshear*,
　　975 F.3d 610 (6th Cir. 2020) ...............................................................9

*Novak v. City of Parma*,
　　932 F.3d 421 (6th Cir. 2019) ...............................................................8

*Promotions, Ltd. v. Conrad*,
　　420 U.S. 546 (1975) .............................................................................8

*Reed v. Town of Gilbert, Ariz.*,
　　576 U.S. 155 (2015) .............................................................................6

*Roberts v. Neace*,
　　958 F.3d 409 (6th Cir. 2020) ...............................................................5

*SawariMedia LLC v. Whitmer*,
　　No. 20-CV-11246, 2020 WL 3097266 (E.D. Mich. June 11, 2020) .........2

*Schickel v. Dilger*,
　　925 F.3d 858 (6th Cir. 2019) ...............................................................7

*South Bay United Pentecostal Church v. Newsom*,
　　140 S. Ct. 1613 (2020) ...................................................................11, 12

*Watchtower Bible & Tract Soc'y of New York, Inc. v. Village of Stratton*,
　　536 U.S. 150 (2002) .............................................................................6

*Ward v. Rock Against Racism*,
　　491 U.S. 781 (1989) ...........................................................................10

**ARGUMENT**

**I.   The Governor's Orders do have arbitrary and content-based exceptions, and she cannot now claw back admissions she has made elsewhere.**

Despite the plain language of her Orders[1] and recent arguments elsewhere, the Governor now claims they contain no exceptions covering constitutionally protected activity. Def.'s Memo. at p.26, PageID 321. The Orders' "Separation of Powers" provision states: "…[N]othing in this order shall be taken to abridge protections guaranteed by the state or federal constitution under these emergency circumstances." The exception's plain text references *the rest of the Order* and tells Michiganders that it provides some level of protection where the rest of the Order provides none. The State disagrees, arguing this text—which never mentions *Jacobson*—merely "preserve[s] the *Jacobson* framework." *Id.* If that was truly the Governor's unexpressed private intent, then the text of the exception is meaningless surplusage.

The Governor's new position strengthens Plaintiffs' vagueness and overbreadth claims because it confirms that millions of Michiganders are being actively misled into believing some of their planned activities that are otherwise banned by the Order can be exempted. That belief arises not only from the Order's plain text, but from the Governor's recent assertions that her Order ***does*** provide exceptions for constitutionally protected activity:

- The Governor's FAQs for her Orders:

  ○ **Q: Does Executive Order 2020-176 prohibit persons from engaging in outdoor activities that are protected by the First Amendment to the United States Constitution?**
  ○ A: No. Persons may engage in expressive activities protected by the First Amendment within the State of Michigan, but must adhere to social distancing measures recommended by the Centers for Disease Control and Prevention,

---

[1]   Plaintiffs' Complaint and Motion cite EO 2020-160, then in effect but recently replaced with EO 2020-176. Defendant concedes her replacement order maintains the challenged restrictions. Def.'s Memo. at p.7-8, PageID 302-3. Because it maintains those restrictions and the constitutional "exception," *see* EO 2020-176(13), Plaintiffs' arguments citing EO 2020-160 apply equally to EO 2020-176. Plaintiffs' claims are not moot.

including remaining at least six feet from people from outside the person's household.

- In *Belanger, et al. v. Whitmer, et al.*, the Governor entered into a Stipulated Order and settlement acknowledging that a pro-life protestor engaged in public speech on a public sidewalk did not violate the Governor's order then in effect. This occurred during the Governor's stay at home order, when the numerical attendance limit for events was effectively 0. *See* Ex. B to Pls.' Sugg. in Supp. of Mtn., PageID 260-264.

- On June 4th, the Governor participated in a march that violated the attendance limits then in effect.[2] The Governor's spokeswoman, citing the Constitutional Exception, later justified the Governor's participation because peaceful protest, even if in excess of the attendance limits, did not violate the order.[3]

- In *SawariMedia LLC v. Whitmer,* No. 20-CV-11246, 2020 WL 3097266, at *8 (E.D. Mich. June 11, 2020), judgment entered, No. 20-CV-11246, 2020 WL 4040704 (E.D. Mich. July 17, 2020), the court noted "Defendants stress that even though the Stay-at-Home Order, and the April 9, April 24, and May 1 extensions of that order, did not expressly exempt constitutionally protected activities, the orders were "interpreted" to allow for those activities…This "interpretation" was found on the State of Michigan's website in a "frequently asked questions" document." In Defendant's *Sawari* brief, they asserted "[E]ven after issuance of the Stay-Home Order, that order and the subsequent orders were interpreted as permitting persons to engage in outdoor expressive activities protected by the First Amendment so long as social distancing measures are observed." *See* Ex. A, Def.'s Brief at p. 18, PageID 129.

- In *Fair and Equal Michigan, et al., v. Benson, et al.*[4], the Court stated:

  *Defendants have asserted that the Executive Orders included an exception for First Amendment activity such as petition drives.* The Court notes that while EO 2020-110 contains such language, no other order expressly did so. Instead the First Amendment protection was found in the FAQ on a governmental website. Of course, like legislative analysis or court rule commentary, the FAQ section did not have the force of law. It is undeniably true that during the "stay at home" period there were several assemblies both at the State Capital and elsewhere where people gathered for the purpose of expressing political views. In some instances, on information and belief, some of the persons assembled were ticketed. In some instances, people were not. However, all were in jeopardy of arrest.

---

[2]   According to the State's briefing here, outdoor events were subject to a 100-person limit at that time. Def.'s Memo. at p.1, PageID 296.

[3]   Mauger and Dickson, *With little social distancing, Whitmer marches with protestors*, The Detroit News (Jun. 4, 2020) https://www.detroitnews.com/story/news/local/michigan/2020/06/04/whitmer-appears-break-social-distance-rules-highland-park-march/3146244001/ ("Brown said the unity march didn't violate [the Governor's] latest order because it states, 'Nothing in this order shall be taken to abridge protections guaranteed by the state or federal constitution.' 'That includes the right to peaceful protest.'")

[4]   Opinion and Order of the Michigan Court of Claims issued June 10, 2020, Case No. 20-000095-MM

*See* Ex. B, p. 10-11 (emphasis added).

- In its briefing in *Kishore v. Whitmer*, No. 20-11605, 2020 WL 3819125, at *5 (E.D. Mich. July 8, 2020), aff'd, No. 20-1661, 2020 WL 4932749 (6th Cir. Aug. 24, 2020), the State asserted:

As discussed above, none of the early Executive Orders expressly prohibited petition circulation, and in fact the orders either indicated that First Amendment activities were permissible or were interpreted to permit engaging in such activities while outdoors and observing social distancing guidelines. Indeed, there were multiple, nationally publicized protests in Michigan that occurred before Plaintiffs filed this action and which effectively demonstrated that First Amendment activities were not precluded by the Governor's orders… Similarly, the FAQ for this order also provides that activities protected by the First Amendment are not prohibited… From March 10, 2020, the date the Governor first declared an emergency, to the present, Plaintiffs could have been circulating petitions and collecting signatures.

See Ex. C, Def.'s Brief at pp.15-16, PageID 147-8.

- Finally, in *Detroit Unity Fund v. Whitmer*, No. 20-1817, 2020 WL 5230726 (6th Cir. Sept. 2, 2020), the State represented multiple times that an exception exists for outdoor activity:

"…the orders were interpreted to permit engaging in First Amendment activities while outdoors and observing social distancing guidelines. Indeed, there were multiple, nationally publicized protests in Michigan that occurred before Detroit Unity filed this action and which effectively demonstrated that First Amendment activities were not precluded by the Governor's orders…"

*See* 2020 WL 5351437 at *29, n.31

In none of these cases did the Governor take her current position: that outdoor activities are actually subject to the 100-person limit, and that rather than allowing mass protests or other activity, the "exception" merely summarizes *Jacobson*. The Constitutional Exception's text has not changed. It must exist for all or for none. Its meaning cannot morph from brief to brief, litigation to litigation, or speaker to speaker. The exception's plain text and the Governor's own history of relaxing her capacity limits convey to Michiganders that there is an available exception.

## II. The Governor's Orders are Unconstitutional under Traditional First Amendment Analysis.

### A. The gathering restrictions under the Governor's orders are based on the content of the expressive activity involved.

Crucially, the Governor now admits that it is *the expressive element* of a particular activity which triggers her Orders. Additionally, her Orders treat activities differently *based on the content* of the expressive activity involved, creating a tiered system where religious and commercial expressive activity are protected, but political expressive activity is not.

#### i. The Governor's briefing reveals that the expressive activity associated with a group event draws the Orders' penalties and prohibitions.

The Governor's brief claims to clarify a "misconception" arising from the vague text of her orders: "while the crowd-size limitation on events and gatherings does not govern these establishments' operations across the board, the limitation does still apply to them; these establishments are no more capable than Plaintiffs of **hosting an indoor event or gathering exceeding 10 people.**" Def.'s Brief at p.18, PageID 313 (emphasis added). In other words, **nothing physical** differentiates Plaintiffs' banned events from the commercial and religious activity the Governor allows. If 11 or 110 EIF members dine at a restaurant, at socially distanced tables and taking all required precautions, they do not violate the restrictions. But if one member rises to speak on election challenges, dinner becomes a prohibited "event" or "planned gathering." It is the expressive conduct itself – the presentation – which triggers punishment.[5] Enforcement triggered by expressive conduct cannot withstand constitutional scrutiny.

---

[5]    Because the expressive element of Plaintiffs' conduct draws the penalty and the Orders are not "generally applicable" regulations, *Arcara v. Cloud Books, Inc.*, 478 U.S. 697 (1986) is distinguishable.

### ii. The restrictions punish speech based on its content as non-religious and non-commercial.

The Order is also content-based, permitting religious and commercial activity while prohibiting other—including political—activity within the same physical circumstances. First, contrary to the Governor's claim that there are no First Amendment exceptions, the Order specifically exempts religious worship in a place of worship:

> Consistent with prior guidance, neither a place of religious worship nor its owner is subject to penalty under section 18 of this order for allowing religious worship at such place. No individual is subject to penalty under section 18 of this order for engaging in religious worship at a place of religious worship.

EO 2020-176(14).

Second, it also permits businesses to host gatherings for commercial operations, subject to some restrictions but permitting more than 10 people indoors.[6] These two exceptions create a tiered system: commercial activity receives the most protection; followed by in-person religious expression at places of worship, with almost no protection for political expression. Across physically similar arrangements, legal protections depend on the content of the expression. Thus, Michiganders can worship and study the Bible in church basements, but the conversation cannot turn to election integrity. Restaurant and casino-goers can dine or gamble in large groups, but if someone rises to lead worship or address election integrity, a crime is committed.[7] "At some point, an exception-ridden policy takes on the appearance and reality of a system of individualized exemptions, the antithesis of a neutral and generally applicable policy and just the kind of state action that must run the gauntlet of strict scrutiny." *Roberts v. Neace*, 958 F.3d 409, 413–14 (6th Cir. 2020)(internal citations omitted).

---

[6]     *See* EO 2020-175(8), (15) (restaurants, bars, casinos).
[7]     This assumes social distancing and masks, measures to which Plaintiffs stipulated. Sitek Decl. ¶18, PageID.267; Tarver Decl. ¶1, PageID.269.

"A law that is content based on its face is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of 'animus toward the ideas contained' in the regulated speech." *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 165 (2015)(citation omitted)(applying strict scrutiny and striking down an ordinance treating "political" signs less favorably than "ideological," *i.e.*, religious, signs, since restrictions depended "entirely on the communicative content of the sign"). By distinguishing between events and groups based not on physical differences relevant to Covid but on the occurrence *and content* of expressive activity, the Governor's Orders violate the First Amendment. *See Reed*, 576 U.S. at 165.

### B. Even a content-neutral Order would fail as a time, place, and manner restriction because it is not narrowly tailored and fails to preserve ample alternatives.

Even a content-neutral time, place, or manner restriction must be both narrowly tailored and preserve ample alternative channels of communication. *Watchtower Bible & Tract Soc'y of New York, Inc. v. Village of Stratton*, 536 U.S. 150, 168–69 (2002). Aside from the lack of content-neutrality addressed above, these Orders fail because they are not narrowly tailored and leave no alternative for protected expressive activity. The Governor's absolute prohibitions on indoor gatherings in excess of 10 people (and any in excess of 100) burden substantially more speech than necessary to achieve the stated goal of limiting large social gatherings. The Governor attempts to rebut Plaintiffs' narrow tailoring arguments by differentiating social gatherings from ordinary business activities permitted under the order. In particular, they distinguish the amount of time that attendees spend in the closed environment. This distinction is unavailing, as Plaintiffs' meetings and trainings are more similar in duration to a worship service or sit down meal than they are to a house or lake party. Likewise, Defendant's suggestions that

Plaintiffs limit their assembly to the virtual world or only meet outside subject to other constitutionally infirm capacity limits, do not present adequate alternative means of expressive assembly.

### C. The Orders are void for vagueness because an ordinary citizen cannot reconcile the plain text of the Constitutional Exception with the Governor's differing interpretation and enforcement of that provision.

A law "may be impermissibly vague because it fails to establish standards for the police and public that are sufficient to guard against the arbitrary deprivation of liberty interests." *City of Chicago v. Morales*, 527 U.S. 41, 52 (1999). Here, the Orders are so vague that the Governor can (and does) interpret them in conflicting ways, case by case, when she litigates or explains herself in the press. *See* Section II, *supra*. "It is established that a law fails to meet the requirements of the Due Process Clause if it is so vague and standardless that it leaves the public uncertain as to the conduct it prohibits...." *Giaccio v. Pennsylvania*, 382 U.S. 399, 402–403 (1966). Michiganders cannot know what is permitted or prohibited because the Governor drafted and has elsewhere promoted and applied a Constitutional Exception, that here, she claims has no force. Due process precludes the Governor – a single government official – from criminalizing expressive assembly subject to her own whims and the conveniences of the moment.

### D. Regardless of whether the Constitutional Exception exists, the Orders are overbroad because they regulate substantially more speech and assembly than the State can justify under the First Amendment.

"A law is overbroad under the First Amendment if it 'reaches a substantial number of impermissible applications' relative to the law's legitimate sweep." *Schickel v. Dilger*, 925 F.3d 858, 880 (6th Cir. 2019)(citations omitted). If, as the Governor now argues, there is no Constitutional Exception, her Orders are facially overbroad as they purport to regulate almost all protected speech and assembly, making it physically impossible to police and requiring

unpredictable, spotty, and potentially arbitrary enforcement. Even if the Governor reversed course yet again and admitted the Constitutional Exception covers *some* political assembly, the danger would persist because the exception contains no clear standards. True, her discretion would now be public and no longer secret, but it would still rest entirely with her. That, too, is a danger for which courts prescribe the admittedly strong medicine of overbreadth doctrine.

### E. The in-person gathering restrictions operate as prior restraints by prospectively prohibiting some events based on the expressive purpose for which the event is held.

The Orders create a *de facto* licensing scheme: the Governor's continued, case by case recognition of exemptions under the Constitutional Exception. The settled rule is that a system of prior restraint "avoids constitutional infirmity only if it takes place under procedural safeguards designed to obviate the dangers of a censorship system." *See Promotions, Ltd. v. Conrad*, 420 U.S. 546, 559 (1975) (citation omitted). But here, as the Governor's past interpretations and enforcement demonstrate, her discretion lacks predictable standards—indeed, *even the existence of the exception itself* is a matter that can be accepted or denied, case by case.

Plaintiffs can hold political events that exceed the Governor's attendance limits only if the Governor agrees[8] they fall within her longstanding Constitutional Exception—just like abortion protests, petition signature gathering, and mass protests that the Governor herself attended this summer. Recognizing the application of the exemption for each planned event and removing the threat of prosecution is solely the Governor's decision. No one knows the criteria the Governor applied to exempt prior gatherings, nor can anyone know why she now claims

---

[8] Defendants cite cases to argue the Orders are not prior restraints because they "merely" threaten ex-post punishment, but those cases lend no support because each punishment resulted from conduct *unrelated* to speech. *See Alexander v. United States*, 509 U.S. 544, 550 (1993) (RICO violation); *Arcara,* 478 U.S. at 698 (prostitution). Here, as addressed in Section II(A), speech itself, not some independent criminal conduct, triggers punishment. And the threat of prosecution is itself a prior restraint, as noted in Defendant's cited case, *Novak v. City of Parma*, 932 F.3d 421, 432 (6th Cir. 2019).

there never was an exception. That is precisely the problem, and it is the worst kind of prior restraint.

### III. *Jacobson* does not save the Governor's otherwise unconstitutional restrictions.

#### A. Under *Jacobson*, courts should still apply the last century of law specifying the required scrutiny where plaintiffs allege constitutional injuries.

*Jacobson v. Massachusetts*, 197 U.S. 11 (1905) did not create a "public safety" exception to the First Amendment. The Sixth Circuit applies the formulae for constitutional scrutiny developed in the century after *Jacobson*, as it recently made clear in a case cited by Defendants:

> In addressing the COVID-19 outbreak, executives at the national, state, and local levels have had difficult decisions to make in honoring public health concerns while respecting individual liberties. Those decisions have now been the subject of numerous legal challenges, from coast to coast. Some involve individual rights for which precedent requires courts to apply a heightened level of scrutiny to government actions, for example, the free exercise of religion, see *Maryville Baptist Church, Inc. v. Beshear*, 957 F.3d 610, 614–15 (6th Cir. 2020), or access to an abortion, *see Adams & Boyle, P.C. v. Slatery*, 956 F.3d 913, 925–26 (6th Cir. 2020).

*League of Indep. Fitness Facilities & Trainers, Inc. v. Whitmer* ("*LIFFT*"), 814 F. App'x 125, 126 (6th Cir. 2020). Courts applying *Jacobson* acknowledge its call for upholding actions unless they are "beyond all question, a plain, palpable invasion of rights secured by the fundamental law," but recognize that *Jacobson*'s call for a level of deference is subsumed within later-developed precedent that articulated a full framework for reconciling core constitutional rights with police powers. *See Maryville*, 957 F.3d at 611 (applying strict scrutiny to free exercise challenge); *Adams & Boyle*, 956 F.3d at 927 ("What we will not countenance, however, is the notion that COVID-19 has somehow demoted *Roe* and *Casey* to second class rights, enforceable against only the most extreme and outlandish violations. Such a notion is incompatible not only

with *Jacobson*, but also with American constitution law…"); *In re Rutledge*, 956 F.3d 1018 (8th Cir. 2020) (analyzing abortion restrictions under ordinary tests pronounced by Supreme Court).

The Governor argues instead that *Jacobson* mandates rational basis review across the board during COVID, even where months have passed, and even where Plaintiffs allege serious First Amendment violations such as content-based restrictions and prior restraints promulgated by a single official. The Governor directs this Court to its prior holding in *CH Royal Oak, LLC v. Whitmer*, No. 1:20-CV-570, 2020 WL 4033315 (W.D. Mich. July 16, 2020), and to a Sixth Circuit decision in *LIFFT*. Def.'s Brief at p.19, PageID 314. Neither case, however, requires rational basis review here.

*LIFFT* and *Royal Oak* (relying on *LIFFT*) applied rational basis review to the challenged restrictions. But in *LIFFT*, the plaintiffs pled injuries to their commercial activity, for which everyone agreed rational basis review would have applied regardless of COVID. *See League of Indep. Fitness Facilities & Trainers, Inc. v. Whitmer*, No. 1:20-CV-458, 2020 WL 3421229, at *3 (W.D. Mich. June 19, 2020) (applying rational basis review); *LIFFT*, 814 F. App'x at 128 ("The parties agree that rational basis review is the hurdle the Governor's Order must clear."). *Royal Oak* then relied on this part of *LIFFT*, even though the applicable test for the *Royal Oak* plaintiffs' First Amendment injury would at least have been intermediate review. *See Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). What *LIFFT* taught was *not* that the Sixth Circuit requires blanket application of rational basis review during COVID, but rather, that district courts are to apply the standard of review *that would apply in non-Covid times* (heightened scrutiny in free exercise and abortion cases, for example).

A recent case from the Western District of Pennsylvania involving similar facts and claims is instructive here. In *Cty. of Butler v. Wolf*, No. 2:20-CV-677, 2020 WL 5510690 at *2

(W.D. Pa. Sept. 14, 2020), the court found that Governor Wolf's restrictions of 25 people indoors and 250 outdoors violated the First Amendment, among other constitutional provisions. The court noted:

> *Jacobson* was decided over a century ago. Since that time, there has been substantial development of federal constitutional law in the area of civil liberties. As a general matter, this development has seen a jurisprudential shift whereby federal courts have given greater deference to considerations of individual liberties, as weighed against the exercise of state police powers. That century of development has seen the creation of tiered levels of scrutiny for constitutional claims. They did not exist when *Jacobson* was decided.

*Id.* at *6.

The court, applying traditional levels of constitutional scrutiny, found that the Governor's restrictions violated the First Amendment. *Id.* at *15. "The imposition of a cap on the *number* of people that may gather for political, social, educational and other expressive gatherings, while permitting larger number for commercial gatherings limited only by a percentage of the occupancy capacity of the facility is not narrowly tailored and does not pass constitutional muster. Moreover, it creates a topsy-turvy world where Plaintiffs are more restricted in areas traditionally protected by the First Amendment than in areas which usually receive far less, if any, protection." *Id.*

Because *Jacobson* does not insulate constitutional violations from the traditional levels of judicial scrutiny, the Court must follow the Sixth Circuit's guidance—and should follow the Pennsylvania district court's persuasive authority—in applying whatever scrutiny would ordinarily be called for, while recognizing the state interests articulated in *Jacobson*.

### B.  *South Bay* does not control.

The Governor continually cites *South Bay United Pentecostal Church* v. *Newsom*, 140 S.Ct. 1613 (2020), claiming that Chief Justice Roberts' concurrence was a binding "holding"

regarding *Jacobson*. But there was no opinion of the Court. Rather, the Supreme Court declined, 5-4, to enter an injunction after the same relief was denied by the district court. *Id.* A Supreme Court injunction would have been extraordinary relief, granted "sparingly and only in the most critical and exigent circumstances," even when "the legal rights at issue are indisputably clear." *Id.*

Chief Justice Robert's concurrence was not joined by any other justice, and while four justices clearly disagreed with his analysis, we cannot know why four other justices voted to deny the application. *Id.* Perhaps at least one of those justices voted "no" because the application failed under the "exigent circumstances" and "indisputably clear" standards, but would have agreed with Justice Alito, who in dissent wrote "[i]t is a considerable stretch to read the [*Jacobson*] decision as establishing the test to be applied when statewide measures of indefinite duration are challenged under the First Amendment or other provisions not at issue in that case." *Calvary Chapel Dayton Valley v. Sisolak*, No. 19A1070, 2020 WL 4251360, at \*5 (U.S. July 24, 2020)(Alito, J., dissenting).

## IV. All factors weigh in favor of preliminary relief.

Because Plaintiffs have demonstrated that they are likely to succeed on the merits of their First Amendment claims, the Court need not consider the three remaining factors. *Bays v. City of Fairborn*, 668 F.3d 814, 819 (6th Cir. 2012). Still, each factor – irreparable harm to Plaintiffs, lack of harm to others, and the public interest – supports preliminary relief. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns,* 427 U.S. 347, 373 (1976). Moreover, "if the plaintiff shows a substantial likelihood that the challenged law is unconstitutional, no substantial harm to others can be said to inhere its enjoinment", for "'it is always in the public interest to prevent violation of a party's

constitutional rights.'" *Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville and Davidson Cnty.,* 274 F.3d 377, 400 (6th Cir.2001) (citation omitted).

### V.  Plaintiffs have standing to challenge the 100-person outdoor attendance restriction.

Plaintiffs have standing to challenge the outdoor restrictions.[9] Plaintiffs specifically allege that they "intend[] to hold outdoor rallies which [they] expect[] will draw attendance in excess of the limits imposed by the Governor's orders" Compl. ¶¶ 45, 47, PageID.11–12. The restrictions on outdoor gatherings—a second-best alternative to indoor gatherings—remain at issue, particularly because Defendant proposes outdoor gatherings as "alternatives." Not only would Plaintiffs' events still be impossible under 100-person limits, which carry the same constitutional infirmities as the indoor limits, but Plaintiffs' pleading focused on indoor activities because the Governor's "FAQ" guidance purported to exempt outdoor activities from her capacity restrictions. She now rebuts this guidance, underscoring the unintelligibility of rules whose true meaning is known only to the Governor, and which morph from litigation to litigation.

### CONCLUSION

Plaintiffs respectfully request that the Court enter the requested injunctive relief.

---

[9]     Plaintiffs do not concede they are "*only* 'making plans for several indoor events.'" Def.'s Brief at p. 12, PageID 307 (emphasis added), nor do Plaintiffs' declarations so state. Sitek Decl. ¶ 7, PageID.265–66; Tarver Decl. ¶ 7, PageID.268 (stating Plaintiffs are "deterred from holding *any* events because the Governor has declared it the law of the state that people cannot gather indoors in groups or more than 10 *or outdoors in groups of more than 100*." (emphasis added).

**GRAVES GARRETT, LLC**

*/s/ Edward D. Greim*
Edward D. Greim
Special Counsel, Thomas More Society
Missouri Bar No. 54034
GRAVES GARRETT, LLC
1100 Main Street, Suite 2700
Kansas City, Missouri 64105
Tel.: (816) 256-3181
Fax: (816) 222-0534
edgreim@gravesgarrett.com

*Attorney for Plaintiffs*

Respectfully submitted this 21st day of September, 2020.

## **CERTIFICATE OF COMPLIANCE**

Pursuant to LCivR 7.2(b)(ii), I, Edward D. Greim, certify that this brief contains 4,262 words exclusive of the case caption, cover sheets, any table of contents, any table of authorities, the signature block, attachments, exhibits, and affidavits as calculated by Microsoft Word 2019.

Respectfully submitted this 21st day of September, 2020.

**GRAVES GARRETT, LLC**

*/s/ Edward D. Greim*
Edward D. Greim
Special Counsel, Thomas More Society
Missouri Bar No. 54034
GRAVES GARRETT, LLC
1100 Main Street, Suite 2700
Kansas City, Missouri 64105
Tel.: (816) 256-3181
Fax: (816) 222-0534
edgreim@gravesgarrett.com

*Attorney for Plaintiffs*

15

## <u>CERTIFICATE OF SERVICE</u>

I, Edward D. Greim, certify that on September 21, 2020, a copy of the foregoing was filed with the Clerk of the Court using the CM/ECF system, which sent notification to the following via e-mail:

Samantha Loree Reasner
Neil Anthony Giovanatti
Office of the Governor, State of Michigan
George W. Romney Building
111 S. Capitol Avenue
Lansing, MI 48909
(517) 241-0061
reasners@michigan.gov
giobanattin@michigan.gov


Respectfully submitted this 21st day of September, 2020.

**GRAVES GARRETT, LLC**

*/s/ Edward D. Greim*
Edward D. Greim
Special Counsel, Thomas More Society
Missouri Bar No. 54034
GRAVES GARRETT, LLC
1100 Main Street, Suite 2700
Kansas City, Missouri 64105
Tel.: (816) 256-3181
Fax: (816) 222-0534
edgreim@gravesgarrett.com

*Attorney for Plaintiffs*